# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

HOPE COLEMAN, individually and as the
legal representative of the ESTATE OF
TERRENCE J. COLEMAN,

      Plaintiff,

  v.

CITY OF BOSTON; WILLIAM EVANS,
individually and in his official and
supervisory capacities as the Commissioner of
the Boston Police Department; JAMES
HOOLEY, individually and in his official and
supervisory capacities as the Chief of the City
of Boston Emergency Medical Services;
SOPHIA DYER, M.D., individually and in her
official and supervisory capacities as the
Medical Director for the Boston Police
Department and Boston Emergency Medical
Services; GARRETT BOYLE, individually and
in his official capacity as a police officer for
the Boston Police Department; KEVIN FINN,
individually and in his official capacity as a
police officer for Boston Police Department;
KYLE MACKINNON, individually and in his
official capacity as an Emergency Medical
Technician for the City of Boston Emergency
Medical Services; TERRENCE MENTELE,
individually and in his official capacity as an
Emergency Medical Technician for the City of
Boston Emergency Services; and
ALEXANDRA MICHALOWSKI, individually
and in her official capacity as a City of Boston
Emergency Services Dispatch Operator,

      Defendants.

Civ. No. _____

## INTRODUCTION

1.      In the early morning hours of October 30, 2016, Plaintiff Hope Coleman called 911 to request medical assistance for her son, Terrence Coleman, a 31-year-old, African-American man who suffered from a mental health disability. Defendant Garrett Boyle, an inexperienced and inadequately trained police officer with the Boston Police Department ("BPD"), responded to the family apartment at 245 Shawmut Avenue in Boston, and while Ms. Coleman stood only a few feet away, he shot and killed Terrence in the foyer just outside the front door.

2.      Ms. Coleman had called for medical assistance because Terrence was experiencing an episode in which, due to his mental illness, he was withdrawn, uncommunicative, and despite the cold weather, unwilling to come inside the apartment from the front stoop of the building. After speaking with Terrence's therapist from the South End Clinic, Ms. Coleman called 911 to request an ambulance to transport Terrence to Tufts Medical Center.

3.      Ms. Coleman made clear to the 911 operator, Defendant Alexandra Michalowski, that Terrence needed only medical attention and that she did not need, or want, any police involvement. Nevertheless, the 911 call about Terrence was entered in the emergency services system with the code "EDP2," for emotionally disturbed persons who are violent or pose dangers of physical harm to others, and contrary to Ms. Coleman's request, Defendant Boyle along with Defendant Kevin Finn, another inexperienced and inadequately trained police officer with the BPD, responded.  A few minutes later, Defendants Terrence

Mentele and Kyle MacKinnon, emergency medical technicians ("EMTs") from
Boston Emergency Medical Services ("BEMS"), also arrived on the scene.

4.      By the time the BPD and BEMS came to the Coleman home, Terrence
had gone inside, and he was quietly sitting in his bedroom. Along with Ms.
Coleman, the EMTs entered the first-floor apartment and told Terrence that they
were going to take him by ambulance to the hospital. Although Terrence refused
any medical assistance, the EMTs would not take "no" for an answer.

5.      When Terrence tried to leave the apartment, Defendant Mentele
stopped him in the small foyer of the building. At that point, Terrence and the
EMTs began to argue. Apparently in response to hearing raised voices, the police
officers burst into the foyer, tackled Terrence, and knocked down Ms. Coleman, who
was standing a few feet away. Then, Defendant Boyle shot Terrence multiple times
and killed him.

6.      Terrence was not a violent person, and he had no criminal record. On
the day that he was shot and killed, Terrence was not engaged in any criminal
activity. Terrence was unarmed, and he posed no danger. Rather, Terrence was a
person who suffered from a mental health disability, and his mother, Ms. Coleman,
called 911 to ask for help transporting Terrence to the hospital.

7.      Following Terrence's death, Defendants Boyle, Finn, Mentele, and
MacKinnon, along with senior officials at the BPD and BEMS, including
Defendants Williams Evans and James Hooley, falsely claimed that Terrence had
brandished a kitchen knife and threatened the EMTs. But Ms. Coleman witnessed

3

the entire episode leading up to the fatal shooting of her son, and she has consistently and unequivocally denied that Terrence had any weapon or threatened anyone with physical harm.

8.    Terrence's tragic death was a result of a BPD officer's use of excessive, unreasonable, and deadly force. Defendants Boyle, Finn, MacKinnon, Mentele, and Michalowski were all inadequately trained to assist persons, like Terrence, who suffer from mental health disabilities. The City of Boston systematically and knowingly fails to train its police officers and EMTs to provide appropriate services to such persons. Additionally, the City of Boston systematically and knowingly lacks an adequate system to categorize and respond to 911 calls involving persons with mental health disabilities.

9.    By this civil action, Ms. Coleman seeks compensatory and punitive damages pursuant to 42 U.S.C. § 1983 for violations of Terrence's rights under the Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution; for violations of Terrence's rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and § 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), as a person who suffered from a mental health disability; pursuant to M.G.L. c. 258, § 2; M.G.L. c. 229, § 2, and M.G.L. c. 231, § 85X, for Terrence's wrongful death; and pursuant to Massachusetts common law, for the negligent response to the 911 call for medical assistance, for the intentional, reckless, and negligent infliction of emotional distress on Ms. Coleman, who witnessed the unlawful seizure and fatal shooting of her son, and for the assault and battery on both Ms. Coleman and Terrence.

10.   Ms. Coleman alleges all facts in this complaint on her personal knowledge or information and belief.

## JURISDICTION AND VENUE

11.   This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 over the federal claims concerning violations of the Fourth, Fifth, and Fourteenth Amendment to the U.S. Constitution as well as the ADA and the Rehabilitation Act. This Court also has pendent jurisdiction under 28 U.S.C. § 1367 over the related claims pursuant to state law.

12.   Venue is proper in this judicial district under 28 U.S.C. § 1391, because the events giving rise to this civil action occurred in this judicial district.

13.   This Court has personal jurisdiction over all Defendants because they are employed by the City of Boston, a municipality within the Commonwealth of Massachusetts.

## PARTIES

14.   Plaintiff Hope Coleman is the mother of the decedent, Terrence Coleman, and the duly appointed Administrator of the Estate of Terrence J. Coleman (Suffolk County Probate Court Docket No. 17P1826). Ms. Coleman brings this action on behalf of herself and the Estate of Terrence J. Coleman.

15.   Before his death, Terrence Coleman was diagnosed with schizophrenia, a mental health impairment that substantially limited one or more of his major life activities. Accordingly, for the purposes of the ADA, Terrence was an individual with a disability.

16.     Defendant City of Boston is a municipal corporation duly organized and existing under the laws of the Commonwealth of Massachusetts. The City of Boston receives federal funds.

17.     Defendant William Evans, an employee of the City of Boston, serves as Commissioner of the BPD and supervises all BPD employees, including Defendants Boyle and Finn. At all relevant times, Evans acted in a supervisory capacity and as an agent, servant, and employee of the City of Boston. This action asserts claims against Evans in his supervisory, official, and individual capacities.

18.     Defendant James Hooley, an employee of the City of Boston, serves as Chief of BEMS and supervises all BEMS employees including Defendants Mentele, MacKinnon, and Michalowski. At all relevant times, Hooley acted in his supervisory capacity and as an agent, servant, and employee of the City of Boston. This action asserts claims against Hooley in his supervisory, official, and individual capacities.

19.     Defendant Sophia Dyer, an employee of the City of Boston, serves as the Medical Director of BEMS, BPD and the Boston Fire Department. At all relevant times, Dyer acted in a supervisory capacity and as an agent, servant, and employee of the City of Boston. This action asserts claims against Dyer in her supervisory, official, and individual capacities.

20.     Defendant Garrett Boyle, an employee of the City of Boston, serves as a BPD police officer (shield number 135986). At all relevant times, Boyle acted as an agent, servant, and employee of the City of Boston. This action asserts claims against Boyle in his official and individual capacities.

21.     Defendant Kevin Finn, an employee of the City of Boston, serves as a BPD police officer (shield number 103632). At all relevant times, Finn acted as an agent, servant, and employee of the City of Boston. This action asserts claims against Finn in his official and individual capacities.

22.     Defendant Kevin MacKinnon, an employee of the City of Boston, serves as a BEMS EMT (badge number 1093). At all relevant times, MacKinnon acted as an agent, servant, and employee of the City of Boston. This action asserts claims against MacKinnon in his official and individual capacities.

23.     Defendant Terrence Mentele, an employee of the City of Boston, serves as a BEMS EMT (badge number 760). At all relevant times, Mentele acted as an agent, servant, and employee of the City of Boston. This action asserts claims against Mentele in his official and individual capacities.

24.     Defendant Alexandra Michalowski, an employee of the City of Boston, serves as an Emergency Services Operator (identification number 881070). At all relevant times, Michalowski acted as an agent, servant, and employee of the City of Boston. This action asserts claims against Michalowski in her official and individual capacities.

25.     In engaging in the conduct described herein, Defendants Evans, Hooley, Dyer, Boyle, Finn, MacKinnon, Mentele, and Michalowski acted under the color of law and in the course and scope of their employment with the City of Boston, and they intended, at least in part, to benefit the City of Boston.

## FACTUAL ALLEGATIONS

**Ms. Coleman Called 911 and Requested Medical Assistance from BEMS for Her Son, Terrence Coleman, Who Suffered from a Mental Health Disability.**

26.     As of October 30, 2016, Terrence, a 31-year-old, African-American man, was living with his mother, Ms. Coleman, in a first-floor apartment at 245 Shawmut Avenue in Boston.

27.     Terrence had no criminal record.

28.     Terrence was known around the neighborhood as a quiet, friendly person who loved music and WWE wrestling, and he often carried CDs and DVDs that he made for friends.

29.     More than 10 years before his death, Terrence had been diagnosed with schizophrenia. Due to his mental health disability, Terrence was unable to work, and he received SSI benefits.

30.     At times, due to his mental illness, Terrence experienced episodes in which he withdrew, became introverted, and did not interact with other people.

31.     Beginning on or about October 29, 2016, Terrence experienced such an episode, and for a few days, he sat outside in the cold on the front stoop of the apartment building and refused to come inside the family apartment.

32.     Ms. Coleman was concerned about Terrence's condition, so she called his therapist at the South End Clinic for advice.

33.     Terrence's therapist recommended that Ms. Coleman call 911, request an ambulance to transport Terrence to Tufts Medical Center for medical attention, and let the therapist know when Terrence had arrived at the hospital.

34.     Neither Ms. Coleman nor Terrence's therapist had any concern that Terrence was violent or posed any danger to himself or anyone else.

35.     Based on the recommendation from Terrence's therapist, shortly after midnight on October 30, 2016, Ms. Coleman called intake at Tufts Medical Center to ensure that staff would be available to see Terrence. Then, Ms. Coleman called 911, and she requested an ambulance to transport Terrence to the hospital.

**In the Emergency Services System, Defendant Michalowski Inaccurately Characterized Terrence Coleman as Violent and Dangerous.**

36.     Ms. Coleman spoke with Defendant Michalowski, the 911 operator who answered the call about Terrence.

37.     Ms. Coleman informed Defendant Michalowski that Terrence suffered from schizophrenia, that he had been sitting outside for many hours in the cold, and that she was worried about Terrence's health.

38.     Ms. Coleman further informed Defendant Michalowski that she had called 911 on the advice of Terrence's therapist.

39.     Ms. Coleman told Defendant Michalowski that Terrence needed only medical assistance, and she asked for an ambulance to transport Terrence to Tufts Medical Center.

40.     Ms. Coleman did not request police assistance, and she expressly directed Defendant Michalowski not to send any police officers to the family home.

41.     Ms. Coleman did not want police officers to respond, because she was concerned that the presence of police officers would be counter-productive, agitate Terrence, and prevent him from getting medical assistance.

9

42.     In response, Defendant Michalowski stated to Ms. Coleman that "the policy" for the City of Boston required police officers from the BPD to respond along with EMTs from BEMS.

43.     Although Ms. Coleman stated on the 911 call that Terrence was not violent and did not pose any danger to himself or anyone else, Defendant Michalowski entered the call into the emergency services system as "EDP2," a code that indicated to all responders that Terrence was violent or posed a danger of physical harm to others.

**Defendants Boyle and Finn Responded to the Family Home in a Marked Police Vehicle, and Defendants Mentele and MacKinnon Followed a Few Minutes Later by Ambulance.**

44.     In response to the 911 call, at approximately 12:46 a.m. on October 30, 2016, Defendants Boyle and Finn responded in a marked police vehicle to 245 Shawmut Avenue.

45.     By the time the police officers arrived, Terrence had gone inside the family home, and he was sitting in his bedroom.

46.     On the street in front of the building, Defendants Finn and Boyle spoke with Ms. Coleman and asked where Terrence was. Ms. Coleman told the police officers that Terrence had gone inside the apartment. Defendants Boyle and Finn then approached the front door of the building, saying they would "give it a try," but Ms. Coleman asked them not to enter the apartment.

47.     At that point, Defendants Boyle and Finn agreed to wait outside the building until the EMTs arrived, but they left the blue lights flashing on top of their police vehicle.

10

48.    Shortly thereafter, Defendants Mentele and MacKinnon arrived in a BEMS ambulance at 245 Shawmut Avenue.

49.    On an overnight shift from October 29, 2016, to October 30, 2016, Defendants Mentele and MacKinnon operated Ambulance 10, and they were assigned to "impact" duty, which meant they served Roxbury, Dorchester, and parts of South Boston.

**In Front of Ms. Coleman, Defendants Boyle, Finn, MacKinnon, and Mentele Unlawfully Seized Terrence Coleman, and Defendant Boyle Unlawfully Shot and Killed Him.**

50.    Defendants Mentele and MacKinnon entered the family home with Ms. Coleman.

51.    Defendant Mentele entered the bedroom to speak with Terrence, who sat on the floor with his head in his hands, and Defendant MacKinnon stayed outside the room, in the hallway of the apartment, speaking with Ms. Coleman.

52.    Defendant Mentele told Terrence that the EMTs wanted to help him, and Defendant Mentele asked Terrence if he would go with them to the hospital.

53.    Terrence did not respond, rather he stood up and walked out of his bedroom, down the hallway, and into the foyer of the building. In his hand, Terrence held a plastic bag that contained a bottle of vitamin water and several CDs or DVDs. Terrence did not have any weapons, in the bag or anywhere else.

54.    As Terrence walked out of the apartment, Defendants Mentele and MacKinnon, along with Ms. Coleman, followed him into the foyer.

11

55.    From the foyer, Terrence saw that there was a police vehicle outside the building, and he saw the flashing blue lights. At that point, Terrence became upset and agitated, and he raised his voice, telling Defendants Mentele and MacKinnon that he did not want to be taken to the hospital and that he wanted to leave the home.

56.    Without conferring with Ms. Coleman or Terrence's therapist about the situation, Defendants Mentele and MacKinnon raised their voices, insisting that Terrence come with them to the hospital. Then, Defendant Mentele lunged at Terrence and tried to grab him.

57.    From outside on the street, Defendants Boyle and Finn heard a commotion, and they burst into the foyer.

58.    Immediately, Defendants Boyle and Finn tackled Terrence and forced him to the floor of the foyer.

59.    Defendants Boyle and Finn also pushed Ms. Coleman to the floor.

60.    Defendant Boyle then shot Terrence multiple times.

61.    Terrence died as a result of his gunshot wounds.

62.    Ms. Coleman was present in the foyer and witnessed the entire fatal encounter between Terrence and Defendants Boyle, Finn, Mentele, and MacKinnon.

63.    At all relevant times, Terrence was unarmed, made no violent movements, and posed no danger to himself or anyone else.

64.    Specifically, Terrence never threatened the EMTs, police officers, or anyone else with a kitchen knife.

**Defendants Evans and Hooley, Along with Defendants Boyle, Finn, Mentele, and MacKinnon Falsely Claimed that Terrence Coleman Threatened the EMTs with a Knife.**

65.    Within a few hours of the fatal incident, Defendant Evans reported to the media that Terrence had attacked the EMTs with a "large knife" and that the police officers had to use deadly force to save the lives of the EMTs.

66.    Similarly, Defendant Hooley also reported to the media that Terrence threatened the EMTs with a knife.

67.    Defendants Boyle, Finn, Mentele, and MacKinnon have each made similar statements to investigators about the fatal shooting of Terrence, claiming that Terrence threatened the EMTs with a kitchen knife and that the police officers had to respond with lethal force.

68.    With regard to other crucial facts, however, the statements of Defendants Boyle, Finn, Mentele, and MacKinnon are inconsistent. For example, their statements differ about where and when Terrence first allegedly pulled out a knife, where Ms. Coleman was standing during the encounter, and when the EMTs called for assistance.

69.    Further, with respect to the critical claim about the kitchen knife, their statements contradict the first-hand observations of Ms. Coleman, who was the only eyewitness not employed by the City of Boston, and who was standing only a few feet away when her son was shot and killed.

70.    After Terrence had been killed, and based on the false statements by Defendants Finn, Boyle, Mentele, and MacKinnon, a search warrant was obtained for the Coleman home and executed on October 30, 2016.

13

71.     During the search, police officers seized a kitchen knife.

72.     Despite the fact that all Defendants claimed that Terrence had threatened the EMTs with a kitchen knife in the foyer outside the apartment, the knife was recovered from inside the apartment.

**The City of Boston Operates a Flawed Emergency Service System that Misunderstands and Endangers Persons Who Suffer from Mental Illness.**

73.     The City of Boston has established and operates an emergency services system that fails to provide reasonable accommodations for persons who suffer from mental health disabilities.

74.     The City of Boston has established and operates a protocol for responding to all incoming 911 calls, including calls to request medical assistance for persons who suffer from mental illnesses.

75.     In February 2016, Defendant Sophia Dyer, M.D., approved and implemented the protocol that, in October 2016, all 911 operators—including Defendant Michalowski—were trained and required to follow.

76.     Pursuant to the protocol, 911 operators follow a standard script to obtain basic information from callers.

77.     Based on that information, 911 operators classify calls with 70 "type codes" and enter those codes into the BEMS system.

78.     All responders see the codes for specific calls, and those codes are designed to guide how responders address the situations.

79.     The protocol is divided into sections, and type codes are grouped together within certain sections.

14

80.    When a 911 operator receives a call concerning a person suffering from a mental illness, the protocol directs the operator to a section for "Altered Mental Status/EDP/Stroke."

81.    The "Altered Mental Status/EDP/Stroke" section of the protocol contains instructions for 911 operators for classifying and responding to 9 types of calls. But only 2 type codes—EDP3 and EDP2—are directly relevant to persons who suffer from mental illnesses. The other type codes that are grouped together under "Altered Mental Status/EDP/Stroke" include codes for diabetic shock, stroke, and overdoses.

82.    The City of Boston and Defendants Evans, Hooley, and Dyer, as supervisors, have established and implemented an irrational and unwarranted policy or practice of grouping persons who suffer from mental illness with persons who experience unrelated emergencies, such as strokes or overdoses.

83.    As a result, the City of Boston fails to accommodate persons with mental health disabilities and the special considerations that bear on assisting persons with mental illnesses.

84.    EDP2 is the type code for a call about an emotionally distressed person who is known or reported to be violent or threatening to others. (The code may also apply to a person who has attempted suicide and is currently conscious.)

85.    EDP3 is the type code for a person with a psychiatric history who is reported to be acting unusually or a non-violent, uninjured person who has

experienced suicidal ideation. (The code may also apply to a call from a BPD officer who has requested a psychiatric evaluation.)

86.    EDP2 and EDP3 are the only two ways a call to assist a person with a mental health disability could potentially be type coded, and both codes generate a BPD response along with a BEMS response.

87.    When Ms. Coleman called 911 and requested medical assistance for her son, Terrence, who suffered from schizophrenia, Defendant Michalowski classified the call with the type code "EDP2," which mischaracterized Terrence as a person who was reportedly violent or posed some danger.

88.    Even if Defendant Michalowski had classified the call with the type code "EDP3," the only other type code for mental illness, the call still would have generated a BPD response along with a BEMS response.

89.    By mandating that the BPD respond to all calls concerning persons who suffer from mental illness, the emergency services system that the City of Boston has established and operates perpetuates discriminatory stereotypes that such persons are violent, and it endangers such persons by inaccurately suggesting to responders that most persons with mental health disabilities pose imminent threats of physical harm.

**The BPD Provides Inadequate Training and Has Discriminatory Policies Concerning Interactions with Persons Who Suffer from Mental Illness.**

90.    Before Defendant Boyle shot and killed Terrence, the City of Boston and the BPD knew, or should have known, of the need to provide proper training for

police officers and to establish appropriate policies for their interactions with persons, like Terrence, who suffer from mental health disabilities.

91. Nearly half of the people killed by Massachusetts police officers in the past 12 years suffered from mental health disabilities.

92. In recent years, police officers in Massachusetts have shot and killed several people with mental illness, and those incidents received extensive media coverage.

93. For example, in 2013, Wilfredo Justiniano, Jr. was shot and killed by a Massachusetts State Police ("MSP") trooper who responded to a 911 call for medical assistance. Justiniano suffered from schizophrenia, and he was unarmed at the time of his death.

94. Later that year, Denis Reynoso was shot and killed by a Lynn Police Department officer who responded to a 911 call for medical assistance; Reynoso was a military veteran who suffered from post-traumatic stress disorder.

95. About one year before the incident in this case, in 2015, Santos Laboy was shot and killed by a MSP trooper. For several years, Laboy struggled with mental illness, and the trooper claimed that Laboy refused to drop a knife.

96. Notwithstanding these high-profile police shootings of persons with mental health issues, as of October 2016, the City of Boston has failed to establish and to implement effective training for BPD officers concerning their interactions with persons with mental illness.

97.     The BPD provides inadequate training for police officers regarding mental health disabilities.  The BPD has only two training programs, one for new officers and one for veteran officers. Each program is voluntary and runs for only about three hours.

98.     The BPD training programs conflate mental health disabilities with various unrelated physical illnesses and behavior problems, such as heart disease, depression, stroke, drug use, Alzheimer's, anxiety, kidney disease, breast cancer, schizophrenia, autism, HIV/AIDS, PTSD, "youth," dementia, and hoarding.

99.     These training programs inaccurately and discriminatorily imply that all of these various diseases, disabilities, and conditions are similar.

100.    Not every issue covered in the BPD training programs is a disability for purposes of the ADA, and by conflating disparate diseases, disorders, illnesses, and disabilities, both programs imply that only one sort of response is required and appropriate in dealing with all persons in these different circumstances.

101.    Both BPD training programs also use dramatized scenarios that erroneously suggest that all persons who suffer from mental health disabilities are violent and dangerous. For example, to demonstrate proper "de-escalation" techniques, both trainings use a video that ends with police officers drawing their guns and making an arrest.

102.    Both BPD training programs focus in large part on G.L. c. 123, § 12, sometimes known as "pink paper," which authorizes police officers to use emergency

restraints and involuntarily hospitalize persons who suffer from mental illness and poses serious risks of harm to themselves or others.

103.   Both BPD training programs endorse and reinforce baseless and discriminatory stereotypes about people who suffer from mental illness, particularly that they are violent and pose dangers of physical harm.

104.   In an internal BPD interview after he fatally shot Terrence, Officer Boyle stated that he could not recall receiving any training from the BPD regarding how to respond appropriately to persons who suffer from mental illness.

**BEMS Also Provides Inadequate Training and Has Discriminatory Policies Concerning Responding to 911 Calls Involving Persons Who Suffer from Mental Illness.**

105.   As of October 2016, the City of Boston and BEMS knew, or should have known, about the need to provide effective training for EMTs regarding mental health disabilities. Indeed, 911 calls concerning persons who suffer from mental illnesses are one of the most common types of calls for emergency services.

106.   Nevertheless, BEMS has failed to establish and to implement effective training for EMTs concerning interactions with persons who suffer from mental illnesses.

107.   BEMS provides limited training on responding to calls regarding persons suffering from mental health disabilities, and those programs focus on maintaining the safety of EMTs rather than reasonably accommodating the persons who need medical assistance.

108.   These inadequate training programs erroneously suggest that all persons who suffer from mental illness are violent and dangerous. By focusing only

on patient restraint and "de-escalation," the programs teach EMTs to expect aggressive and erratic persons, and they fail to train EMTs to accommodate the particular needs of persons with mental health disabilities.

109.    The BEMS training programs endorse and reinforce baseless and discriminatory stereotypes about people who suffer from mental illness, particularly that they are violent and pose dangers of physical harm.

## CAUSES OF ACTION

### First Cause of Action
### (Violation of Fourth and Fourteenth Amendments: Excessive Force)

110.    Ms. Coleman realleges and incorporates each and every allegation contained in the preceding paragraphs.

111.    At all relevant times, Defendants Boyle, Finn, Mentele, and MacKinnon were employees of the Defendant City of Boston and acted under the color of state law.

112.    In responding to the 911 call from Ms. Coleman for medical assistance, Defendants Boyle, Finn, Mentele, and MacKinnon jointly and in concert used excessive and unreasonable force by forcibly tackling, physically restraining, and fatally shooting Terrence.

113.    By using excessive and unreasonable force against Terrence, Defendants Boyle, Finn, Mentele, and MacKinnon deprived Terrence of his clearly established rights under the Fourth and Fourteenth Amendments to the U.S. Constitution to be free from excessive and unreasonable force.

114.    As a result of the excessive and unreasonable force that Defendants

Boyle, Finn, Mentele, and MacKinnon used, Terrence suffered damages.

## Second Cause of Action
### (Violation of Fourth and Fourteenth Amendments: Unlawful Seizure)

115.    Ms. Coleman realleges and incorporates each and every allegation

contained in the preceding paragraphs.

116.    In responding to the 911 call, Defendants Boyle, Finn, Mentele, and

MacKinnon unlawfully restrained Terrence by physically preventing him from

leaving the Coleman home and wrongfully insisting that he go by ambulance to the

hospital.

117.    By unlawfully seizing Terrence, Defendants Boyle, Finn, Mentele, and

MacKinnon deprived Terrence of his clearly established rights under the Fourth

and Fourteenth Amendments to the U.S. Constitution to be free from unlawful and

unreasonable seizures.

118.    As a result of this unlawful seizure by Defendants Boyle, Finn,

Mentele, and MacKinnon, Terrence suffered damages.

## Third Cause of Action
### (Violation of Fifth and Fourteenth Amendments: Due Process)

119.    Ms. Coleman realleges and incorporates each and every allegation

contained in the preceding paragraphs.

120.    In responding to the 911 call, Defendants Boyle, Finn, Mentele, and

MacKinnon intentionally or recklessly deprived Terrence of his life and liberty

21

without due process of law by physically restraining Terrence and, then, fatally shooting him.

121.    By depriving Terrence of his life and liberty without due process, Defendants Boyle, Finn, Mentele, and MacKinnon violated Terrence's rights under the Fifth and Fourteenth Amendments to the U.S. Constitution.

122.    As a result of the due process violations by Defendants Boyle, Finn, Mentele, and MacKinnon, Terrence suffered damages.

## Fourth Cause of Action
### (Municipal Liability)

123.    Ms. Coleman realleges and incorporates each and every allegation contained in the preceding paragraphs.

124.    At all relevant times, Defendants Boyle, Finn, Mentele, MacKinnon, and Michalowski served as employees of Defendant City of Boston, and they acted in accordance with a policy or custom of Defendant City of Boston.

125.    Despite the obvious need for adequate training for police officers, EMTs, and EMT dispatch operators about responding to 911 calls involving persons who suffer from mental health disabilities and requests for medical assistance, Defendant City of Boston has maintained, and continues to maintain, a policy or practice of providing inadequate training for police officers, EMTs, and EMT dispatch operators.

126.    At all relevant times, Defendant City of Boston knew, or should have known, that there was a need for adequate training.

22

127.    Nevertheless, Defendant City of Boston provides inadequate training to police officers, EMTs, and EMT dispatch operators that promotes baseless and discriminatory stereotypes that persons with mental health disabilities are violent and dangerous; that police officers and EMTs who respond to such calls will likely need to use force or restrain these persons; and that such encounters will likely end in arrests.

128.    Defendant City of Boston's policy or practice of providing inadequate and discriminatory training for police officers, EMTs, and EMT dispatch operators proximately caused Terrence's injuries and death.

129.    Defendant City of Boston did not adequately train Defendants Boyle, Finn, Mentele, MacKinnon, and Michalowski, who received no training whatsoever or only limited, inadequate, and discriminatory training.

130.    As a result of their deficient training, rather than provide appropriate medical assistance to Terrence, or an appropriate police response, Defendants Boyle, Finn, Mentele, and MacKinnon escalated the situation, resorted to physical force, and fatally shot Terrence.

131.    As a result of the actions taken by these inadequately trained employees of Defendant City of Boston, Terrence suffered damages.

### Fifth Cause of Action
### (Supervisory Liability)

132.    Ms. Coleman realleges and incorporates each and every allegation contained in the prior paragraphs.

133.    By unlawfully seizing and fatally shooting Terrence, Defendants Boyle, Finn, Mentele, and MacKinnon violated Terrence's constitutional rights.

134.    At all relevant times, Defendant Evans supervised Defendants Boyle and Finn, and Defendant Hooley supervised Defendants Mentele, MacKinnon, and Michalowski.

135.    At all relevant times, Defendant Dyer was the Medical Director for BEMS and the BPD, and in that capacity, she supervised Defendants Boyle, Finn, Mentele, MacKinnon, and Michalowski.

136.    Defendants Evans, Hooley, and Dyer knew, or should have known, that in response to 911 calls for emergency services, interactions with persons who suffer from mental health disabilities often result in tragic violence, including the injury and death of such persons.

137.    Defendants Evans, Hooley, and Dyer were deliberately indifferent to the substantial risk of harm to persons, like Terrence, who suffer from mental health disabilities and who are the subject of 911 calls to request medical assistance.

138.    Defendants Evans, Hooley, and Dyer's deliberate indifference and negligent failure to provide adequate training to and supervision of their employees was a direct and proximate cause of Terrence's injuries and death.

139.    As a result of Defendants Evans, Hooley, and Dyer's deliberate indifference, Terrence suffered damages.

24

**Sixth Cause of Action**
**(Violation of the ADA – Failure to Accommodate)**

140.   Ms. Coleman realleges and incorporates each and every allegation

contained in the preceding paragraphs.

141.   Title II of the ADA states, in pertinent part:

> [N]o qualified individual with a disability shall, by reason
> of such disability, be excluded from participation in or be
> denied the benefits of the services, programs, or activities
> of a public entity, or subjected to discrimination by any
> such entity. 42 U.S.C. § 12132.

142.   Under the ADA, a "public entity" includes state and local governments,

their agencies, and their instrumentalities. 42 U.S.C. § 12131(1).

143.   Within the meaning of Title II of the ADA, Defendant City of Boston is

a "public entity."

144.   Under the ADA, the term "disability" includes physical and mental

impairments that substantially limit one or more major life activities. 42 U.S.C. §

12102(2). A "'qualified individual with a disability' means an individual with a

disability who, with or without reasonable modifications to rules, policies, or

practices … meets the essential eligibility requirements for the receipt of services or

the participation in programs or activities provided by a public entity." 42 U.S.C.

§ 12131(2).

145.   At all relevant times, within the meaning of Title II of the ADA,

Terrence was a "qualified individual with a disability." Terrence had an impairment

that substantially limited major life activities. As a resident of Boston, he was

qualified to participate in the programs, services, and activities of the City of

Boston, including but not limited to receiving emergency services and other appropriate assistance from EMTs and police officers.

146.   At all relevant times, Defendant City of Boston knew, or should have known, that Terrence suffered from mental illness and, therefore, had a disability for the purposes of the ADA.

147.   Defendant City of Boston excluded Terrence from participation in or denied him the benefits of a public service, or otherwise discriminated against Terrence, on the basis of his disability, by failing to make reasonable accommodations to address his mental illness.

148.   Acting as employees of Defendant City of Boston, and in accordance with an official policy or practice, Defendants Boyle, Finn, Mentele, MacKinnon, and Michalowski failed to make reasonable accommodations and provide appropriate medical assistance to Terrence, who suffered from a mental health disability, and instead, resorted to deadly violence.

149.   As a result of the failure of Defendant City of Boston to provide reasonable accommodations, in violation of the ADA, Terrence suffered damages.

**Seventh Cause of Action**
**(Violation of the ADA – Failure to Train)**

150.   Ms. Coleman realleges and incorporates each and every allegation contained in the preceding paragraphs.

151.   Defendant City of Boston excluded Terrence from participation in or denied him the benefits of a public service or otherwise discriminated against

Terrence, on the basis of his disability, by failing to train its employees to make reasonable accommodations to serve persons with mental health disabilities.

152.    Had Defendant City of Boston trained its police officers and EMTs to make reasonable accommodations to provide appropriate medical assistance rather than resort to deadly violence in situations involving persons with mental health disabilities, Terrence would not have been unlawfully seized, shot, and killed.

153.    As a result of the failure of Defendant City of Boston to train its employees, in violation of the ADA, Terrence suffered damages.

### Eighth Cause of Action
### (Rehabilitation Act)

154.    Ms. Coleman realleges and incorporates each and every allegation contained in the preceding paragraphs.

155.    Section 504 of the Rehabilitation Act provides, in pertinent part:

> No otherwise qualified individual with a disability in the United States … shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance[.] 29 U.S.C. § 794(a).

156.    Defendant City of Boston is a recipient of federal financial assistance within the meaning of Section 504 of the Rehabilitation Act, and the services of the BPD and BEMS constitute a "program or activity" that Defendant City of Boston provided and provides. 29 U.S.C. § 794(b).

157.    Defendant City of Boston excluded Terrence from participation in or denied him the benefits of a public service, or otherwise discriminated against Terrence, on the basis of his disability.

158.   Defendant City of Boston knew that Terrence had a disability and still failed to reasonably accommodate his disability and as a result he was subjected to discrimination, unnecessarily seized, and unreasonably killed.

159.   As a result of the failure of employees of the Defendant City of Boston to make reasonable accommodations, in violation of the Rehabilitation Act, Terrence suffered damages.

## Ninth Cause of Action
### (Wrongful Death – Individual Liability)

160.   Ms. Coleman realleges and incorporates each and every allegation contained in the preceding paragraphs.

161.   In answering and coordinating the response to Ms. Coleman's 911 call for medical assistance, Defendant Michalowski owed a duty of care to Terrence.

162.   In responding to a 911 call for medical assistance, Defendants Boyle and Finn owed a duty of care to Terrence.

163.   In responding to a 911 call for medical assistance, and in their attempts to provide such medical assistance, Defendants MacKinnon and Mentele also owed a duty of care to Terrence.

164.   By unjustifiably designating Terrence as a violent and dangerous person, and by sending two BPD officers to the Coleman home, Defendant Michalowski breached her duty of care to Terrence.

165.   By seizing and then shooting Terrence multiple times and killing him, Defendants Boyle, Finn, MacKinnon, and Mentele, jointly and in concert, engaged in conduct that was intentional, reckless, grossly negligent, or negligent.

28

166.    By failing to intervene and prevent Defendant Boyle from using unreasonable and excessive force against Terrence, Defendants Finn, MacKinnon, and Mentele engaged in conduct that was intentional, reckless, grossly negligent, or negligent.

167.    Defendants Boyle, Finn, MacKinnon, Mentele, and Michalowski's conduct proximately caused Terrence's death.

168.    Defendants Finn, MacKinnon, and Mentele's failure to intervene, in violation of their duty of care that they owed to Terrence, also proximately caused Terrence's death.

169.    As a result of Defendants Finn, MacKinnon, Mentele, and Michalowski's negligence, the Estate of Terrence Coleman is entitled to damages.

### Tenth Cause of Action
### (Wrongful Death – Vicarious Liability)

170.    Ms. Coleman realleges and incorporates each and every allegation contained in the preceding paragraphs.

171.    At all relevant times, Defendants Evans, Hooley, Dyer, Boyle, Finn, MacKinnon, Mentele, and Michalowski acted as employees of Defendant City of Boston.

172.    Because Defendants Evans, Hooley, Dyer, Boyle, Finn, MacKinnon, Mentele, and Michalowski's negligence proximately caused of Terrence's wrongful death, Defendant City of Boston is vicariously liable for his death.

173.    As a result of Defendants Evans, Hooley, Dyer, Boyle, Finn, MacKinnon, Mentele, and Michalowski's negligence in the course of their

employment for Defendant City of Boston, the Estate of Terrence Coleman is entitled to damages.

174.    Defendant City of Boston was timely notified of Ms. Coleman's intent to bring suit under G.L. c. 258, § 2, because pursuant to G.L. c. 258, § 4, Ms. Coleman mailed a presentment claim form letter to Corporation Counsel for the City of Boston on April 4, 2018.

**Eleventh Cause of Action**
**(Loss of Consortium)**

175.    Ms. Coleman realleges and incorporates each and every allegation contained in the preceding paragraphs.

176.    As a result of Defendants Evans, Hooley, Dyer, Boyle, Finn, MacKinnon, Mentele, and Michalowski's negligence, which led to Terrence's wrongful death, Ms. Coleman has suffered a loss of his society and companionship.

177.    As a result of Defendants Evans, Hooley, Dyer, Boyle, Finn, MacKinnon, Mentele, and Michalowski's negligence, Ms. Coleman has suffered damages; she has been deprived of the full enjoyment of the parent-child relationship, has suffered a loss of comfort, solace, and moral support, and her social and recreational life has been curtailed.

**Twelfth Cause of Action**
**(Intentional Infliction of Emotional Distress)**

178.    Ms. Coleman realleges and incorporates each and every allegation contained in the preceding paragraphs.

30

179.   By unlawfully seizing and fatally shooting Terrence, an unarmed, non-violent person who suffered from mental illness, Defendants Boyle, Finn, Mentele, and MacKinnon, jointly and in concert, engaged in conduct that was extreme, outrageous, and beyond all possible bounds of decency.

180.   Ms. Coleman was present, in the foyer area by the front door of the family home, when Defendant Boyle shot and killed her son, Terrence.

181.   As an eyewitness to the fatal shooting of Terrence by Defendant Boyle, Ms. Coleman suffered emotional distress.

182.   Defendants Boyle, Finn, Mentele, and MacKinnon knew, or should have known, that their seizure and killing of Terrence would likely cause emotional distress to Ms. Coleman.

183.   Defendants Boyle, Finn, Mentele, and MacKinnon's extreme and outrageous conduct proximately caused Ms. Coleman's emotional distress.

184.   By making statements that Terrence threatened EMTs with a knife, and by telling the media that the BPD officers had no choice but to use deadly force against him, which they knew were false allegations, Defendants Evans and Hooley, jointly and in concert, engaged in conduct that was extreme, outrageous, and beyond all possible bounds of decency.

185.   Defendants Evans and Hooley knew or should have known that their false, public statements about Terrence's death would likely cause emotional distress to Ms. Coleman

186.   Defendants Evans and Hooley's extreme and outrageous conduct proximately caused Ms. Coleman's emotional distress.

187.   Ms. Coleman's emotional distress has been, and continues to be, severe, and no reasonable person could be expected to endure such distress, including but not limited to anxiety, depression, difficulty breathing, sleep deprivation, loss of appetite, and subsequent weight loss.

188.   As a result of Defendants Evans, Hooley, and Boyle's actions, Ms. Coleman suffered damages.

### Thirteenth Cause of Action
### (Negligent Infliction of Emotional Distress)

189.   Ms. Coleman realleges and incorporates each and every allegation contained in the preceding paragraphs.

190.   By designating Terrence as a violent and dangerous person, and by sending two BPD officers to the Coleman home, Defendant Michalowski breached her duty of care to Terrence, and set in motion a series of events that led to Terrence's death.

191.   In responding to a 911 call for medical assistance, Defendants Boyle, Finn, MacKinnon, and Mentele owed a duty of care to Terrence.

192.   By unreasonably seizing and fatally shooting Terrence, an unarmed, non-violent person who suffered from mental illness, in the presence of Ms. Coleman, who witnessed her son's wrongful death, Defendants Boyle, Finn, Mentele, and MacKinnon, jointly and in concert, engaged in negligent conduct that breached their duty of care to Terrence.

193.    By failing to intervene and prevent Defendant Boyle from using unreasonable and excessive force on Terrence, Defendants Finn, MacKinnon, Mentele, and Michalowski engaged in negligent conduct that breached their duty of care to Terrence and led to Terrence's death.

194.    As an eyewitness to the fatal shooting of Terrence by Defendant Boyle, Ms. Coleman suffered emotional distress.

195.    Any reasonable person in Ms. Coleman's situation would have suffered emotional distress.

196.    Defendants Boyle, Finn, MacKinnon, Mentele, and Michalowski's negligence proximately caused Ms. Coleman's emotional distress, including but not limited to anxiety, depression, difficulty breathing, sleep deprivation, loss of appetite and subsequent weight loss.

197.    As a result of Defendants Boyle, Finn, MacKinnon, Mentele, and Michalowski's negligence, Ms. Coleman suffered damages.

### Fourteenth Cause of Action
### (Negligence)

198.    Ms. Coleman realleges and incorporates each and every allegation contained in the preceding paragraphs.

199.    In responding to a 911 call for medical assistance, Defendants Boyle, Finn, Mentele, MacKinnon, and Michalowski owed a duty of care to Terrence, an unarmed, non-violent person who suffered from mental illness and needed medical assistance.

200.   By designating Terrence as a violent and dangerous person, and by sending two BPD officers to the Coleman home, Defendant Michalowski breached her duty of care to Terrence.

201.   By unlawfully seizing and fatally shooting Terrence, rather than attempting to de-escalate the situation, providing appropriate medical attention to Terrence, and reasonably accommodating his mental health disability, Defendants Boyle, Finn, Mentele, and MacKinnon breached their duty of care to Terrence.

202.   By breaching their duty to Terrence, Defendants Boyle, Finn, Mentele, MacKinnon, and Michalowski proximately caused harm to Terrence, including his wrongful death.

203.   As a result of Defendants Boyle, Finn, Mentele, MacKinnon, and Michalowski's negligence, Terrence suffered damages.

### Fifteenth Cause of Action
### (Assault and Battery of Terrence)

204.   Ms. Coleman realleges and incorporates each and every allegation contained in the preceding paragraphs.

205.   By using excessive and unjustified force against Terrence, Defendants Boyle and Finn, jointly and in concert, intentionally and without justification or excuse caused Terrence to suffer physical injuries.

206.   As a result of Defendants Boyle and Finn's unjustified physical battery of Terrence, he suffered damages.

## Sixteenth Cause of Action
### (Assault and Battery of Ms. Coleman)

207.   Ms. Coleman realleges and incorporates each and every allegation contained in the preceding paragraphs.

208.   By drawing his weapon in an unnecessary and unreasonable display of and use of force, while Ms. Coleman was only a few feet away from him, Defendant Boyle intentionally and overtly placed Ms. Coleman in reasonable apprehension of immediate physical battery.

209.   By rushing into the foyer of her apartment building and pushing Ms. Coleman to the ground, Defendants Boyle and Finn, jointly and in concert, intentionally and without justification or excuse, battered Ms. Coleman and caused her to suffer physical injuries.

210.   As a result of Defendants Boyle and Finn's unjustified physical battery of Ms. Coleman, she suffered damages.

**WHEREFORE**, Ms. Coleman requests that this court:

  a.   Award compensatory damages against all Defendants;

  b.   Award punitive damages against Defendants Evans, Hooley, Dyer, Boyle, Finn, Mentele, MacKinnon, and Michalowski;

  c.   Award the cost of this action, including reasonable attorney's fees; and

  d.   Award such other relief as this Court may deem necessary and appropriate.

## JURY DEMAND

Ms. Coleman demands a jury trial on all counts so triable.

Respectfully submitted,

**HOPE COLEMAN**

By her attorneys,

_/s/ Daniel N. Marx_
Daniel N. Marx (BBO# 674523)
William W. Fick (BBO# 650562)
Rebecca N. Chapman (BBO# 694052)
FICK & MARX LLP
100 Franklin Street, 7th Floor
Boston, MA 02110
(857) 321-8360
DMARX@FICKMARX.COM
WFICK@FICKMARX.COM
RCHAPMAN@FICKMARX.COM


Oren Sellstrom (BBO# 569045)
Sophia L. Hall (BBO# 684541)
Lawyers' Committee for Civil Rights
    and Economic Justice
61 Batterymarch Street, 5th Floor
Boston, MA 02110
(617) 984-0274
Osellstrom@lawyerscom.org
Shall@lawyerscom.org



Dated:  April 4, 2018