## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HOPE COLEMAN, individually and as the legal representative of the ESTATE OF TERRENCE J. COLEMAN,<br><br>   Plaintiff,<br><br> v.<br><br>CITY OF BOSTON, BOSTON PUBLIC HEALTH COMMISSION, WILLIAM EVANS, SOPHIA DYER, M.D., GARRETT BOYLE, and KEVIN FINN,<br><br>   Defendants. | **FIRST AMENDED COMPLAINT**<br><br>No. 18-cv-10646-MLW<br><br>**Leave to file granted: March 5, 2019 [DE 61]** |

### INTRODUCTION

1. In the early morning hours of October 30, 2016, Plaintiff Hope Coleman called 911 to request medical assistance for her son, Terrence Coleman, a 31-year-old, African-American man who suffered from a mental health disability. Defendant Garrett Boyle, an inexperienced and inadequately trained police officer with the Boston Police Department ("BPD"), responded to the family apartment at 245 Shawmut Avenue in Boston, and while Ms. Coleman stood only a few feet away, he shot and killed Terrence in the foyer just outside the front door.

2. Ms. Coleman had called for medical assistance because Terrence was experiencing an episode in which, due to his mental illness, he was withdrawn, uncommunicative, and despite the cold weather, unwilling to come inside the apartment from the front stoop of the building. After speaking with Terrence's

1

therapist from the South End Clinic, Ms. Coleman called 911 to request an ambulance to transport Terrence to Tufts Medical Center.

3.     Ms. Coleman made clear to the 911 operator, Alexandra Michalowski, that Terrence needed only medical attention and that she did not need, or want, any police involvement. Nevertheless, the 911 call about Terrence was entered in the emergency services system with the code "EDP2," for emotionally disturbed persons who are violent or pose dangers of physical harm to others, and contrary to Ms. Coleman's request, Defendant Boyle along with Defendant Kevin Finn, another inexperienced and inadequately trained police officer with the BPD, responded.  A few minutes later, Terrence Mentele and Kyle MacKinnon, inadequately trained emergency medical technicians ("EMTs") from Boston Emergency Medical Services ("BEMS"), a Bureau of the Boston Public Health Commission ("BPHC"), also arrived on the scene.

4.     By the time the BPD and BEMS came to the Coleman home, Terrence had gone inside, and he was quietly sitting in his bedroom. Along with Ms. Coleman, the EMTs entered the first-floor apartment and told Terrence that they were going to take him by ambulance to the hospital. Although Terrence refused any medical assistance, the EMTs would not take "no" for an answer.

5.     When Terrence tried to leave the apartment, Mentele stopped him in the small foyer of the building. At that point, Terrence and the EMTs began to argue. Apparently in response to hearing raised voices, the police officers burst into

the foyer, tackled Terrence, and knocked down Ms. Coleman, who was standing a few feet away. Then, Defendant Boyle shot Terrence multiple times and killed him.

6.     Terrence was not a violent person, and he had no criminal record. On the day that he was shot and killed, Terrence was not engaged in any criminal activity. Terrence was unarmed, and he posed no danger. Rather, Terrence was a person who suffered from a mental health disability, and his mother, Ms. Coleman, called 911 to ask for help transporting Terrence to the hospital.

7.     Following Terrence's death, Defendant BPD officers Boyle and Finn, along with EMTs Mentele, and MacKinnon, as well as senior officials at the BPD and BEMS, including Defendant (then BPD Commissioner) Williams Evans and BEMS Chief James Hooley, falsely claimed that Terrence had brandished a kitchen knife and threatened the EMTs. But Ms. Coleman witnessed the entire episode leading up to the fatal shooting of her son, and she has consistently and unequivocally denied that Terrence had any weapon or threatened anyone with physical harm.

8.     Terrence's tragic death was a result of a BPD officer's use of excessive, unreasonable, and deadly force. Defendants Boyle and Finn, as well as EMTs MacKinnon, Mentele, and BEMS Dispatcher Michalowski were all inadequately trained to assist persons, like Terrence, who suffer from mental health disabilities. The City of Boston and BPHC systematically and knowingly fail to train police officers and EMTs to provide appropriate services to such persons. Additionally, the City of Boston and BPHC systematically and knowingly lack an adequate system to

3

categorize and respond to 911 calls involving persons with mental health disabilities.

9.     By this civil action, Ms. Coleman seeks compensatory and punitive damages pursuant to 42 U.S.C. § 1983 for violations of Terrence's rights under the Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution; for violations of Terrence's rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and § 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), as a person who suffered from a mental health disability; pursuant to M.G.L. c. 258, § 2; M.G.L. c. 229, § 2, and M.G.L.  c. 231, § 85X, for Terrence's wrongful death; and pursuant to Massachusetts common law, for the negligent response to the 911 call for medical assistance, for the intentional, reckless, and negligent infliction of emotional distress on Ms. Coleman, who witnessed the unlawful seizure and fatal shooting of her son, and for the assault and battery on both Ms. Coleman and Terrence.

10.     Ms. Coleman alleges all facts in this complaint on her personal knowledge or information and belief.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 over the federal claims concerning violations of the Fourth, Fifth, and Fourteenth Amendment to the U.S. Constitution as well as the ADA and the Rehabilitation Act. This Court also has pendent jurisdiction under 28 U.S.C. § 1367 over the related claims pursuant to state law.

12.     Venue is proper in this judicial district under 28 U.S.C. § 1391, because the events giving rise to this civil action occurred in this judicial district.

13.     This Court has personal jurisdiction over all Defendants because they are employed by the City of Boston, a municipality within the Commonwealth of Massachusetts, and/or the Boston Public Health Commission, an independent public agency organized under the laws of the Commonwealth of Massachusetts.

## PARTIES

14.     Plaintiff Hope Coleman is the mother of the decedent, Terrence Coleman, and the duly appointed Administrator of the Estate of Terrence J. Coleman (Suffolk County Probate Court Docket No. 17P1826). Ms. Coleman brings this action on behalf of herself and the Estate of Terrence J. Coleman.

15.     Before his death, Terrence Coleman was diagnosed with schizophrenia, a mental health impairment that substantially limited one or more of his major life activities. Accordingly, for the purposes of the ADA, Terrence was an individual with a disability.

16.     Defendant City of Boston is a municipal corporation duly organized and existing under the laws of the Commonwealth of Massachusetts. The City of Boston receives federal funds.

17.     Defendant Boston Public Health Commission ("BPHC") is an independent public agency duly organized and existing under the laws of the Commonwealth of Massachusetts. It is governed by a seven-member Board of Health appointed by the Mayor of Boston. BPHC receives federal funds.

18.     Defendant William Evans, at all relevant times, was an employee of the City of Boston, served as Commissioner of the BPD, and supervised all BPD employees, including Defendants Boyle and Finn. At all relevant times, Evans acted as an agent, servant, and employee of the City of Boston. This action asserts claims against Evans individually.

19.     Defendant Sophia Dyer serves as the Medical Director of BEMS, BPD and the Boston Fire Department. At all relevant times, Dyer acted as an agent, servant, and employee of BPHC and/or the City of Boston. This action asserts claims against Dyer individually.

20.     Defendant Garrett Boyle, an employee of the City of Boston, serves as a BPD police officer (shield number 135986). At all relevant times, Boyle acted as an agent, servant, and employee of the City of Boston. This action asserts claims against Boyle individually.

21.     Defendant Kevin Finn, an employee of the City of Boston, serves as a BPD police officer (shield number 103632). At all relevant times, Finn acted as an agent, servant, and employee of the City of Boston. This action asserts claims against Finn individually.

22.     In engaging in the conduct described herein, Defendants Evans, Dyer, Boyle, and Finn acted under the color of law and in the course and scope of their employment with the City of Boston and/or BPHC, and they intended, at least in part, to benefit the City of Boston and/or BPHC.

## FACTUAL ALLEGATIONS

**Ms. Coleman Called 911 and Requested Medical Assistance from BEMS for Her Son, Terrence Coleman, Who Suffered from a Mental Health Disability.**

23.     As of October 30, 2016, Terrence, a 31-year-old, African-American man, was living with his mother, Ms. Coleman, in a first-floor apartment at 245 Shawmut Avenue in Boston.

24.     Terrence had no criminal record.

25.     Terrence was known around the neighborhood as a quiet, friendly person who loved music and WWE wrestling, and he often carried CDs and DVDs that he made for friends.

26.     More than 10 years before his death, Terrence had been diagnosed with schizophrenia. Due to his mental health disability, Terrence was unable to work, and he received SSI benefits.

27.     At times, due to his mental illness, Terrence experienced episodes in which he withdrew, became introverted, and did not interact with other people.

28.     Beginning on or about October 29, 2016, Terrence experienced such an episode, and for a few days, he sat outside in the cold on the front stoop of the apartment building and refused to come inside the family apartment.

29.     Ms. Coleman was concerned about Terrence's condition, so she called his therapist at the South End Clinic for advice.

30.     Terrence's therapist recommended that Ms. Coleman call 911, request an ambulance to transport Terrence to Tufts Medical Center for medical attention, and let the therapist know when Terrence had arrived at the hospital.

31.     Neither Ms. Coleman nor Terrence's therapist had any concern that Terrence was violent or posed any danger to himself or anyone else.

32.     Based on the recommendation from Terrence's therapist, shortly after midnight on October 30, 2016, Ms. Coleman called intake at Tufts Medical Center to ensure that staff would be available to see Terrence. Then, Ms. Coleman called 911, and she requested an ambulance to transport Terrence to the hospital.

**In the Emergency Services System, Michalowski Inaccurately Characterized Terrence Coleman as Violent and Dangerous.**

33.     Ms. Coleman spoke with Michalowski, the 911 operator who answered the call about Terrence.

34.     Ms. Coleman informed Michalowski that Terrence suffered from schizophrenia, that he had been sitting outside for many hours in the cold, and that she was worried about Terrence's health.

35.     Ms. Coleman further informed Michalowski that she had called 911 on the advice of Terrence's therapist.

36.     Ms. Coleman told Michalowski that Terrence needed only medical assistance, and she asked for an ambulance to transport Terrence to Tufts Medical Center.

37.     Ms. Coleman did not request police assistance, and she expressly directed Michalowski not to send any police officers to the family home.

38.     Ms. Coleman did not want police officers to respond, because she was concerned that the presence of police officers would be counter-productive, agitate Terrence, and prevent him from getting medical assistance.

39.     In response, Michalowski stated to Ms. Coleman that "the policy" for the City of Boston and/or BPHC required police officers from the BPD to respond along with EMTs from BEMS.

40.     Although Ms. Coleman stated on the 911 call that Terrence was not violent and did not pose any danger to himself or anyone else, Michalowski entered the call into the emergency services system as "EDP2," a code that indicated to all responders that Terrence was violent or posed a danger of physical harm to others.

**Defendants Boyle and Finn Responded to the Family Home in a Marked Police Vehicle, and EMTs Mentele and MacKinnon Followed a Few Minutes Later by Ambulance.**

41.     In response to the 911 call, at approximately 12:46 a.m. on October 30, 2016, Defendants Boyle and Finn responded in a marked police vehicle to 245 Shawmut Avenue.

42.     By the time the police officers arrived, Terrence had gone inside the family home, and he was sitting in his bedroom.

43.     On the street in front of the building, Defendants Finn and Boyle spoke with Ms. Coleman and asked where Terrence was. Ms. Coleman told the police officers that Terrence had gone inside the apartment. Defendants Boyle and Finn then approached the front door of the building, saying they would "give it a try," but Ms. Coleman asked them not to enter the apartment.

44.     At that point, Defendants Boyle and Finn agreed to wait outside the building until the EMTs arrived, but they left the blue lights flashing on top of their police vehicle.

45.     Shortly thereafter, EMTs Mentele and MacKinnon arrived in a BEMS ambulance at 245 Shawmut Avenue.

46.     On an overnight shift from October 29, 2016, to October 30, 2016, Mentele and MacKinnon operated Ambulance 10, and they were assigned to "impact" duty, which meant they served Roxbury, Dorchester, and parts of South Boston.

**In Front of Ms. Coleman, Defendants Boyle and Finn, along with EMTs MacKinnon and Mentele, Unlawfully Seized Terrence Coleman, and Defendant Boyle Unlawfully Shot and Killed Him.**

47.     EMTs Mentele and MacKinnon entered the family home with Ms. Coleman.

48.     Mentele entered the bedroom to speak with Terrence, who sat on the floor with his head in his hands, and MacKinnon stayed outside the room, in the hallway of the apartment, speaking with Ms. Coleman.

49.     Mentele told Terrence that the EMTs wanted to help him, and Mentele asked Terrence if he would go with them to the hospital.

50.     Terrence did not respond, rather he stood up and walked out of his bedroom, down the hallway, and into the foyer of the building. In his hand, Terrence held a plastic bag that contained a bottle of vitamin water and several CDs or DVDs. Terrence did not have any weapons, in the bag or anywhere else.

51.     As Terrence walked out of the apartment, EMTs Mentele and MacKinnon, along with Ms. Coleman, followed him into the foyer.

52.     From the foyer, Terrence saw that there was a police vehicle outside the building, and he saw the flashing blue lights. At that point, Terrence became upset and agitated, and he raised his voice, telling EMTs Mentele and MacKinnon that he did not want to be taken to the hospital and that he wanted to leave the home.

53.     Without conferring with Ms. Coleman or Terrence's therapist about the situation, EMTs Mentele and MacKinnon raised their voices, insisting that Terrence come with them to the hospital. Then, Mentele lunged at Terrence and tried to grab him.

54.     From outside on the street, Defendants Boyle and Finn heard a commotion, and they burst into the foyer.

55.     Immediately, Defendants Boyle and Finn tackled Terrence and forced him to the floor of the foyer.

56.     Defendants Boyle and Finn also pushed Ms. Coleman to the floor.

57.     Defendant Boyle then shot Terrence multiple times.

58.     Terrence died as a result of his gunshot wounds.

59.     Ms. Coleman was present in the foyer and witnessed the entire fatal encounter between Terrence and Boyle, Finn, Mentele, and MacKinnon.

60.     At all relevant times, Terrence was unarmed, made no violent movements, and posed no danger to himself or anyone else.

61.     Specifically, Terrence never threatened the EMTs, police officers, or anyone else with a kitchen knife.

**Defendant Evans and BEMS Chief Hooley, Along with Defendants Boyle and Finn, as well as EMTs Mentele and MacKinnon, Falsely Claimed that Terrence Coleman Threatened the EMTs with a Knife.**

62.     Within a few hours of the fatal incident, Defendant Evans reported to the media that Terrence had attacked the EMTs with a "large knife" and that the police officers had to use deadly force to save the lives of the EMTs.

63.     Similarly, Chief Hooley also reported to the media that Terrence threatened the EMTs with a knife.

64.     Defendants Boyle and Finn, as well as EMTs Mentele and MacKinnon, have each made similar statements to investigators about the fatal shooting of Terrence, claiming that Terrence threatened the EMTs with a kitchen knife and that the police officers had to respond with lethal force.

65.     With regard to other crucial facts, however, the statements of Boyle, Finn, Mentele, and MacKinnon are inconsistent. For example, their statements differ about where and when Terrence first allegedly pulled out a knife, where Ms. Coleman was standing during the encounter, and when the EMTs called for assistance.

66.     Further, with respect to the critical claim about the kitchen knife, their statements contradict the first-hand observations of Ms. Coleman, who was the only eyewitness not employed by the City of Boston or BPHC, and who was standing only a few feet away when her son was shot and killed.

67.     After Terrence had been killed, and based on the false statements by Finn, Boyle, Mentele, and MacKinnon, a search warrant was obtained for the Coleman home and executed on October 30, 2016.

68.     During the search, police officers seized a kitchen knife.

69.     Despite the fact that all Defendants claimed that Terrence had threatened the EMTs with a kitchen knife in the foyer outside the apartment, the knife was recovered from inside the apartment.

**The City of Boston and/or BPHC Operate a Flawed Emergency Service System that Misunderstands and Endangers Persons Who Suffer from Mental Illness.**

70.     The City of Boston and/or BPHC have established and operate an emergency services system that fails to provide reasonable accommodations for persons who suffer from mental health disabilities.

71.     The City of Boston and/or BPHC have established and operate a protocol for responding to all incoming 911 calls, including calls to request medical assistance for persons who suffer from mental illnesses.

72.     In February 2016, Defendant Sophia Dyer, M.D., approved and implemented the protocol that, in October 2016, all 911 operators—including Michalowski—were trained and required to follow.

73.     Pursuant to the protocol, 911 operators follow a standard script to obtain basic information from callers.

74.     Based on that information, 911 operators classify calls with 70 "type codes" and enter those codes into the BEMS system.

75.     All responders see the codes for specific calls, and those codes are designed to guide how responders address the situations.

76.     The protocol is divided into sections, and type codes are grouped together within certain sections.

77.  When a 911 operator receives a call concerning a person suffering from a mental illness, the protocol directs the operator to a section for "Altered Mental Status/EDP/Stroke."

78.  The "Altered Mental Status/EDP/Stroke" section of the protocol contains instructions for 911 operators for classifying and responding to 9 types of calls. But only 2 type codes—EDP3 and EDP2—are directly relevant to persons who suffer from mental illnesses. The other type codes that are grouped together under "Altered Mental Status/EDP/Stroke" include codes for diabetic shock, stroke, and overdoses.

79.  The City of Boston, BPHC, and Defendants Evans and Dyer, have established and implemented an irrational and unwarranted policy or practice of grouping persons who suffer from mental illness with persons who experience unrelated emergencies, such as strokes or overdoses.

80.  As a result, the City of Boston and BPHC fail to accommodate persons with mental health disabilities and the special considerations that bear on assisting persons with mental illnesses.

81.  EDP2 is the type code for a call about an emotionally distressed person who is known or reported to be violent or threatening to others. (The code may also apply to a person who has attempted suicide and is currently conscious.)

82.  EDP3 is the type code for a person with a psychiatric history who is reported to be acting unusually or a non-violent, uninjured person who has

14

experienced suicidal ideation. (The code may also apply to a call from a BPD officer who has requested a psychiatric evaluation.)

83.    EDP2 and EDP3 are the only two ways a call to assist a person with a mental health disability could potentially be type coded, and both codes generate a BPD response along with a BEMS response.

84.    When Ms. Coleman called 911 and requested medical assistance for her son, Terrence, who suffered from schizophrenia, Michalowski classified the call with the type code "EDP2," which mischaracterized Terrence as a person who was reportedly violent or posed some danger.

85.    Even if Michalowski had classified the call with the type code "EDP3," the only other type code for mental illness, the call still would have generated a BPD response along with a BEMS response.

86.    By mandating that the BPD respond to all calls concerning persons who suffer from mental illness, the emergency services system that the City of Boston and/or BPHC have established and operate perpetuates discriminatory stereotypes that such persons are violent, and it endangers such persons by inaccurately suggesting to responders that most persons with mental health disabilities pose imminent threats of physical harm.

**The BPD Provides Inadequate Training and Has Discriminatory Policies Concerning Interactions with Persons Who Suffer from Mental Illness.**

87.    Before Defendant Boyle shot and killed Terrence, the City of Boston, Evans, and the BPD knew, or should have known, of the need to provide proper

training for police officers and to establish appropriate policies for their interactions with persons, like Terrence, who suffer from mental health disabilities.

88.     Nearly half of the people killed by Massachusetts police officers in the past 12 years suffered from mental health disabilities.

89.     In recent years, police officers in Massachusetts have shot and killed several people with mental illness, and those incidents received extensive media coverage.

90.     For example, in 2013, Wilfredo Justiniano, Jr. was shot and killed by a Massachusetts State Police ("MSP") trooper who responded to a 911 call for medical assistance. Justiniano suffered from schizophrenia, and he was unarmed at the time of his death.

91.     Later that year, Denis Reynoso was shot and killed by a Lynn Police Department officer who responded to a 911 call for medical assistance. Reynoso was a military veteran who suffered from post-traumatic stress disorder.

92.     About one year before the incident in this case, in 2015, Santos Laboy was shot and killed by a MSP trooper. For several years, Laboy struggled with mental illness, and the trooper claimed that Laboy refused to drop a knife.

93.     Notwithstanding these high-profile police shootings of persons with mental health issues, as of October 2016, the City of Boston and Evans had failed to establish and to implement effective training for BPD officers concerning their interactions with persons with mental illness.

94.    The BPD provides inadequate training for police officers regarding mental health disabilities.  The BPD has only two such training programs, one for new officers and one for veteran officers. Each program is voluntary and runs for only about three hours.

95.    The BPD training programs conflate mental health disabilities with various unrelated physical illnesses and behavior problems, such as heart disease, depression, stroke, drug use, Alzheimer's, anxiety, kidney disease, breast cancer, schizophrenia, autism, HIV/AIDS, PTSD, "youth," dementia, and hoarding.

96.    These training programs inaccurately and discriminatorily imply that all of these various diseases, disabilities, and conditions are similar.

97.    Not every issue covered in the BPD training programs is a disability for purposes of the ADA, and by conflating disparate diseases, disorders, illnesses, and disabilities, both programs imply that only one sort of response is required and appropriate in dealing with all persons in these different circumstances.

98.    Both BPD training programs also use dramatized scenarios that erroneously suggest that all persons who suffer from mental health disabilities are violent and dangerous. For example, to demonstrate proper "de-escalation" techniques, both trainings use a video that ends with police officers drawing their guns and making an arrest.

99.    Both BPD training programs focus in large part on G.L. c. 123, § 12, sometimes known as "pink paper," which authorizes police officers to use emergency

restraints and involuntarily hospitalize persons who suffer from mental illness and poses serious risks of harm to themselves or others.

100.   Both BPD training programs endorse and reinforce baseless and discriminatory stereotypes about people who suffer from mental illness, particularly that they are violent and pose dangers of physical harm.

101.   In an internal BPD interview after he fatally shot Terrence, Defendant Boyle stated that he could not recall receiving any training from the BPD regarding how to respond appropriately to persons who suffer from mental illness.

**BPHC and BEMS Also Provide Inadequate Training and Have Discriminatory Policies Concerning Responding to 911 Calls Involving Persons Who Suffer from Mental Illness.**

102.   As of October 2016, the City of Boston, BPHC, and BEMS knew, or should have known, about the need to provide effective training for EMTs regarding mental health disabilities. Indeed, 911 calls concerning persons who suffer from mental illnesses are one of the most common types of calls for emergency services.

103.   Nevertheless, BPHC and BEMS have failed to establish and to implement effective training for EMTs concerning interactions with persons who suffer from mental illnesses.

104.   BPHC and BEMS provide limited training on responding to calls regarding persons suffering from mental health disabilities, and those programs focus on maintaining the safety of EMTs rather than reasonably accommodating the persons who need medical assistance.

105.   These inadequate training programs erroneously suggest that all persons who suffer from mental illness are violent and dangerous. By focusing only

on patient restraint and "de-escalation," the programs teach EMTs to expect aggressive and erratic persons, and they fail to train EMTs to accommodate the particular needs of persons with mental health disabilities.

106.    The BPHC and BEMS training programs endorse and reinforce baseless and discriminatory stereotypes about people who suffer from mental illness, particularly that they are violent and pose dangers of physical harm.

## CAUSES OF ACTION

### Count One
### (Violation of Fourth and Fourteenth Amendments: Excessive Force)

107.    Ms. Coleman realleges and incorporates each and every allegation contained in the preceding paragraphs.

108.    At all relevant times, Defendants Boyle and Finn were employees of the Defendant City of Boston and acted under the color of state law.

109.    In responding to the 911 call from Ms. Coleman for medical assistance, Defendants Boyle and Finn jointly and in concert used excessive and unreasonable force by forcibly tackling, physically restraining, and fatally shooting Terrence.

110.    By using excessive and unreasonable force against Terrence, Defendants Boyle and Finn deprived Terrence of his clearly established rights under the Fourth and Fourteenth Amendments to the U.S. Constitution to be free from excessive and unreasonable force.

111.    As a result of the excessive and unreasonable force that Defendants Boyle and Finn used, Terrence suffered damages.

**Count Two**
**(Violation of Fourth and Fourteenth Amendments: Unlawful Seizure)**

112.   Ms. Coleman realleges and incorporates each and every allegation contained in the preceding paragraphs.

113.   In responding to the 911 call, Defendants Boyle and Finn unlawfully restrained Terrence by physically preventing him from leaving the Coleman home.

114.   By unlawfully seizing Terrence, Defendants Boyle and Finn deprived Terrence of his clearly established rights under the Fourth and Fourteenth Amendments to the U.S. Constitution to be free from unlawful and unreasonable seizures.

115.   As a result of this unlawful seizure by Defendants Boyle and Finn, Terrence suffered damages.

**Count Three**
**(*Monell* Liability)**

116.   Ms. Coleman realleges and incorporates each and every allegation contained in the preceding paragraphs.

117.   At all relevant times, Defendants Boyle and Finn served as employees of Defendant City of Boston, and they acted in accordance with a policy or custom of Defendant City of Boston.

118.   As described above, Defendants Boyle and Finn violated and caused violations of Terrence's constitutional rights to be free of unlawful seizure and excessive force.

119.   At all relevant times, Mentele, MacKinnon, and Michalowski served as employees of Defendant BPHC, and they acted in accordance with a policy or custom of Defendant BPHC.

120.   As described above, BPHC employees Mentele, MacKinnon, and Michalowski violated and caused violations of Terrence's constitutional rights to be free from unlawful seizure and excessive force.

121.   Despite the obvious need for adequate training for police officers, about responding to 911 calls involving persons who suffer from mental health disabilities and requests for medical assistance, Defendant City of Boston has maintained, and continues to maintain, a policy or practice of providing inadequate training for police officers, .

122.   Despite the obvious need for adequate training for EMTs and EMT dispatch operators about responding to 911 calls involving persons who suffer from mental health disabilities and requests for medical assistance, Defendant BPHC has maintained, and continues to maintain, a policy or custom of providing inadequate training for EMTs and EMT dispatch operators.

123.   At all relevant times, Defendants City of Boston and BPHC knew, or should have known, that there was a need for adequate training.

124.   Nevertheless, Defendant City of Boston provides inadequate training to police officers that promotes baseless and discriminatory stereotypes that persons with mental health disabilities are violent and dangerous; that police officers who

respond to such calls will likely need to use force or restrain these persons; and that such encounters will likely end in arrests.

125.    Likewise, Defendant BPHC provides inadequate training to EMTs and EMT dispatch operators that promotes baseless and discriminatory stereotypes that persons with mental health disabilities are violent and dangerous; that police officers and EMTs who respond to such calls will likely need to use force or restrain those persons, and that such encounters will likely end in arrests.

126.    Defendant City of Boston's policy or practice of providing inadequate and discriminatory training for police officers proximately caused Terrence's injuries and death.

127.    Defendant BPHC's policy or practice of providing inadequate and discriminatory training for EMTs and EMT dispatch operators proximately caused Terrence's injuries and death.

128.    As a result of their deficient training, rather than provide appropriate medical assistance to Terrence, or an appropriate police response, Defendant City of Boston employees Boyle and Finn as well as Defendant BPHC employees Mentele, MacKinnon, and Michalowski escalated the situation, resorted to physical force, unlawfully seized, and fatally shot Terrence, all in violation of his constitutional rights.

129.    As a result of the actions taken by these inadequately trained employees of Defendants City of Boston and BPHC, Terrence suffered damages.

## Count Four
### (Supervisory Liability)

130.    Ms. Coleman realleges and incorporates each and every allegation contained in the prior paragraphs.

131.    By unlawfully seizing and fatally shooting Terrence, Defendants Boyle and Finn violated Terrence's constitutional rights.

132.    At all relevant times, Defendant Evans supervised Defendants Boyle and Finn.

133.    At all relevant times, Defendant Dyer was the Medical Director for BEMS and the BPD, and in that capacity, she also supervised Defendants Boyle and Finn.

134.    Defendants Evans and Dyer knew, or should have known, that in response to 911 calls for emergency services, interactions with persons who suffer from mental health disabilities often result in tragic violence, including the injury and death of such persons.

135.    Defendants Evans and Dyer were deliberately indifferent to the substantial risk of harm to persons, like Terrence, who suffer from mental health disabilities and who are the subject of 911 calls to request medical assistance.

136.    Defendants Evans', and Dyer's deliberate indifference and negligent failure to provide adequate training to and supervision of their employees was a direct and proximate cause of Terrence's injuries and death.

137.    As a result of Defendants Evans' and Dyer's deliberate indifference, Terrence suffered damages.

## Count Five
## (Violation of the ADA – Failure to Accommodate)

138.    Ms. Coleman realleges and incorporates each and every allegation contained in the preceding paragraphs.

139.    Title II of the ADA states, in pertinent part:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or subjected to discrimination by any such entity. 42 U.S.C. § 12132.

140.    Under the ADA, a "public entity" includes state and local governments, their agencies, and their instrumentalities. 42 U.S.C. § 12131(1).

141.    Within the meaning of Title II of the ADA, Defendants City of Boston and BPHC each qualifies as a "public entity."

142.    Under the ADA, the term "disability" includes physical and mental impairments that substantially limit one or more major life activities. 42 U.S.C. § 12102(2). A "'qualified individual with a disability' means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices … meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

143.    At all relevant times, within the meaning of Title II of the ADA, Terrence was a "qualified individual with a disability." Terrence had an impairment that substantially limited major life activities. As a resident of Boston, he was qualified to participate in the programs, services, and activities of the City of Boston

and BPHC, including but not limited to receiving emergency services and other appropriate assistance from EMTs and police officers.

144.   At all relevant times, Defendants City of Boston and BPHC knew, or should have known, that Terrence suffered from mental illness and, therefore, had a disability for the purposes of the ADA.

145.   Defendants City of Boston and BPHC excluded Terrence from participation in or denied him the benefits of a public service, or otherwise discriminated against Terrence, on the basis of his disability, by failing to make reasonable accommodations to address his mental illness.

146.   Acting as employees of Defendant City of Boston and/or BPHC, and in accordance with an official policy or practice, Boyle, Finn, Mentele, MacKinnon, and Michalowski failed to make reasonable accommodations and provide appropriate medical assistance to Terrence, who suffered from a mental health disability, and instead, resorted to deadly violence.

147.   As a result of the failure of Defendants City of Boston and/or BPHC to provide reasonable accommodations, in violation of the ADA, Terrence suffered damages.

**Count Six**
**(Violation of the ADA – Failure to Train)**

148.   Ms. Coleman realleges and incorporates each and every allegation contained in the preceding paragraphs.

149.   Defendants City of Boston and BPHC excluded Terrence from participation in or denied him the benefits of a public service or otherwise

discriminated against Terrence, on the basis of his disability, by failing to train their employees to make reasonable accommodations to serve persons with mental health disabilities.

150.   Had Defendants City of Boston and/or BPHC trained their police officers and EMTs to make reasonable accommodations to provide appropriate medical assistance rather than resort to deadly violence in situations involving persons with mental health disabilities, Terrence would not have been unlawfully seized, shot, and killed.

151.   As a result of the failures of Defendant City of Boston and/or BPHC to train its employees, in violation of the ADA, Terrence suffered damages.

## Count Seven
### (Rehabilitation Act)

152.   Ms. Coleman realleges and incorporates each and every allegation contained in the preceding paragraphs.

153.   Section 504 of the Rehabilitation Act provides, in pertinent part:

> No otherwise qualified individual with a disability in the United States … shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance[.] 29 U.S.C. § 794(a).

154.   Defendants City of Boston and BPHC are recipients of federal financial assistance within the meaning of Section 504 of the Rehabilitation Act, and the services of the BPD and BEMS constitute a "program or activity" that Defendants City of Boston and BPHC provided and provide. 29 U.S.C. § 794(b).

26

155.    Defendants City of Boston and BPHC excluded Terrence from participation in or denied him the benefits of a public service, or otherwise discriminated against Terrence, on the basis of his disability.

156.    Defendants City of Boston and BPHC knew that Terrence had a disability and still failed to reasonably accommodate his disability and as a result he was subjected to discrimination, unnecessarily seized, and unreasonably killed.

157.    As a result of the failure of employees of Defendants City of Boston and/or BPHC to make reasonable accommodations, in violation of the Rehabilitation Act, Terrence suffered damages.

## Count Eight
### (Wrongful Death – Individual Liability)

158.    Ms. Coleman realleges and incorporates each and every allegation contained in the preceding paragraphs.

159.    In responding to a 911 call for medical assistance, Defendants Boyle and Finn owed a duty of care to Terrence.

160.    By seizing and then shooting Terrence multiple times and killing him, Defendants Boyle and Finn, jointly and in concert, engaged in conduct that was intentional, reckless, grossly negligent, or negligent.

161.    By failing to intervene and prevent Defendant Boyle from using unreasonable and excessive force against Terrence, Defendant Finn engaged in conduct that was intentional, reckless, grossly negligent, or negligent.

162.    Defendants Boyle's and Finn's, conduct proximately caused Terrence's death.

163.   Defendant Finn's, failure to intervene, in violation of his duty of care owed to Terrence, also proximately caused Terrence's death.

164.   As a result of Defendants Finn's negligence, the Estate of Terrence Coleman is entitled to damages.

## Count Nine
### (Wrongful Death – Vicarious Liability)

165.   Ms. Coleman realleges and incorporates each and every allegation contained in the preceding paragraphs.

166.   At all relevant times, Defendants Evans, Boyle and Finn acted as employees of Defendant City of Boston.

167.   Because Defendants Evans', Boyle's, and Finn's, negligence proximately caused of Terrence's wrongful death, Defendant City of Boston is vicariously liable for his death.

168.   As a result of Defendants Evans's, Boyle's, and Finn's, negligence in the course of their employment for Defendant City of Boston, the Estate of Terrence Coleman is entitled to damages.

169.   Defendant City of Boston was timely notified of Ms. Coleman's intent to bring suit under G.L. c. 258, § 2, because pursuant to G.L. c. 258, § 4, Ms. Coleman mailed a presentment claim form letter to Corporation Counsel for the City of Boston on April 4, 2018.

**Count Ten**
**(Loss of Consortium)**

170.    Ms. Coleman realleges and incorporates each and every allegation contained in the preceding paragraphs.

171.    As a result of Defendants Evans', Boyle's, and Finn's negligence, which led to Terrence's wrongful death, Ms. Coleman has suffered a loss of his society and companionship.

172.    As a result of Defendants Evans', Boyle's, and Finn's, negligence, Ms. Coleman has suffered damages; she has been deprived of the full enjoyment of the parent-child relationship, has suffered a loss of comfort, solace, and moral support, and her social and recreational life has been curtailed.

**Count Eleven**
**(Intentional Infliction of Emotional Distress)**

173.    Ms. Coleman realleges and incorporates each and every allegation contained in the preceding paragraphs.

174.    By unlawfully seizing and fatally shooting Terrence, an unarmed, non-violent person who suffered from mental illness, Defendants Boyle and Finn, jointly and in concert, engaged in conduct that was extreme, outrageous, and beyond all possible bounds of decency.

175.    Ms. Coleman was present, in the foyer area by the front door of the family home, when Defendant Boyle shot and killed her son, Terrence.

176.    As an eyewitness to the fatal shooting of Terrence by Defendant Boyle, Ms. Coleman suffered emotional distress.

177.   Defendants Boyle and Finn should have known that their seizure and killing of Terrence would likely cause emotional distress to Ms. Coleman.

178.   Defendants Boyle's and Finn's extreme and outrageous conduct proximately caused Ms. Coleman's emotional distress.

179.   By making statements that Terrence threatened EMTs with a knife, and by telling the media that the BPD officers had no choice but to use deadly force against him, which they knew were false allegations, Defendant Evans engaged in conduct that was extreme, outrageous, and beyond all possible bounds of decency.

180.   Defendant Evans knew or should have known that his false, public statements about Terrence's death would likely cause emotional distress to Ms. Coleman

181.   Defendant Evans' extreme and outrageous conduct proximately caused Ms. Coleman's emotional distress.

182.   Ms. Coleman's emotional distress has been, and continues to be, severe, and no reasonable person could be expected to endure such distress, including but not limited to anxiety, depression, difficulty breathing, sleep deprivation, loss of appetite, and subsequent weight loss.

183.   As a result of Defendants Evans', Boyle's, and Finn's actions, Ms. Coleman suffered damages.

## Count Twelve
### (Negligent Infliction of Emotional Distress)

184.   Ms. Coleman realleges and incorporates each and every allegation contained in the preceding paragraphs.

185.    In responding to a 911 call for medical assistance, Defendants Boyle and Finn owed a duty of care to Terrence.

186.    By unreasonably seizing and fatally shooting Terrence, an unarmed, non-violent person who suffered from mental illness, in the presence of Ms. Coleman, who witnessed her son's wrongful death, Defendants Boyle and Finn, jointly and in concert, engaged in negligent conduct that breached their duty of care to Terrence.

187.    By failing to intervene and prevent Defendant Boyle from using unreasonable and excessive force on Terrence, Defendant Finn engaged in negligent conduct that breached his duty of care to Terrence and led to Terrence's death.

188.    As an eyewitness to the fatal shooting of Terrence by Defendant Boyle, Ms. Coleman suffered emotional distress.

189.    Any reasonable person in Ms. Coleman's situation would have suffered emotional distress.

190.    Defendants Boyle and Finn proximately caused Ms. Coleman's emotional distress, including but not limited to anxiety, depression, difficulty breathing, sleep deprivation, loss of appetite and subsequent weight loss.

191.    As a result of Defendants Boyle's and Finn's, negligence, Ms. Coleman suffered damages.

### Count Thirteen
### (Negligence)

192.    Ms. Coleman realleges and incorporates each and every allegation contained in the preceding paragraphs.

193.   In responding to a 911 call for medical assistance, Defendants Boyle and Finn owed a duty of care to Terrence, an unarmed, non-violent person who suffered from mental illness and needed medical assistance.

194.   By unlawfully seizing and fatally shooting Terrence, rather than attempting to de-escalate the situation, providing appropriate medical attention to Terrence, and reasonably accommodating his mental health disability, Defendants Boyle and Finn breached their duty of care to Terrence.

195.   By breaching their duty to Terrence, Defendants Boyle and Finn proximately caused harm to Terrence, including his wrongful death.

196.   As a result of Defendants Boyle's and Finn's negligence, Terrence suffered damages.

## Count Fourteen
## (Assault and Battery of Terrence)

197.   Ms. Coleman realleges and incorporates each and every allegation contained in the preceding paragraphs.

198.   By using excessive and unjustified force against Terrence, Defendants Boyle and Finn, jointly and in concert, intentionally and without justification or excuse caused Terrence to suffer physical injuries.

199.   As a result of Defendants Boyle and Finn's unjustified physical battery of Terrence, he suffered damages.

32

## Count Fifteen
## (Assault and Battery of Ms. Coleman)

200.    Ms. Coleman realleges and incorporates each and every allegation contained in the preceding paragraphs.

201.    By drawing his weapon in an unnecessary and unreasonable display of and use of force, while Ms. Coleman was only a few feet away from him, Defendant Boyle intentionally and overtly placed Ms. Coleman in reasonable apprehension of immediate physical battery.

202.    By rushing into the foyer of her apartment building and pushing Ms. Coleman to the ground, Defendants Boyle and Finn, jointly and in concert, intentionally and without justification or excuse, battered Ms. Coleman and caused her to suffer physical injuries.

203.    As a result of Defendants Boyle and Finn's unjustified physical battery of Ms. Coleman, she suffered damages.

**WHEREFORE**, Ms. Coleman requests that this court:

a.    Award compensatory damages against all Defendants;

b.    Award punitive damages against Defendants Evans, Dyer, Boyle and Finn;

c.    Award the cost of this action, including reasonable attorney's fees; and

d.    Award such other relief as this Court may deem necessary and appropriate.

## JURY DEMAND

Ms. Coleman demands a jury trial on all counts so triable.

33

Respectfully submitted,

**HOPE COLEMAN**

By her attorneys,

_____*/s/ William W. Fick*_____

Daniel N. Marx (BBO# 674523)
William W. Fick (BBO# 650562)
Rebecca N. Chapman (BBO# 694052)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
dmarx@fickmarx.com
wfick@fickmarx.com
rchapman@fickmarx.com


Oren Sellstrom (BBO# 569045)
Sophia L. Hall (BBO# 684541)
Lawyers for Civil Rights
61 Batterymarch Street, 5th Floor
Boston, MA 02110
(617) 984-0274
osellstrom@lawyerscom.org
shall@lawyerscom.org

Dated:  March 5, 2019

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants March 5, 2019.

_____*/s/ William Fick*_____

34