UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HOPE COLEMAN, individually and as the legal representative of the ESTATE of TERRENCE J. COLEMAN, <br>       Plaintiff, <br><br>     v. <br><br> CITY OF BOSTON *et al.*, <br>       Defendants. | No. 18-cv-10646-MLW |

**PLAINTIFF HOPE COLEMAN'S MOTION FOR SANCTIONS AGAINST
DEFENDANT CITY OF BOSTON FOR DISCOVERY VIOLATIONS
AND INCORPORATED MEMORANDUM OF LAW**

Pursuant to Federal Rules of Civil Procedure 16(f) and 37(b)(2), Plaintiff Hope Coleman hereby files this Motion seeking sanctions for repeated discovery violations by Defendant City of Boston. Specifically, Ms. Coleman requests that the Court: (1) direct that certain designated facts be taken as established for purposes of this action; (2) order the completion of the City's Rule 30(b)(6) deposition under the Court's "live" supervision; (3) impose financial sanctions to compensate Ms. Coleman for attorneys' fees and expenses incurred litigating these discovery matters; and (4) grant any further relief the Court deems appropriate. She requests a hearing in this matter.

**BACKGROUND**

On October 30, 2016, Defendant Garrett Boyle, an officer with the Boston Police Department ("BPD"), shot and killed Terrence Coleman, a 31-year-old African-American man living with mental illness, outside the Coleman family home. Boyle and Defendant Kevin Finn, another BPD officer, had responded to a 911 call from Plaintiff Hope Coleman, who requested an ambulance to transport Terrence, her son, to Tufts Medical Center for medical attention. There is no body camera or other footage of the fatal shooting; only the accounts of five witnesses: Ms. Coleman, Defendants Boyle

and Finn, and Kyle MacKinnon and Terrence Mentele, EMTs with Boston Emergency Medical Services ("BEMS"), who also responded to the 911 call.

Ms. Coleman was interviewed by BPD detectives immediately after the shooting, at 2:29 am, at the hospital, just minutes after finding out her son had passed away. In that recorded interview, Ms. Coleman unequivocally stated that she witnessed the entire incident, that Terrence did not have a knife or any other weapon, and that he posed no threat to the officers, EMTs, or anyone else, when Boyle shot and killed him. Nevertheless, the following day – before the officers or EMTs had been interviewed – Defendant William Evans, then-Commissioner of the BPD, went in front of the news media and publicly reported that Terrence had violently attacked the EMTs with a "large knife," requiring the officers to use deadly force against him. D.E. 62 ¶ 62.

Meanwhile, investigators from the BPD's Firearms Discharge Investigation Team ("FDIT") waited several days to interview Boyle, Finn, and the EMTs. During that period, the investigators failed to separate the witnesses, collect their electronic devices (or any relevant communications on those devices), or instruct the officers and EMTs not to communicate with each other about the incident. To the contrary, all four individuals were represented by the same union and the same law firm, and they convened in person prior to their formal interviews. During the ensuing interviews, in the presence of their attorneys, the officers and EMTs all told versions of the same story: Terrence attacked them with a knife, so Boyle had to shoot and kill him.

The BPD's handling of the aftermath of the shooting encouraged collusion between the officers and the EMTs to produce the false narrative that Terrence attacked the EMTs with a knife. Not only did Evans almost immediately tell the media Terrence was armed with a knife, and not only were the officers and EMTs given several days to communicate and align their stories, but within a few days of the shooting, the BPD re-issued firearms to Boyle and Finn. This happened before the officers had even been interviewed, and before any preliminary investigative findings could have been

made. Further, even though the BPD deemed Boyle and Finn medically and psychologically fit to carry weapons, it nevertheless placed both officers on "leave," supposedly due to injuries they sustained.

Much of the discovery at issue in this Motion concerns the City's inadequate investigation of the shooting, failure to discipline the officers, almost immediate re-issuance of firearms to them, and the as-yet unexplained decisions about their "leave" status and later return to work. These post-shooting events are relevant to Ms. Coleman's claims against the City and other defendants because they bear on the credibility of Boyle, Finn, and Evans. Separately and independently, they also serve as evidence of the culture, pattern, and practice at the BPD prior to the shooting. *See Bordanaro v. McLeod*, 871 F.2d 1151, 1167 (1st Cir. 1989) ("Post-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right"); *Kibbe v. Springfield*, 777 F.2d 801, 806 (1st Cir. 1985) (police chief's failure to make changes in practice in the aftermath of incident permitted inference that officers' actions were "'the way things are done and have been done in the City of Borger' and thus reflected city policy") (citing with approval and discussing *Grandstaff v. City of Borger,* 767 F.2d 161, 171 (5th Cir. 1985)).

## PROCEDURAL HISTORY

The City has failed, for years, to meet its discovery obligations in this case. *See* D.E. 114 at 2, 5, 16-22 (detailing late production of documents and inadequate preparation of Rule 30(b)(6) witnesses). After exhausting her available alternatives, on March 18, 2022, Ms. Coleman moved to compel the production of certain documents and to re-open the City's Rule 30(b)(6) deposition and Evans' deposition. *See* D.E. 114.

On September 15, 2022, after hearing argument, this Court allowed Ms. Coleman's motion and ordered as follows:

> defendants shall: (a) produce all documents concerning the discussions defendants
> Boyle and Finn had with the [BPD] evaluators regarding their fitness to return to duty;

3

(b) produce all documents concerning training for the BPD's Firearm Discharge Investigation Team ("FDIT"); (c) produce all documents concerning the policies, practices, or training concerning the return of firearms to police officers following shootings resulting in death, and all documents concerning the reissuance of firearms to Boyle and Finn, including, but not limited to, the related applications for licenses to carry firearms and documents related to Exhibit 1 of the Motion [D.E. 114-1]; and (d) identify one or more witnesses sufficiently knowledgeable to answer questions on the issues of (i) the FDIT investigation of Boyle and Finn, (ii) the finding that Boyle and Finn were fit to return to duty and the reissuance of firearms to them, and (iii) whether the BPD has ever reexamined its Rule 303 concerning the use of deadly force.

D.E. 127 ("the September 15 Order") ¶ 3. The need to re-open depositions was based on the inadequate preparation and knowledge of the City's Rule 30(b)(6) witnesses, *see* D.E. 114 at 19-20,[1] and the City's late production of documents, such that Ms. Coleman did not have relevant documents when she deposed the witnesses. *See* D.E. 130 at 35 (discussion of Ms. Coleman's inability to question Evans concerning D.E. 114-1, the re-issuance of firearms documents[2]).

During the hearing, the Court directed the parties to its recent decision in *Red Wolf Energy Trading, LLC v. Bia Cap. Mgmt.*, LLC, No. CV 19-10119-MLW, 2022 WL 4112081 (D. Mass. Sept. 8, 2022). *See* D.E. 130 at 37-38. It ordered the parties to report back to the Court on September 28, 2022, and October 12, 2022. D.E. 127, which they did.

On September 29, 2022, the City requested an extension of the time until October 4, 2022, to respond to the Court's order and to supplement its discovery production, D.E. 132, which the Court allowed. D.E. 133. Then, the City requested Ms. Coleman's assent to extend the deadline to complete its Rule 30(b)(6) deposition until December 12, 2022, on the ground that the City had new counsel (its fourth and fifth attorneys assigned to this case since inception) and needed two additional months

---

[1] Ms. Coleman corrects the following mistake in the discussion of cases at D.E. 114 at 19: *Calzaturficio S.C.A.R.P.A., v. Fabiano Shoe Co.,* 201 F.R.D. 33, 36 (D. Mass. 2001), was authored by Magistrate Judge Collings.

[2] Ms. Coleman refers to D.E. 114-1 as the "re-issuance forms" or "re-issuance documents" – the internal documents by which the BPD, and Evans personally, authorized the re-issuance of firearms to Boyle and Finn as early as November 2, 2016.

to prepare its Rule 30(b)(6) witnesses. Ms. Coleman reluctantly agreed to the extension of the fact discovery deadline to December 12, 2022, which the Court adopted. *See* D.E. 139, 140. The City is now seeking a further extension to January 9, 2023, D.E. 141, which Ms. Coleman opposes. *See* D.E. 142.

With regard to document discovery, the September 15 Order required the City to produce: the BPD's medical and psychological evaluations of Boyle and Finn, Sept. 15 Order ¶ 3(a); all documents accompanying the firearm re-issuance forms, D.E. 114-1, including any "attached sheet[s]" concerning supposed physical/mental health exams and the "IAD records and other information supplied" to BPD officials who signed the forms, *see id.* ¶ 3(c); and the officers' applications for licenses to carry firearms as private citizens, *see id.* As of this filing, the City has produced some of the ordered documents but failed to produce all of them, as discussed more fully below.

With regard to its Rule 30(b)(6) deposition, the City designated Evans to answer questions concerning topics (ii) and (iii) of the September 15 Order ("whether the BPD has *ever* reexamined its Rule 303 concerning the use of deadly force" (emphasis added), and the BPD's decisions concerning Boyle and Finn's return to work and the re-issuance of firearms to both officers), and Detective Thomas Pratt to address topic (i) (the FDIT investigation of the fatal shooting).

On December 6, 2022, the City produced Evans for deposition,[3] but Evans repeatedly admitted that he could not answer questions and had not prepared to testify on the City's behalf, as discussed further below. Moreover, despite the deadline to complete fact discovery by December 12, 2022, which the City proposed, the City has not yet produced Pratt to answer questions about the FDIT investigation of the Coleman shooting.

---

[3] Evans testified in both in his personal capacity and on the City's behalf, pursuant to Fed. R. Civ. P. 30(b)(6).

**ARGUMENT**

I.    **THE CITY VIOLATED THE COURT'S ORDERS AND THE DISCOVERY RULES BY FAILING TO PRODUCE ADEQUATELY PREPARED RULE 30(b)(6) WITNESSES, FAILING TO PRODUCE DOCUMENTS, AND DELAYING THE PRODUCTION OF DOCUMENTS.**

   A.    **The City failed to prepare Evans to testify and failed to produce Pratt.**

Since the Court's September 14 and 15 orders and its subsequent order adopting the jointly proposed fact discovery deadline of December 12, the City has produced one deponent (Evans) who was so ill-prepared as to defeat the purpose of the Rule 30(b)(6) deposition, and it has failed to produce the other deponent (Pratt).

First, the City designated Evans to address the BPD's re-evaluation and re-examination of Rule 303. Yet when Evans appeared for the Rule 30(b)(6) deposition, he was not aware of major changes to Rule 303 in 2020, the basis for those changes, or even that he would be asked to address the re-examination of Rule 303.

> Q. [Showing the witness the 2020 revision of Rule 303] Are you familiar with this?
> A. No.
> Q. Have you ever seen this document before?
> A. No. I left in 2018.
> Q. Did you review any documents since 2018 in preparation to testify on the City's behalf?
> A. No. This is the first time I've seen this, when I was provided this this morning. I have not read it.
> Q. The bold language on here is new; is that fair to say?
> A. I don't know. I haven't looked at it.... Like I said, I just got this about 15 minutes ago.
> Q. Are you aware that you are testifying on the topic of the evolution and reevaluation of Rule 303?
> MS. BOSTWICK: Objection.
> A. I did not know I was going to talk about the evolution of the rule. I knew I was going to speak about the rule.

Tr. at 11-13, attached as Exhibit A.

With regard to the requirements in the new version of Rule 303 that officers attempt to de-escalate when feasible and consider whether subjects' non-compliance may be due to mental illness or other circumstances, Evans was unable to speak to the reasons for the changes.

> Q. [The 2020 version of Rule 303] says, "Prior to using physical non-deadly and/or deadly force, all Boston police officers, when possible and feasible, will use proper de-escalation techniques to decrease the likelihood that officers will need to utilize use of force, and to minimize the level of force required," do you see that?
> A. Yes.
> Q. Was there a BPD policy on de-escalation in 2016?
> A. This policy was not in effect.
> Q. Was there a policy, a different policy, on de-escalation prior to this?
> A. Well, Rule 303 speaks to de-escalation in the sense that you meet the continuum of force. So if someone has different weapons coming at you, the rule specifies that you can use nonlethal force or lethal force. So that is inherent in that policy on how to use de-escalation tactics. . . .
> . . . .
> Q. In 2016, were officers required to de-escalate?
> MS. BOSTWICK: Objection
> A. Always by the letter of the law, by the letter of the policy. If someone -- the policy implies if someone was coming at them with their hands, they weren't authorized to use deadly force. So this de-escalation policy was implied in Rule 303 and 304, and that's the way the officers were trained in the academy.
> Q. So my question is, were they required to use de-escalation when possible and when feasible?
> MS. BOSTWICK: Objection.
> A. Absolutely. We were always taught if we didn't have to use deadly force, that would be a last resort.
> Q. Where was that rule written down?
> A. It's in Rule 303. The only time you can use deadly force is when you are met with the threat of deadly force or someone else is in imminent danger of great bodily harm or deadly force. It's clearly in Rule 303, and normally the force clearly spells it in 304.
> Q. And if in that situation an officer was met with a certain amount of force and could either respond with force or de-escalate, in 2016 did the BPD require the officer to attempt to de-escalate when possible and when feasible?
> MS. BOSTWICK: Objection.
> A. We always trained our officers that if they are not met with lethal force, then they shouldn't be using Rule 303. I always thought we used a lot of restraint. That was taught in the academy, and it's clearly spelled out in the rules that if someone is unarmed, you do not use deadly force. There's no doubt about it.
> . . . .
> Q. What caused the BPD to change its policy [to add the de-escalation requirement]?
> MS. BOSTWICK: Objection.
> A. I have no clue why. I can guess. You know, I can guess what it was, but I was not involved in the BPD. I left in August of 2018. I don't know what discussions took place to change the policy. You know, I can guess, but it's just -- I had no input to it.

Q. What did you do in your capacity as a witness on behalf of the City to prepare to answer questions about this?
MS. BOSTWICK: Objection.
A. You know, I met with the City's attorneys two days ago. Again, like I said to you earlier, I printed this morning the two exhibits that were given to me. I just briefly looked at them before I got on the Zoom call.

Tr. at 13-18.

Evans was similarly unable or unwilling to answer questions concerning the change in the new version of Rule 303 that requires officers to "us[e] effective communication techniques to engage with individuals who are not compliant with orders by establishing rapport, asking questions and providing advice to defuse[sic] conflict and achieve voluntary compliance before resorting to force options," Ex. B[4] at COB 6398:

Q. Why were those things added to the rule?
MS. BOSTWICK: Objection.
A. I have no idea. I was long gone by then.
Q. What have you done as a witness on behalf of the City to determine why the City added this language?
A. Nothing.

Tr. at 22.

The same was true concerning the BPD's requirements, added in 2020, that officers attempt to determine whether an individual's non-compliance may be due to mental illness, drug intoxication, or other factors beyond the individual's control, before resorting to deadly force. *See id.* at 26-27; Ex. B at COB 6398. With regard to the addition of language in Rule 303 that permits officers to "disengage," if subjects are not interested in police interventions or assistance, *see id.*, Evans testified:

Q. What caused the change?
A. I have no clue. Again, I can speculate, but I wasn't involved in the discussions.
Q. Did you do anything to learn about the changes?
A. Not within the Boston Police Department, no.

_____

[4] Exhibit B, the 2020 amendment to Rule 303, was originally designated as "confidential" by the City under the Protective Order. By email dated December 23, 2022, the City agreed to withdraw that designation so as to permit the public filing of the document.

Tr. at 28-29.

The City has stated that it was not aware Ms. Coleman wished to ask questions about the re-evaluation of Rule 303 subsequent to Evans' tenure. *See* Ex. C. But this Court's September 15 order was unambiguous, directing the City to "identify one or more witnesses sufficiently knowledgeable to answer questions on … whether the BPD has *ever* reexamined its Rule 303 concerning the use of deadly force" (emphasis added).

Even apart from this Court's order, it was unreasonable for the City to have expected the Rule 303 "reexamin[ation]" topic, Sept. 15 Order ¶ 3, to be limited to changes in or before 2018. In fact, the line of questioning that Det. Pratt initially failed to address – the ground for Ms. Coleman's motion to compel – concerned updates subsequent to the 2003 version, which was in effect in 2016. *See* Pratt Tr., D.E. 114-6, at 45-7. Ms. Coleman asked the witness whether the 2003 version of Rule 303 was "the most up-to-date version," to which the witness stated (erroneously) that he thought it was. *Id.* at 45. Ms. Coleman then inquired "'whether ... Rule 303 has *ever* been ... reevaluated or reexamined to be updated" and "when *the most recent time* was that it was reevaluated or reexamined,'" questions the witness was unable to answer. D.E. 114 at 15 (quoting Pratt Tr. at 46-47) (emphasis added); *see also* D.E. 130 at 48 (discussing at Sept. 14 hearing the question "whether Rule 303 had ever been reexamined"); *id.* at 54-55 (Plaintiff explaining that she was interested in "remedial measures" and "whether [the City] ha[d] looked into problems and become aware of problems in the implementation of that rule"). These questions sought information about subsequent measures the City had undertaken to respond to the crisis of police violence against mentally ill individuals, especially persons of color. Moreover, the City produced the 2020 amendment in discovery. It is only logical that Ms. Coleman would ask the "re-examination" witness questions about the documents.

Finally, the City's assertion that "Evans was not qualified to answer any questions about any BPD rule or regulation after he left BPD nor would any other police commissioner," Ex. C, only

underscores the fundamental deficiency in the City's approach to its Rule 30(b)(6) depositions: it is obligated to prepare a witness to speak to "information known or reasonably available to the organization" – not simply information the witness is personally "qualified" to speak to based on personal knowledge. Fed. R. Civ. P. 30(b)(6). Through nine different witnesses, the City has failed to live up to that obligation.

As the City's Rule 30(b)(6) witness, Evans was not even prepared to answer questions about any substantive revisions to Rule 303 *during his own tenure* or whether/where any such revisions may have been written down:

> Q. [W]as the rule revised during your tenure as Commissioner?
> A. I'm sure they looked at it numerous times, but I can't be sure if there was any revisions. You know, again, I was the Commissioner from 2013 to 2018. I am not sure for sure. You know, looking at these notes, I would say no, but I'm not sure if there were any revisions to it or if there was any talk of revisions.... You know, to the best of my recollection I can't be sure. I can look at what is on paper, but I'm not sure if there were any internal changes internal changes to the rule that didn't happen to make it to the paper. I'm not sure.

*Id.* 6-7. Similarly, in response to the question whether the BPD "conduct[ed] any assessment of Rule 303 prior to the[] [2020] changes," Evans testified:

> A. I have no knowledge of that.
> Q. Did you do anything to find out?
> A. I did not.

*Id.* at 35.

Second, the City designated Evans to address the topic of Boyle's and Finn's leave after the shooting, their return to work, and the re-issuance of firearms to both officers, along with related documents the BPD had produced. The issues of leave status, fitness to return, and re-issuance of firearms are relevant to the BPD's investigation of the shooting, BPD's collusion in the aftermath of Terrence's death, and the credibility of the officers' claims of physical injury and/or psychological trauma as a result of the alleged altercation with Terrence.

Ms. Coleman's understanding, based on imperfect and incomplete information from the City (and the officers themselves), is that Boyle and Finn went out "on leave" shortly after the shooting, and remained out for several weeks (in Finn's case) and several months (in Boyle's case) due to purported injuries that they had suffered. But the available medical records do not document any serious injuries, and the BPD produced internal forms purporting to clear the officers, physically and mentally, to be re-issued firearms as of November 2, 2016, three days after the shooting. *See* D.E. 114-1. Those re-issuance forms contain attestations that each officer had been medically and psychologically cleared by the Occupational Health Services Unit and also cleared by the Internal Affairs Department ("IAD"). *See id.*

A primary subject of Ms. Coleman's Motion to Compel was how these BPD re-issuance forms came to be signed on November 2, 2016, apparently at the behest of Pat Rose, the former President of the BPD's police union, *see* D.E. 114 at 7, 10; whether the medical and investigative documents supposedly attached to the re-issuance forms actually exist; and if they do, what they say. Yet even though Evans himself signed the re-issuance forms, and he should have further prepared to address the documents as the City's Rule 30(b)(6) designee, he was unable to provide useful information. For example, when asked why, for each officer, there are two re-issuance forms, signed on different dates, *see* D.E. 114-1, Evans testified:

> A. I don't know. Maybe one was a preliminary firearm going back to them, and then maybe the next one was a more permanent firearm. Again, I'm looking at the forms. I don't recall why this took place.
> Q. Did you do anything to find out?
> A. I did not.

Tr. at 53-54.

With regard to the IAD and FDIT aspects of the re-issuance of weapons, Evans was unable to answer questions about: what process, if any, was followed to clear the officers to receive weapons, what the "IAD information presented to me" (referenced in the forms Evans personally signed, D.E.

114-1) consisted of, or whether *any* IAD, FDIT, or other investigative procedure had actually taken place as of November 2, 2016. He did not know whose signature appeared on the forms on behalf of Internal Affairs, *see* Tr. at 47-48 ("A. . . . it's a tough signature. I don't want to say whose it is. Q. Did you do anything to find out in preparation for today's deposition? A. I did not.").

When shown the firearms re-issuance documents, signed by him on November 2, 2016, *before the officers were interviewed by FDIT or IAD*, Evans testified:

> Q. And you said that you assumed that someone had looked at IAD records prior to this document coming across your desk? [discussing D.E. 114-1]
> A. You know, I don't assume. I'm sure they read all the reports and looked at everything they had to before they gave this to me.
> Q. And what were those reports? Remember, the document was signed on November 2nd . . . .
> A. I don't know. I don't know what they looked at.
> Q. Do you know if there were any reports that were written prior to November 2nd?
> A. I'm sure there was.
> Q. And what report would that be?
> MS. McATEER: Objection.
> A. I am sure the incident report, for one.
> Q. Is that an IAD record?
> A. Well, it would go to IAD, but I don't know if IAD writes records. I don't know what they did.
> Q. But your testimony is that the person who signed this document -- and you don't know who that person is -- that that person looked at IAD records?
> MS. McATEER: Objection.
> A. I can't speak for them. All I can speak to is they signed the record.
> Q. And on behalf of the City, did such IAD records exist when this form was signed?
> MS. McATEER: Objection.
> A. I don't know.
> Q. What have you done to find out?
> A. Nothing. Again, I'm far removed from something that happened seven years ago.
> Q. Did you know that you are testifying under oath as a witness for the City and the Police Department?
> MS. McATEER: Objection.
> A. Yes.
> Q. And that that requires you to learn information that you did not personally know?
> MS. McATEER: Objection.
> A. I don't have access to those records.

Tr. at 70-71.

12

Even with regard to the BPD's re-issuance process *in general,* Evans gave conflicting and incoherent answers about what investigative findings were required before the re-issuance of weapons to officers involving in a fatal shooting:

> Q. Can you tell me generally after an officer-involved shooting how the process for reissuing firearms to officers is supposed to work?
> MS. McATEER: Objection.
> A. Well, from the best of my recollection, the officer after a shooting has his handgun taken. There's a preliminary investigation done by the FDIT team along with Internal Affairs where they make a preliminary finding, and based on the preliminary finding, you know, with the District Attorney's Office, who would be Dan Conley, a fitness-to-return-to-duty decision is made, or issuing back his firearm is made under the totality of the whole circumstance.
> Q. And you said it's made based on the FDIT finding?
> A. Not on the FDIT finding, on the preliminary investigation.
> Q. By the FDIT team and the DA?
> A. No. I think by Internal Affairs in conjunction with the FDIT team. The DA will do a separate criminal investigation.
> Q. So who are the different players who should evaluate the officer and the situation before the firearms are reissued?
> MS. McATEER: Objection.
> A. Well, Internal Affairs, the FDIT team, and our human resource department.

Tr. at 39-40.

As the City's Rule 30(b)(6) witness, Evans could not identify the documents that accompanied the re-issuance forms, which he signed, D.E. 114-1, nor could he describe the administrative process that the documents supposedly reflect:

> Q. [Showing witness the firearms re-issuance documents] And do you see where there's a checkmark next to the box that says, "Occupational Health Services Unit reports that the above officer has passed a physical/medical and/or psychological exam, and may carry a firearm without restrictions"?
> A. I see it.
> Q. Then it says, "(see attached sheet)"?
> A. Where does it say that? (Examines document) Oh, yes. Got it. I was looking at the wrong place.
> Q. Where is the attached sheet to which that notation refers?
> A. I'm not sure.
> Q. Did you do anything to find out before you came to testify today?
> A. I just had this form in front of me. I only went with what I had in front of me.
> Q. So as you sit here today, do you know on behalf of the City what attached sheet is supposed to accompany this form?

A. I know I got other paperwork. It could be one of those forms, but it's not attached to the sheet I had.

Q. Is there supposed to be a specific form?

A. I don't know.

Q. And in this case, is it true that Occupational Health Services reported that the officer had passed a physical or psychological exam?

MS. McATEER: Objection.

A. Based on the form I'm looking at, the box is checked.

. . . .

Q. And in preparation for your deposition today as a witness for the City, did you do anything to figure out what in fact happened in the process in this case?

A. I did not.

Q. Were you aware that you were going to testify on this issue?

A. I received this document, and I was aware I was going to have to speak on the document.

Q. And were you aware you were going to have to speak about any information known by the Boston Police Department, not just information that you personally were aware of?

MS. McATEER: Objection.

A. I was not aware of that. I was given this document to look at, and that's the – that's all I did.

Tr. at 41-44.

Evans was unable to provide any information about the BPD's mental/psychological fitness evaluations of Boyle and Finn. When shown documents concerning Finn's medical/psychological evaluation, *see* Sealed Ex. D, Evans testified:

A. This is the first time I seen this.

Q. On the bottom right-hand side, do you see the date, and then underneath it says, "per Nancy Driscoll"?

A. I see her name, yes.

Q. What does that mean to be dated ["]per Nancy Driscoll["]?

A. It means she seen this document and she's signing.

Q. Meaning she added the date or she added the signature on the left?

MS. McATEER: Objection.

A. I don't know what that means.

Q. Did you do anything to find out what happened in terms of clearing the officers in this case?

MS. McATEER: Objection.

A. This is the first time I seen this document. I don't usually go down to the level of looking at all this paperwork.

Q. And in your capacity as a designee for the City, did you do anything to find out what happened in terms of clearing the officers to return to work?

A. I signed the final form that you showed me earlier, and that was about the extent.

14

Tr. at 57-58. Given Evans' complete lack of knowledge, either personally or as the City's designee, Ms. Coleman did not bother to show him additional documents about Boyle's medical/psychological evaluation. *See* Sealed Ex. E.[5]

Although additionally designated as the City's Rule 30(b)(6) witness to address the officers' leave and return to work, *see* Sept. 15 Order ¶ 3(d)(ii), Evans was unable to answer basic questions:

> Q. On what date was Officer Finn cleared as fit to return to duty?
> MS. McATEER: Objection.
> A. Based on the paperwork I'm looking at, November 2nd of 2016.
> Q. And what was that clearance based on?
> A. I don't know.
> Q. And when did Officer Finn actually return to duty?
> A. I don't know.
> Q. Do you know if he returned to duty on November 2, 2016?
> A. I know the paperwork says that. I don't know if he needed more time because of the trauma of the incident, so I can't tell you when he physically returned to duty. I know the paperwork says 11/2, but if he was dealing with the Stress Unit [sic] or other matters, I'm not really sure when physically he did go back to duty.
> Q. Do you know what his status was in the interim?
> A. According to this, it says, "Full duty as of: 11/2," and I'm sure before that time he was on administrative duty with pay.
> Q. And between 11/2 -- because I can represent to you that he did not actually return to work on 11/2 -- between 11/2 and the date on which he did return, what was his status?
> MS. McATEER: Objection.
> A. According to this, he's back full duty.
> Q. So the testimony on behalf of the City is that Officer Kevin Finn returned to active duty on November 2, 2016; is that right?
> MS. McATEER: Objection.
> A. I'm not saying he returned to active duty. His status says, "Full duty." I'm not saying he was physically active back on patrol. I have no knowledge of that.
> Q. What have you done to figure out what the officers' leave status was and when they returned to work?
> MS. McATEER: Objection.
> A. Again, this is the first time I have seen this form [Sealed Ex. C]. I just looked at the paperwork in front of me. I did no investigation on anything further.

Tr. at 58-60.

---

[5] Ms. Coleman contemporaneously files under Seal Exhibits D and E, comprising the BPD's medical and psychological evaluations of Finn and Boyle.

**B.     The City failed to produce documents and prejudiced Ms. Coleman by its late production of documents.**

While the City produced some documents comprising the BPD's evaluation of the officers' fitness to return to duty, pursuant to ¶ 3(a) of the September 15 Order, *see* Sealed Exs. D & E, the City failed to produce: documents (or testimony) sufficient to establish who signed the "Duty Status Sheet" for Finn, Sealed Ex. D at COB 6206, or why that document is dated "November 2, 2016[,] per Nancy Driscoll," *id.*; the "psychological/FFD evaluation [of Finn] by Dr. Robert Mullaly," *id.* at COB 6207; documents showing *any* medical or psychological evaluation of Boyle prior to December 8, 2016, *see* Sealed Ex. E, notwithstanding the attestation on November 2, 2016, *see* D.E. 114-1; or the "attached sheets" from the Occupational Health Services Unit that supposedly accompanied the firearms re-issuance forms, D.E. 114-1, to confirm that the officers had "passed . . . physical/medical and/or psychological exam[s]."

Further, pursuant to ¶ 3(c) of the September 15 Order, the City produced several pages of records concerning the re-issuance of firearms to Boyle and Finn after the shooting, but none of these comprised the "IAD records and other information supplied to" Internal Affairs, referenced in the firearms re-issuance forms, D.E. 114-1. Nor did the City produce Boyle and Finn's applications for licenses to carry firearms. *See* Sept. 15 Order ¶ 3.

Moreover, the City's unexplained late disclosure of critical documents, which should have been produced years ago, has prejudiced Ms. Coleman. For instance, for years, Ms. Coleman requested all IAD records concerning the fatal shooting of Terrence. The City first acknowledged that there was an IAD investigation, of any kind, in December, 2020 – two and a half years into this case. *See* D.E. 114 at 16 (using the internal pagination of the Memo to Compel). The City suggested it had not previously produced any IAD documents because it had been under the impression the IAD investigation was still pending (although it produced no log indicating IAD document(s) were being withheld on the basis of investigative privilege). *See id.* Then, more than a full year later, in January

2022, the City produced the firearms re-issuance documents, which suggest that unidentified "IAD records" existed as of November 2, 2016. *See* D.E. 114-1 at COB 3885, 3887. Those "IAD records" still have not been produced. And, as discussed above, Evans was unable to answer questions as to whether they exist.[6]

Similarly, the City only recently produced the Commissioner's Memos amending Rule 303, including a set of 2020 revisions adding a de-escalation requirement and requiring officers to consider, among other things, subjects' "mental impairment," "behavioral crisis," "developmental disability," or "other factors beyond the individual's control" before calibrating their force response. Ex. B at COB 6398. These documents were plainly responsive to Ms. Coleman's initial requests, and her counsel should have had an opportunity to question the City's other witnesses about them.[7]

The same is true regarding the recently-produced FDIT training materials, COB 6215-6338, which state, in relevant part, that "Any officer who has discharged or witnessed an[] OIS shall be separated from any potential witnesses and ordered not to discuss the facts and circumstances of the shooting incident with anyone other tha[n] their legal counsel, medical/mental health professionals, or union reps." COB 6305. Ms. Coleman has asked about the BPD's questionable decision to interview her at the hospital, on the night of the shooting, while providing Boyle and Finn several days to prepare for their interviews (and to communicate with each other, both directly and through their shared counsel), its failure to sequester them in the interim, seize their phones (or any relevant

---

[6] The City's designated Rule 30(b)(6) witness concerning IAD issues, Jeffrey Walcott, deposed on August 20, 2021, was similarly unable to answer basic questions about any efforts by IAD to investigate. *See* D.E. 114 at 20 & n.8; D.E. 114-13 (transcript).

[7] To date, beyond the Commissioner's Memo amending the Rule, Ex. B, the City has not produced any evaluations, drafts, proposals, reports or other documents concerning the revisions.

communication), instruct them not to communicate, or even instruct them to save their communications.

Finally, the City also recently produced emails concerning FDIT training that suggest that the "goal" of such training is to "help the investigator understand an officer's perspective relative to the psychological and cognitive effects of an officer-involved shooting," COB 6483, an objective that is inconsistent with a neutral, diligent investigation concerning a fatal police shooting. Again, these documents were responsive to Ms. Coleman's initial requests, and her counsel should have had an opportunity to question the City's witnesses about them.

## II.   THE COURT SHOULD DEEM CERTAIN FACTS ESTABLISHED, JUDICIALLY SUPERVISE THE REMAINDER OF THE CITY'S RULE 30(b)(6) DEPOSITION, AND ORDER THE CITY TO COMPENSATE MS. COLEMAN FOR THE FEES AND EXPENSES INCURRED LITIGATING THESE DISCOVERY ISSUES.

District courts have broad authority to impose sanctions in response to a party's failure to obey discovery orders. *Red Wolf*, 2022 U.S. Dist. Lexis 162470, at *50 (citing *Robson v. Hallenbeck*, 81 F.3d 1, 2 (1st Cir. 1996); Fed. R. Civ. P. 16(f) & 37(b)(2)(A)). "Sanctions must be both 'just' and 'specifically related to the particular 'claim' which was at issue in the order to provide discovery.'" *Red Wolf*, 2022 U.S. Dist. Lexis 162470, at *51 (citations omitted). Permissible sanctions for "not obeying a discovery order" include "directing that . . . designated facts be taken as established," "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence," and "payment of expenses." Fed. R. Civ. P. 37(b).

Here, the City has dragged its heels in producing discovery for years, put forth witness after witness on its behalf who have been unprepared to testify, failed to produce documents despite repeated requests, and now violated this Court's orders. Ms. Coleman has suffered significant prejudice as a result, including the delay in litigation caused by the City's conduct, the missed opportunity to question witnesses concerning relevant documents, and the substantial expenditure of resources in an effort to obtain discovery to which she is plainly entitled. The Court's time and

attention has also been wasted. Accordingly, Ms. Coleman requests several remedies. Specifically, she requests that this Court direct that certain designated facts be taken as established for purposes of this action, *see* Fed. R. Civ. P. 37(b)(2)(i); order the completion of the City's Rule 30(b)(6) deposition under this Court's "live" supervision; order an award of monetary sanctions; and grant any other relief the Court deems appropriate.

**A.** **The Court should direct that certain designated facts be taken as established for purposes of this action.**

Rule 37(b)(2)(i) permits the Court, as a sanction for violation of its discovery orders, to "direct that matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims." Accordingly, in lieu of attempting to depose Evans for a third time, Ms. Coleman proposes that the following facts be deemed established for purposes of the action. This list will need to be supplemented after the completion of Pratt's deposition.

      1.    <u>Proposed established facts concerning the re-issuance of firearms</u>

- As of November 2, 2016, when the BPD re-issued firearms to Boyle and Finn, the BPD had not physically, medically, or psychologically evaluated them, nor had either officer "passed a physical, medical, or psychological exam." *See* D.E. 114-1.

- The one-page forms for the "re-issuance of firearms" to Boyle (*id.* at COB 3885) and Finn (*id.* at COB 3887), both dated November 2, 2016, did not include any "attached sheets," and as of November 2, 2016, no relevant "IAD records" existed.

- The signature on the BPD "Duty Status Sheet" for Finn (Ex. D at COB 6206) was backdated to November 2, 2016, at the direction of Nancy Driscoll, Chief of the BPD's Bureau of Administration & Technology.

- Before December 8, 2016, the BPD did not conduct any medical, physical or psychology evaluation of Boyle (*see* Ex. E at COB 6203).

- As of November 2, 2016, when the BPD re-issued firearms to Boyle and Finn, both officers were on "leave," and neither officer had been issued a license to carry a personal firearm under Massachusetts law.

      2.    <u>Proposed established facts concerning the officers' leave from work</u>

- The BPD put Boyle and Finn on "leave," with pay, due to "injury" – in Boyle's case, for months, and in Finn's case, for weeks – even though neither officer was seriously injured on October 30, 2016, and the BPD deemed both officers fit to be re-issued firearms as of November 2, 2016.

      3.      <u>Proposed established facts concerning the re-evaluation of BPD Rule 303</u>

- As of October 30, 2016, the BPD did not have any policy or practice that required officers, when interacting with persons living with mental illness, to make reasonable accommodations for their disabilities, to attempt to de-escalate situations, or to try to disengage from such situations, before resorting to force force.

- As of October 30, 2016, the BPD knew that persons living with mental illness were disproportionately the victims of police shootings, including fatal shootings.

- As of October 30, 2016, the BPD knew other police departments, in Massachusetts and elsewhere, had revised their policies and practices on the use of force and implemented new programs, such as crisis intervention teams, to reduce the heightened risk of police shootings involving persons living with mental illness.

- During Evans' tenure at BPD, and until 2020, the BPD did not revise Rule 303, regarding the use of force, to minimize the risk of police shootings involving persons living with mental illness.

**B.    The Court should judicially supervise the remainder of the City's Rule 30(b)(6) deposition, as well as any additional witness interrogation that may be required.**

Ms. Coleman requests that completion of the City's 30(b)(6) deposition be conducted under the Court's "live" supervision, including the questioning of Pratt and any further questioning of Evans (should the Court decline to make factual findings as requested above). As part of its broad authority, courts may judicially supervise depositions. *See, e.g.*, *Hofmann v. Hofmann (In re Renewable Energy Dev. Corp.)*, Nos. 20-4040, 20-4041, 20-4045, 2022 U.S. App. LEXIS 24778, at *7 (10th Cir. Sep. 1, 2022) (district court granted motion requesting judicial supervision of deposition, explaining that given the "facts and history of this case," judicial supervision was "an appropriate remedy," and ordered magistrate judge to supervise deposition); *Barth v. City of Peabody*, No. 15-13794-MBB, 2019 U.S. Dist. LEXIS 103059, at *6 (D. Mass. June 19, 2019) ("This court also advised the parties that they could

conduct the deposition at the courthouse in the event the deposition needed supervision."); *Condit v. Dunne*, 225 F.R.D. 100, 112 (S.D.N.Y. 2004) (finding parties "would benefit from on-hand Court supervision of their depositions," referring that supervision to a Magistrate Judge to supervise consistent with Federal Rule of Civil Procedure 30 and the court's Order).

Given the number of unproductive depositions that Ms. Coleman has taken, at her considerable expense, due to the City's failure to prepare its witnesses in compliance with Rule 30(b)(6), this remedy is warranted. Ms. Coleman has repeatedly raised concerns about the lack of adequate witness preparation with the City. *See, e.g.,* D.E. 114-9 at 16-17 (July 14, 2021 letter to Defs.); *id.* at 26-30 (Sept. 27, 2021 letter to Defs.); D.E. 114 at 19-20. The City initially refused Ms. Coleman's requests that it produce substitute witnesses and, when the Court ordered it to do so, failed to prepare the witness (Evans) as it was required to, both under Rule 30(b)6) and under this Court's orders.

### C.   The Court should award monetary sanctions.

Ms. Coleman requests that a monetary sanction be imposed on the City, in an amount to be determined at a later date, after fact discovery is complete, both to compensate Ms. Coleman for the substantial time and effort spent corralling, cajoling, and attempting to compel the City to comply with its discovery obligations, as well as a sanction against the City. Rule 30(d)(2) expressly authorizes sanctions against anyone who "impedes, delays, or frustrates the fair examination of the deponent." Rule 37(b)(2)(C) provides that "the court *must* order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." (Emphasis added); *see Red Wolf*, 2022 U.S. Dist. LEXIS 162470, at *76; Fed. R. Civ. P.37(a)(5)(A), (c)(1).[8] The failures here are unjustified.

---

[8] In addition to numerous rounds of correspondence with the City requesting documents, Ms. Coleman also was forced to serve a second set of document requests, needlessly, in response to the

Finally, the Court should enter any other relief it deems just and appropriate.

Respectfully submitted,

**HOPE COLEMAN**

by her attorneys,

*/s/ Amy Barsky*
Amy Barsky (BBO# 601111)
Daniel N. Marx (BBO# 674523)
William W. Fick (BBO# 650562)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
DMARX@FICKMARX.COM
WFICK@FICKMARX.COM
ABARSKY@FICKMARX.COM

Oren Sellstrom (BBO# 569045)
Sophia L. Hall (BBO# 684541)
Lawyers for Civil Rights
61 Batterymarch Street, 5th Floor
Boston, MA 02110
(617) 984-0274
OSELLSTROM@LAWYERSFORCIVILRIGHTS.ORG
SHALL@LAWYERSFORCIVILRIGHTS.ORG

---

City's baseless objection to producing the firearms re-issuance documents and FDIT materials that the documents were outside the scope of Ms. Coleman's original document requests. *See* D.E. 114-9 at 37-41. In order to avoid wasteful motion practice on that point, Ms. Coleman sent new requests on October 28, 2021. The City then refused to produce the documents on the grounds it raised in its Opposition to the Motion to Compel. *See* D.E. 116.

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that, in accordance with D. Mass. L.R. 7.1(a)(2), counsel for the parties have conferred and have attempted in good faith to resolve and narrow the issues presented here.

*/s/ Amy Barsky*


## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on December 23, 2022.

*/s/ Amy Barsky*