# Exhibit A

Page 1

```
 1                              Volume VIII
                               Pages 1 to 88
 2                             Exhibits 1 to 3
 3
              UNITED STATES DISTRICT COURT
 4               DISTRICT OF MASSACHUSETTS
 5    - - - - - - - - - - - - - - - -x
                                    :
 6    HOPE COLEMAN, individually    :
      and as the legal             :
 7    representative of the        :
      ESTATE OF TERRENCE J. COLEMAN, :
 8               Plaintiff,         :
                                    :
 9         vs.                      :   Civil Action
                                    :   No. 18-cv-10646
10    CITY OF BOSTON, BOSTON PUBLIC :
      HEALTH COMMISSION, WILLIAM    :
11    EVANS, SOPHIA DYER, M.D.,     :
      GARRETT BOYLE, and KEVIN FINN, :
12               Defendants.        :
                                    :
13    - - - - - - - - - - - - - - - -x
14          CONTINUED REMOTE DEPOSITION OF CITY OF
      BOSTON, THROUGH ITS DESIGNEE WILLIAM EVANS,
15    appearing remotely from Boston, Massachusetts, a
      witness called by counsel for the Plaintiff, taken
16    pursuant to Rule 30(b)(6) of the Federal Rules of
      Civil Procedure, before Ken A. DiFraia, Registered
17    Professional Reporter and Notary Public in and for
      the Commonwealth of Massachusetts, appearing
18    remotely from Peabody, Massachusetts, on Tuesday,
      December 6, 2022, commencing at 9:19 a.m.
19
20
21
22
23
24
```

**Page 2**

1 (ALL PARTICIPANTS ATTENDED VIA ZOOM)
2 PRESENT:
3 Fick & Marx LLP
    (by Amy Barksy, Esq., and
4   Daniel N. Marx, Esq.)
    24 Federal Street, 4th Floor,
5   Boston, MA 02110,
    abarsky@fickmarx.com; dmarx@fickmarx.com
6   857.321.8360,
    -and-
7 Lawyers for Civil Rights
    (by Sophia L. Hall, Esq.)
8   61 Batterymarch Street, Boston, MA 02110,
    shall@lawyersforcivilrights.org
9   617.482.1145, for the Plaintiff.
10 City of Boston Law Department
    (by Sarah McAteer, Esq., and
11  Elizabeth Bostwick, Esq.)
    Boston City Hall, 1 City Hall Square,
12  Room 615, Boston, MA 02201,
    sarah.mcateer@boston.gov;
13  elizabeth.bostwick@boston.gov, 617.635.4048,
    for the Defendants City of Boston,
14  William Evans, Garrett Boyle and Kevin Finn.
15 Boston Public Health Commission
    (by Batool Raza, Assistant General Counsel)
16  1010 Massachusetts Avenue, 6th Floor,
    Boston, MA 02118,
17  braza@bphc.org, 617.534.5609,
    for the Defendant Boston Public Health
18  Commission.
19 Adler, Cohen, Harvey, Wakeman, Guekguezian, LLP
    (by Alexander E. Terry, Esq.)
20  75 Federal Street, 10th Floor,
    Boston, MA 02110,
21  aterry@adlercohen.com, 617.423.6674,
    for the Defendant Sophia Dyer, M.D.
22
23
24

**Page 3**

1            I N D E X
2
  WITNESS      DIRECT CROSS REDIRECT RECROSS
3
4 WILLIAM EVANS
5 BY MS. BARSKY          4
6
7
          * * * *
8
       E X H I B I T S
9
  NO.      DESCRIPTION          PAGE
10
  Exhibit 1  Copy of 6/11/20 version of    11
11          Rule 303, Bates Nos. COB 006397
           to COB 006406
12
  Exhibit 2  Copy of Boston Police document   38
13          regarding reissuance of
           firearm, Bates Nos. COB 3885 to
14          COB 3888
15 Exhibit 3  Copy of Boston Police Duty    56
           Status Sheet for Kevin Finn,
16          with attachments, Bates
           Nos. COB 006206 to COB006212
17
18
          * * * *
19
20
21
22
23
24

**Page 4**

1          P R O C E E D I N G S
2            WILLIAM EVANS
3 a witness called for examination by counsel for the
4 Plaintiff, having been satisfactorily identified by
5 the production of his driver's license and being
6 first duly sworn by the Notary Public, was examined
7 and testified as follows:
8        MS. BARSKY:  Attorneys, can we agree to the
9 stipulations that have been in place at the other
10 depositions?
11       MS. BOSTWICK:  yes.
12       MS. McATEER:  Yes.
13       MR. TERRY:  Agreed.
14       MS. RAZA:  Yes.
15            DIRECT EXAMINATION
16 BY MS. BARSKY:
17   Q.  Morning, Commissioner.
18   A.  Morning.
19   Q.  Do you understand that you are here today
20 as a designee or representative of the City of
21 Boston, what is called a 30(b)(6) witness?
22   A.  Yes.
23   Q.  What does that mean to you?
24   A.  That I'm a witness in this case from when I

**Page 5**

1 was the Police Commissioner of Boston, and it's a
2 civil litigation against the City.
3   Q.  And do you understand the difference
4 between appearing as a normal fact witness and
5 appearing as a designee to speak on behalf of the
6 City?
7   A.  Yes.
8   Q.  What did you do to prepare to testify in
9 this capacity for the City?
10   A.  I was briefed by the City's attorneys, as
11 well as I read a synopsis of my prior deposition.
12   Q.  Did you read any other documents?
13   A.  No.
14   Q.  And how many times did you speak with your
15 attorneys?
16   A.  One time.
17   Q.  Approximately for how long?
18   A.  Probably an hour, an hour and 15 minutes.
19   Q.  Did you review any documents other than the
20 synopsis of your prior testimony?
21   A.  Yes.
22   Q.  Which documents?
23   A.  I reviewed some documents regarding
24 Rule 303, Firearm Investigation Team, procedures for

1 handling firearm evidence, a progress note on
2 officers who had their weapons taken from them, as
3 well as issuance of a firearm form on Garrett Boyle,
4 as well as a range form.
5    Q.   Do you know if those were the same
6 documents that the City provided to us?
7    A.   I'm not sure what they provided to you.
8    Q.   Okay.  When you say "a progress note," was
9 that, like, a medical progress note?
10    A.   Yes.
11    Q.   And my understanding is you've been
12 designated to talk on two topics.  One is the
13 evolution of Rule 303, and the other is the return
14 to work of Officers Finn and Boyle and the
15 reissuance of firearms to those officers; is that
16 right?
17    A.   That's what I was told.
18    Q.   And that someone else will be speaking to
19 the FDIT issues?
20    A.   Yes.
21    Q.   Okay.  Let's talk about Rule 303 first.
22 Which version of Rule 303 was in effect in 2016?
23    A.   I believe Rule 303 dated April 11, 2003.
24    Q.   And was the rule revised during your tenure

1 as Commissioner?
2    A.   I'm not really sure if there was any
3 amendments during that time.  I know there was some
4 revisions on shooting at motor vehicles, but I can't
5 be sure if there were any revisions during my time.
6    Q.   And as a deponent on behalf of the City,
7 what did you do to figure that out?
8    A.   You know, I looked at the paperwork I have
9 currently.  You know, I can't be sure -- at the back
10 of this order, it does have some amendments, 2007,
11 2008, on ballistics.  You know, there was some
12 amendments on this that were added on, based on the
13 order that I have.
14    Q.   Other than the changes with regard to kinds
15 of weapons, did the BPD reevaluate Rule 303 between
16 2003 and 2016?
17    A.   I'm sure they looked a it numerous times,
18 but I can't be sure if there was any revisions.  You
19 know, again, I was the Commissioner from 2013 to
20 2018.  I am not sure for sure.  You know, looking at
21 these notes, I would say no, but I'm not sure if
22 there were any revisions to it or if there was any
23 talk of revisions.
24    Q.   So on behalf of the City, your answer is

1 that there were no revisions other than to the kind
2 of weaponry between 2003 and 2016?
3         MS. McATEER:  Objection.  You can answer
4 the question.
5    A.   You know, to the best of my recollection, I
6 can't be sure.  I can look at what is on paper, but
7 I'm not sure if there were any internal changes to
8 the rule that didn't happen to make it to the paper.
9 I'm not sure.
10    Q.   Where would such internal changes be found?
11    A.   Maybe in the individual unit's policies
12 that didn't make it.  Maybe there's internal
13 changes to the Ballistic Unit.  Maybe there's
14 changes to the FIDT team.
15         Internal procedures, I can't speak to that.
16 I can speak to the overall policy here.
17    Q.   What kinds of internal changes does the BPD
18 have that aren't reflected in the text of the rule?
19    A.   Well, there might be different people who
20 respond to FDIT changes.  There might be different
21 procedures as technology moves along.  Digital, we
22 have gone to a lot of digital photography.  And a
23 lot of the different techniques on analyzing crime
24 scenes has changed over the years that won't -- all

1 the technology isn't put into these policies, but
2 they are put into the internal procedures in -- you
3 know, the newer technology is changing every day,
4 and that's not put into policies.
5    Q.   When you say newer procedures, where and in
6 what form are newer procedures written down?
7    A.   Well, they are internal, or they are inside
8 the different units of the Police Department.  As
9 technology gets better, newer tools come along, I'm
10 sure the internal policies that are in-house change.
11    Q.   What I'm getting at is, other than the
12 written rules, what documents does the Boston Police
13 Department have that record its internal policies?
14    A.   All I know is the overall policy, but that
15 doesn't speak for the internal workings of each
16 department.
17         This is the overall policy.  It doesn't
18 cover all of the rules and regulations.  Most of
19 them have writing, This is the rule, but basically
20 use the rule when other situations come into effect.
21         So, you know, it doesn't actually talk
22 about all the rules and procedures.  This is an
23 overall policy of the internal workings of different
24 units, whether it be the Sexual Assault Unit...

3 (Pages 6 - 9)

Page 10

1      They have internal rules and procedures
2  that do not play out in the major overall policy.
3      Q.   And are those internal rules and procedures
4  written down somewhere?
5      A.   Well, I'm sure most have them somewhat
6  documented.  Some of them just happen as policies
7  change and their procedures change, so.
8      Each department has a protocol on how they
9  respond.  They are not in the rules.
10     Q.   And are those written protocols?
11     A.   I'm not sure.  Where we have so many
12  specialized units, all those -- their procedures are
13  not outlined in the overall policy.
14     This is general policy here that we're
15  looking at.  Our whole rules and regulations don't
16  get into the specifics of each individual unit in
17  the Police Department.
18     Q.   Let's look at what I emailed around as
19  Exhibit B, was premarked as Exhibit B.
20     MS. BARSKY:   Ken, I will put that in the
21  Chat in case it didn't make it to you.  Then can we
22  mark it as Exhibit 1, please.
23     (Discussion off the record)
24

Page 11

1      (Document marked as Evans
2      Exhibit 1 for identification)
3      Q.   Commissioner, can you tell me when you have
4  that open.
5      A.   Where do I open it on the screen?  I'm not
6  a big -- I don't see it in front of me.
7      THE COURT REPORTER:   It's In the Chat,
8  Commissioner
9      A.   Okay, I see the Chat.  I can't open it, but
10  I think I still have it in front of me.
11     Q.   It's the June 11, 2020 version of Rule 303.
12     A.   Yes.  I have it in front of me.
13     Q.   Are you familiar with this?
14     A.   No.
15     Q.   Have you ever seen this document before?
16     A.   No.  I left in 2018.
17     Q.   Did you review any documents since 2018 in
18  preparation to testify on the City's behalf?
19     A.   No.  This is the first time I've seen this,
20  when I was provided this this morning.  I have not
21  read it.
22     Q.   The bold language on here is new; is that
23  fair to say?
24     A.   I don't know.  I haven't looked at it.  The

Page 12

1  statement of the use of force, I can see that the
2  De-escalation, just quickly looking at it, that's
3  new.
4      Q.   All of the bold language in the document as
5  a matter of procedure is changed language, new
6  language; is that correct?
7      MS. BOSTWICK:   Objection.
8      A.   I don't know.  Like I said, I just got this
9  about 15 minutes ago and I printed it.  I would say
10  the de-escalation is new to me.  I didn't get the
11  chance to read the rest of it, but I can say right
12  now we didn't have a de-escalation policy.  I'm sure
13  that came about after the George Floyd incident.
14     Q.   Tell me about how that came about.
15     A.   I don't know.  I'm just saying I assume
16  that.  I have had no dealings with the BPD since I
17  left in 2018.  So I have no clue how this came about
18  in the procedure.
19     Q.   Have you prepared to testify about the
20  evolution of Rule 303?
21     A.   No.  I was given a briefing 303.  I know
22  the rule very well over the course of my 36 years,
23  so I can speak to the rule, but I did not get this
24  document until when I looked at it 20 minutes ago.

Page 13

1  It was in my email.  I have never seen it before.
2      Q.   Are you aware that you are testifying on
3  the topic of the evolution and reevaluation of
4  Rule 303?
5      MS. BOSTWICK:   Objection.
6      A.   I did not know I was going to talk about
7  the evolution of the rule.  I knew I was going to
8  speak about the rule.
9      Q.   Let's look at these changes and see how far
10  we can get.  On Page 1 of the -- not the cover page,
11  but Page 1 of the Rule 303, which is Bates stamped
12  in the bottom right corner 6398, do you see the
13  paragraph captioned "De-escalation"?
14     A.   Yes, I see it.
15     Q.   It says, "Prior to using physical
16  non-deadly and/or deadly force, all Boston police
17  officers, when possible and feasible, will use
18  proper de-escalation techniques to decrease the
19  likelihood that officers will need to utilize use of
20  force, and to minimize the level of force required,"
21  do you see that?
22     A.   Yes.
23     Q.   Was there a BPD policy on de-escalation in
24  2016?

4 (Pages 10 - 13)

Page 14

1    A.   This policy was not in effect.
2    Q.   Was there a policy, a different policy, on
3  de-escalation prior to this?
4    A.   Well, Rule 303 speaks to de-escalation in
5  the sense that you meet the continuum of force.  So
6  if someone has different weapons coming at you, the
7  rule specifies that you can use nonlethal force or
8  lethal force.  So that is inherent in that policy on
9  how to use escalation tactics.  If someone is coming
10  at you with their hand, you are allowed to use
11  nonlethal force.  If someone is coming at you with a
12  deadly weapon, you are allowed.
13       So the escalation continuum is implied in
14  Rule 303 and 304.  We never had a policy as in depth
15  as this, but in Rule 303 and 304, the continuum of
16  force within our rules of engagement and escalation
17  are inherent in that rule.
18    Q.   So in your own words, what was the change
19  here?
20    A.   It just applies out more -- it gets more
21  into details about language barriers, drug
22  interdiction.  It just gets more into detail, where
23  we didn't have such a specific detailed rule before.
24  But de-escalation was taught in the academy, and the

Page 15

1  rule gives you the continuum of violence, which is
2  the de-escalation continuum basically that says you
3  meet the threat with the allowable use of force,
4  which is what happened.
5    Q.   This policy says that officers are required
6  to de-escalate if possible, right?
7       MS. BOSTWICK:  Objection.
8    A.   When possible and when feasible.
9    Q.   In 2016, were officers required to
10  de-escalate?
11       MS. BOSTWICK:  Objection
12    A.   Always by the letter of the law, by the
13  letter of the policy.  If someone -- the policy
14  implies if someone was coming at them with their
15  hands, they weren't authorized to use deadly force.
16  So this de-escalation policy was implied in Rule 303
17  and 304, and that's the way the officers were
18  trained in the academy.
19    Q.   So my question is, were they required to
20  use de-escalation when possible and when feasible?
21       MS. BOSTWICK:  Objection.
22    A.   Absolutely.  We were always taught if we
23  didn't have to use deadly force, that would be a
24  last resort.

Page 16

1    Q.   Where was that rule written down?
2    A.   It's in Rule 303.  The only time you can
3  use deadly force is when you are met with the threat
4  of deadly force or someone else is in imminent
5  danger of great bodily harm or deadly force.  It's
6  clearly in Rule 303, and normally the force clearly
7  spells it in 304.
8    Q.   And if in that situation an officer was met
9  with a certain amount of force and could either
10  respond with force or de-escalate, in 2016 did the
11  BPD require the officer to attempt to de-escalate
12  when possible and when feasible?
13       MS. BOSTWICK:  Objection.
14    A.   We always trained our officers that if they
15  are not met with lethal force, then they shouldn't
16  be using Rule 303.
17       I always thought we used a lot of
18  restraint.  That was taught in the academy, and it's
19  clearly spelled out in the rules that if someone is
20  unarmed, you do not use deadly force.  There's no
21  doubt about it.
22    Q.   But, Commissioner, you are not answering my
23  question.  What was the BPD's policy on
24  de-escalation in 2016?

Page 17

1       MS. BOSTICK:  Objection.
2    A.   The policy under Rule 303 was you
3  de-escalate any chance you get and you do not use
4  deadly force on unarmed individuals.  That was the
5  policy.  Was it clearly the policy like you are
6  trying to say it was in 2020, absolutely not, but we
7  had a strict policy that you do not use deadly force
8  unless the threat was there.
9    Q.   Well, let's look at it differently.  Was
10  there any change substantively to the BPD's policy
11  on de-escalation in this 2020 amendment?
12       MS. BOSTWICK:  Objection.
13    A.   Looking at it, yes, there is.
14    Q.   What caused the BPD to change its policy?
15       MS. BOSTWICK:  Objection.
16    A.   I have no clue why.  I can guess.  You
17  know, I can guess what it was, but I was not
18  involved in the BPD.  I left in August of 2018.
19       I don't know what discussions took place to
20  change the policy.  You know, I can guess, but it's
21  just -- I had no input to it.
22    Q.   What did you do in your capacity as a
23  witness on behalf of the City to prepare to answer
24  questions about this?

5 (Pages 14 - 17)

Page 18

1    MS. BOSTWICK:  Objection.
2    A.   You know, I met with the City's attorneys
3 two days ago.  Again, like I said to you earlier, I
4 printed this morning the two exhibits that were
5 given to me.  I just briefly looked at them before I
6 got on the Zoom call.
7    Q.   To make sure that we're clear about the
8 policy as of 2016, it sounded like you said the
9 BPD's policy was to encourage de-escalation; is that
10 accurate:
11    MS. BOSTWICK:  Objection.
12    A.   No.  The policy was clearly spelled out in
13 the continuum of force on what level of force you
14 use when you are faced with a threat from an
15 assailant or someone who threatens you.  Again, the
16 continuum of de-escalation is built into that
17 policy.
18    If someone is coming at you ready to hit
19 you with their hand, you don't pull out a gun.  You
20 have pepper spray, you have a baton to deal with that.
21 If the level of escalation goes up to the level
22 where they have a knife or a deadly weapon that
23 could inflict serious bodily harm on you or someone
24 else, then you have the ability to neutralize the

Page 19

1 threat if someone is going to be killed by pulling
2 out your handgun.
3    So the de-escalation was built into the
4 policy.
5    Q.   Are pepper spray and batons examples of
6 de-escalation?
7    MS. BOSTWICK:  Objection.
8    A.   They are a nonlethal use of force when you
9 are faced with someone who is not necessarily going
10 to use deadly force on you.
11    It's called the continuum of force.
12 Officers are taught that numerous times throughout
13 their careers that you meet the level of force with
14 their level of force that is coming at you.  So that
15 in itself, 303, has built into it the whole idea of
16 escalation and de-escalation.
17    Q.   Does the word "escalation" or
18 "de-escalation" appear anywhere in the BPD's rule as
19 of 2016?
20    MS. BOSTWICK:  Objection.
21    A.   I am not sure if it actually says the word,
22 but it's taught, and it's reiterated, and it is
23 clearly spelled out when you use a certain level of
24 force.

Page 20

1    Q.   How does the continuum of force require an
2 officer confronted with a knife to try to talk to
3 the person, back up, or otherwise de-escalate?
4    A.   I don't believe the policy dealt with that,
5 but clearly if the person with a knife was putting
6 the officer in grave bodily danger or imminent
7 death, or another one, then he would have more than
8 justifiable use of his deadly force to neutralize
9 the threat.
10    Q.   And my question is, in that moment if he
11 also had an option to talk and try to de-escalate,
12 was he required to exercise that option?
13    MS. BOSTWICK:  Objection.
14    A.   It would be the officer's best judgment.
15 If he felt his life was in imminent danger and
16 there's no time to try to de-escalate, he would be
17 more than justified to use deadly force.  It all
18 depends on the circumstances of the case.
19    If this was an outside scene where he had
20 plenty of distance and separation, that's another
21 story.  In this particular case, he didn't have time
22 to, you know --
23    Q.   Commissioner, I'm asking you about the
24 policy.  In other words, the policy did not require

Page 21

1 him to attempt to de-escalate if possible and
2 feasible; is that correct?
3    MS. BOSTWICK:  Objection.
4    A.   Well, that's always taught, is that if you
5 do not have to shoot, you don't shoot.  But the
6 policy doesn't specifically say what you are telling
7 me, but it's taught.
8    Q.   If we look at that same paragraph, the next
9 thing it says is, "This includes using effective
10 communication techniques," do you see that?
11    A.   Yes.  That's all new.
12    Q.   What was the BPD's policy as of 2016 on
13 using effective communication techniques?
14    A.   I don't know what it was.  It wasn't in the
15 rule.  In the academy de-escalation tactics,
16 language, all that was taught, especially now more
17 than ever, to the younger recruits.  So it's not in
18 the rule, but, you know, de-escalation and, you
19 know, that whole idea of verbal judo, those are some
20 of the things that are taught to try to de-escalate.
21 If your question is was it in the rule, no, it
22 wasn't in the rule.
23    Q.   How about the next thing listed here, which
24 is, "establishing rapport, asking questions and

6 (Pages 18 - 21)

Page 22

1 providing advice"?

2  A.  This is all new in 2020.

3  Q.  Did the BPD have a policy on establishing

4 rapport, asking questions and providing advice to

5 defuse conflict prior to 2020?

6     MS. BOSTWICK:  Objection.

7  A.  It wasn't in the rule.

8  Q.  How about attempting to "achieve voluntary

9 compliance before resorting to force options"?

10  A.  That was taught in the academy, but it's

11 not in the rule.

12  Q.  Why were those things added to the rule?

13     MS. BOSTWICK:  Objection.

14  A.  I have no idea.  I was long gone by then.

15  Q.  What have you done as a witness on behalf

16 of the City to determine why the City added this

17 language?

18  A.  Nothing.

19     MS. BOSTWICK:  Objection.  I think we asked

20 and answered this.

21     THE WITNESS:  I know.

22     I'll wait, Liz.  I'm sorry.  I'm jumping in.

23  A.  Nothing.  Again, I was gone.

24  Q.  Commissioner, were there any changes in

Page 23

1 training that were instituted along with the changes

2 in the rule here?

3  A.  I have no clue.  Again, I've been gone

4 since -- I'm been gone almost five years now.  I

5 have no idea.

6     I thought we did a good job with training.

7 I'm not sure what they teach the young recruits now.

8  Q.  If once this rule was in effect officers

9 failed to comply with the rule, could they be

10 disciplined?

11  A.  I'm not sure.  It's hypothetical.  I'm not

12 sure.

13  Q.  Have any officers been disciplined for

14 failing to comply with the new de-escalation policy?

15     MS. BOSTWICK:  Objection.

16  A.  Again, I don't speak to anyone with the BPD

17 around issues on this.

18  Q.  Let's look at Section 6 of this policy,

19 which is Bates stamped in the bottom right 6401.

20  A.  Section 6 of this rule, is that what we are

21 talking about?

22  Q.  Yes.

23  A.  Let me make sure I got it here.  (Examines

24 document)  Okay, Section 6, got it.

Page 24

1  Q.  Do you see where it says, "Boston police

2 officers are instructed, when feasible, to exhaust

3 all alternatives before using deadly force.  This

4 includes de-escalation and verbal commands"?

5  A.  Yes, I see it.

6  Q.  Was that language new in 2020?

7  A.  It wasn't there when I was there.  Yes.

8  Q.  Why was the language added?

9     MS. BOSTWICK:  Objection.

10  A.  I have no clue.

11  Q.  What was the policy in 2016?

12  A.  That if you were met with a deadly threat

13 by an assailant, you have every right to neutralize

14 that threat when your life was in danger or someone

15 else's life was in danger.  That was the policy.

16  Q.  When you say "every right," does that

17 extend to a situation in which the officer could

18 de-escalate?

19     MS. BOSTWICK:  Objection.

20  A.  Again, it's hypothetical.  You would have

21 to be in that situation.

22  Q.  Let's look back at the first page right

23 underneath that paragraph on De-escalation.  So 6398

24 is the page number at the bottom right.

Page 25

1  A.  Yes.  Go ahead.

2  Q.  And it says, "Where feasible, police

3 officers will try to determine whether an

4 individual's failure to comply with an order is the

5 result of one of the following factors," and then it

6 lists a number of factors, including mental

7 impairment, developmental disability and behavioral

8 crisis?

9  A.  Yes.

10  Q.  Was this language added in 2020?

11  A.  On the order I see, it was.

12  Q.  What was the BPD's policy on police

13 officers trying to determine whether an individual's

14 failure to comply with an order was the result of

15 one of these factors prior to 2020?

16  A.  There was no specific order.  Again, mental

17 health training in dealing with mentally challenged

18 individuals was taught in the academy, but there was

19 no specific policy when I was there, not to this

20 extent.

21  Q.  Were Boston police officers required to do

22 this prior to 2020?

23     MS. BOSTWICK:  Objection.

24  A.  What was the question again one more time?

7 (Pages 22 - 25)

Page 26

1 I'm sorry.

2    Q.   Prior to 2020, were Boston police officers
3 required to try to determine whether an individual's
4 failure to comply with an order was the result of
5 one of these factors?

6       MS. BOSTWICK:  Objection.

7    A.   It wasn't in the rule.

8    Q.   Was it required?

9    A.   It was taught in the academy to consider
10 all these factors, yes.

11    Q.   That's not an answer to the question of
12 whether it was required.

13       MS. BOSTWICK:  Objection.

14    A.   I don't get it.  It's the totality of the
15 circumstances.  They took that into consideration,
16 but there was no spelled out rule saying "required,"
17 as you are asking me.

18    Q.   After this bulleted list, it says, "When
19 feasible, after evaluating whether the failure to
20 comply is based on one of these factors, the police
21 officer may then determine whether physical force
22 and what level of force is appropriate," do you see
23 that?

24    A.   I see it.

Page 27

1    Q.   Is that new?

2    A.   Everything in this rule is new, so.  As you
3 continue to tear apart this rule, just realize this
4 was all after me.  It's all new.

5    Q.   Do you understand that you are testifying
6 as the City on behalf of the City?

7    A.   I think I said that from the get-go.

8    Q.   And do you understand that that requires
9 you to learn facts that you did not personally know?

10    A.   I did not have this rule until 15 minutes
11 before we had this deposition.

12    Q.   At the bottom of the page, there's a
13 statement about disengagement which reads, "If the
14 situation it not an arrestable offense and the
15 manner cannot be resolved safely, the officer may
16 disengage," do you see that?

17    A.   I see it.

18    Q.   What was the BPD policy in 2016 regarding
19 disengagement?

20    A.   We didn't have a specific policy on it, but
21 a lot of these procedures were taught in the academy.

22    Q.   What is this procedure, in your own words?

23    A.   If a situation is not arrestable, then, you
24 know, if you can, don't lock anyone up, and move

Page 28

1 about your business.  You know, either get the
2 person the help they need or, you know, go on to the
3 next call.  That's basically what the rule is
4 saying, disengage.

5    Q.   In what kinds of situations is
6 disengagement appropriate?

7    A.   I mean, there's all kinds of situations.
8 You know, if when the officers get there and they
9 speak the individual and everything's fine, you
10 know, they make an evaluation and they leave the
11 scene and let the family deal with it or let the
12 appropriate person deal with it.

13    Q.   Has the BPD policy on disengagement changed
14 between 2016 and 2021, let's say?

15    A.   Based on the rule I'm reading right now,
16 you know, they have it listed in the policy, but I
17 don't think the policy -- you know, it's always been
18 trying to de-escalate in any situation you can, but
19 with this new rule, everything is put in writing.
20 So I would say the policy has changed because it's
21 in writing.

22    Q.   What caused the change?

23    A.   I have no clue.  Again, I can speculate,
24 but I wasn't involved in the discussions.

Page 29

1    Q.   Did you do anything to learn about the
2 changes?

3    A.   Not with the Boston Police Department, no.

4    Q.   Does this statement about disengagement
5 apply to interactions with people who are mentally ill?

6       MS. McATEER:  Objection.

7    Q.   You can answer.

8    A.   I would think you would still want to
9 engage them to get them the help they would need.
10 So, you know, I would hope we wouldn't just leave
11 someone that's mentally ill to deal with the crisis
12 they are involved in.  To disengage would be to walk
13 away from someone in crisis.

14       So I don't understand -- we really wouldn't
15 fully disengage.  If you are talking about using
16 deadly force, absolutely, but you wouldn't fully
17 disengage.  You would want to get them the services
18 they so desperately need.

19       So it's sort of -- disengage, walk away, I
20 don't know if that's what you would do.

21    Q.   In 2016, is that what you mean?

22    A.   Well, I mean in general.  If someone is in
23 a mental health crisis, you wouldn't walk away from
24 them without getting them the medical attention they

Page 30

1 need.
2    Q.   Was that the BPD's policy in 2016?
3    A.   We are first responders.  If someone is in
4 a medical crisis, whether it's physical or mental,
5 we have a responsibility to get them the care they
6 need.  That dates back well before 2016.
7    Q.   So your answer is that that was the policy
8 as of 2016, correct?
9    A.   My answer is if someone is in a medical
10 crisis, yes, we would have to get them the services
11 they need.
12    Q.   On the next page, at the very top there's a
13 mention of the Street Outreach Unit, do you see that?
14    A.   What is the number of the page?
15    Q.   6399.
16    A.   Okay.  Hold on for a second.
17    Q.   It's the next page from the page that we
18 were on.
19    A.   I know.  I know.  I know.  I'm just making
20 sure I got them all.  (Examines document)  Yes.  I
21 got it.  Okay.  Go ahead.
22    Q.   It says, "The Street Outreach Unit is a
23 resource available to support all officers when
24 dealing with individuals suffering from substance

Page 31

1 use disorder, mental health and/or homelessness."
2    A.   Right.
3    Q.   What is this Street Outreach Unit?
4    A.   It is mental health clinicians who worked
5 alongside the Boston Police Department.  So if we
6 had a call, we could summons them to the call.
7    Q.   Did the Street Outreach Unit exist in 2016?
8    A.   I think maybe one or two officers or one or
9 two clinicians only worked at a time.  It hadn't got
10 to the level it is right now.  It was in its
11 infancy.  There was only one or two officers
12 covering the whole City 24/7 at the time.
13    Q.   When is the Street Outreach Unit intended
14 to be used?
15    A.   It's intended to be used if there's a
16 person in crisis.  But the problem is we only had
17 one or two officers covering the whole City 24/7.
18    Q.   Was the Street Outreach Unit helpful in
19 addressing people in crisis?
20        MS. McATEER:  Objection.  You can answer.
21    A.   I believe they were.  Unfortunately there
22 was only one or two of them.  When you need them as
23 quick as you do, it's tough to get them on the scene.
24    Q.   In 2016 you mean?

Page 32

1    A.   Yes.
2    Q.   What problems does a Street Outreach Unit
3 address?
4    A.   Well, I think they address someone that
5 might be having a mental health crisis.
6    Q.   Why would you want a Street Outreach Unit
7 for that?
8    A.   To help the officer navigate the call.
9    Q.   Why?
10    A.   Because they have an above-and-beyond
11 expertise beyond the officer to help deal with the
12 crisis.
13    Q.   Was the Street Outreach Unit a helpful
14 mechanism to address that?
15        MS. McATEER:  Objection.  You can answer.
16    A.   Again, I only had I believe one or two, but
17 I did hear that they were effective.
18    Q.   What were the goals that they were
19 effective in furthering?
20    A.   They could assist the officer at the scene
21 if he didn't have the tools necessary to deal with
22 the incident.
23    Q.   What were those tools?
24    A.   Well, the officers are taught in the

Page 33

1 academy.  We have mental health professionals.  We
2 have 40 hours of State-mandated mental health
3 training.  If it was outside his bag of tools and
4 someone from the outside can be brought in to assist
5 him, that's what I mean about the tools.
6        You know, he's taught about de-escalation.
7 I'm sure he's taught to talk in a calm manner.
8        They are given a lot of this training in
9 the academy, but I would think that one of these
10 mental health clinicians review additional training
11 beyond what the officer has.
12    Q.   And what are the dangers of the officers
13 handling a situation on their own?
14        MS. McATEER:  Objection.
15    A.   Every call an officer goes to there's
16 danger.  You know, in domestic violence cases, in
17 any case where someone's emotions are running
18 high -- and sometimes that happens in a mental
19 health case -- the officer could be put in danger.
20    Q.   Looking at these 2020 changes that we've
21 been talking about, did you ever consider putting in
22 place such policies during your tenure as
23 Commissioner?
24        MS. McATEER:  Objection.

9 (Pages 30 - 33)

Page 34

1    A.   Did I ever consider them?  No, because I
2  thought Rule 303 and 304 and the officers training,
3  which we really expanded the amount of mental health
4  training, I think we had it as a priority, I think
5  Superintendent Holmes.
6        So we were focusing on that whole idea of
7  de-escalation in our academy training.  I believe
8  Rule 303 deals with the whole escalation policy.
9  So, you know, it never rose to the level of a crisis
10  where we had to change the rule.
11        Again, during my tenure and previous,
12  Boston Police don't use a lot of lethal force.  So
13  if it wasn't broken, there was no reason to fix it.
14    Q.   When you say "if it wasn't broken," do you
15  mean if there wasn't a crisis?
16        MS. McATEER:  Objection.
17    A.   I mean we very rarely use deadly force.
18        And I witnessed numerous instances over the
19  course of my career where officers have used
20  tremendous restraint using de-escalation tactics.  I
21  was always very proud of how little we shot and how
22  well we did in de-escalating.  So I did not see it
23  as a problem that needed to be put into a policy.
24    Q.   Was the BPD waiting for a crisis in order

Page 35

1  to change the policy?
2        MS. McATEER:  Objection.
3    A.   Absolutely not.
4    Q.   Was there any evaluation or assessment of
5  the 2003 version of Rule 303?
6        MS. McATEER:  Objection.
7    A.   Can you repeat that.
8    Q.   Did the BPD conduct any assessment of
9  Rule 303 prior to these changes?
10        MS. McATEER:  Objection.
11    A.   I have no knowledge of that.
12    Q.   Did you do anything to find out?
13    A.   I did not.
14    Q.   Did you talk to anyone?
15    A.   I've talked to a lot of people over my
16  career.  I don't know if I ever spoke about it, but,
17  you know, I thought it was a good policy.  And
18  again, I thought we were probably one of the best
19  trained progressive departments, who very rarely
20  used deadly force.  So there was very little need to
21  dig into this policy because I thought the officers
22  followed it pretty well.
23    Q.   On what basis did you think that?
24    A.   On the amount of reports I read and

Page 36

1  watching the tactics they used.  When people were
2  coming and using deadly force, their ability to
3  de-escalate it.  I was very proud of numerous
4  situations over the course of my career where the
5  officers acted with unbelievable restraint.
6        I thought we were a model for the country
7  on use of force, as I read across the country in
8  cities like LA, NYPD, and others, the amount of
9  officer-involved shootings.  We very rarely used
10  deadly force.
11    Q.   And your testimony is that that conclusion
12  is based on your personal observation of officers in
13  action?
14    A.   It's not personal observation.  It's from
15  reading reports and --
16        MS. McATEER:  Objection.  Sorry.
17    A.   It's from reading every report every day
18  and seeing the amount of restraint that our officers
19  use daily.  And the amount of guns and weapons they
20  take in situations where they could have used deadly
21  force, I was proud of the amount of restraint they
22  used day in and day out.
23    Q.   You mentioned a 40-hour training on
24  de-escalation?

Page 37

1    A.   I believe that's what it was while they
2  were in the academy.  Mass. Criminal Justice
3  Certification, that every officer is required to do
4  that.
5    Q.   And that was about de-escalation?
6    A.   I don't know what it was about.  It was
7  mental health training.
8    Q.   Was that 40-hour mental health training
9  given to officers Finn and Boyle?
10    A.   If they were in the academy during this
11  time, yes.
12    Q.   Let's move on now and talk about the
13  officers return to work after the shooting in this
14  case.
15    A.   Yes.
16    Q.   After an officer-involved shooting, who at
17  the BPD has the ultimate authority to decide whether
18  and when officers receive weapons?
19        MS. McATEER:  Objection.
20    A.   I do.  The Police Commissioner does.
21    Q.   And who has the ultimate authority to
22  decide whether and when officers return to duty?
23    A.   The Police Commissioner.
24    Q.   And who has the ultimate authority to

Page 38

1 designate them on a particular leave status?
2        MS. McATEER: Objection.
3     A.   The Police Commissioner.
4     Q.   I'm going to put a document in the Chat
5 that was premarked with the Letter C.
6        MS. BARSKY: Ken, can you mark that as
7 Exhibit 2.
8          (Document marked as Evans
9          Exhibit 2 for identification)
10     Q.   Commissioner, can you let me know when you
11 have that document.
12     A.   It's not -- which one is it?  Because I
13 have some in front of me.
14     Q.   It's not from this morning.  It's one that
15 I just put in the Chat.
16     A.   I don't have it in the Chat right now.
17     Q.   The Chat in the Zoom application?
18     A.   Yes, I don't have it in there.
19       (Discussion off the record)
20     A.   I'm not a tech guy.  I apologize.  I don't
21 see it.  Which document are you talking about?
22 Because I may have it.  Or is this something that
23 the City attorneys didn't give me?
24     Q.   I think we have to have you look at the

Page 39

1 official exhibit because I want to make sure we are
2 looking at the same document.
3        MS. McATEER: Do you want to email it to
4 me, and I can forward it to him?
5        MS. BARSKY: Sure, or if you have it in the
6 Chat, you can send it to him.
7        MS. McATEER: Fair enough.
8        MS. BARSKY: We can go off the record.
9       (Discussion off the record)
10     A.   (Examines document)  Okay.
11     Q.   Commissioner, do you recognize this document?
12     A.   Yes.
13     Q.   Is that your signature at the bottom?
14     A.   Yes.
15     Q.   Can you tell me generally after an
16 officer-involved shooting how the process for
17 reissuing firearms to officers is supposed to work.
18        MS. McATEER: Objection.
19     A.   Well, from the best of my recollection, the
20 officer after a shooting has his handgun taken.
21 There's a preliminary investigation done by the FDIT
22 team along with Internal Affairs where they make a
23 preliminary finding, and based on the preliminary
24 finding, you know, with the District Attorney's

Page 40

1 Office, who would be Dan Conley, a
2 fitness-to-return-to-duty decision is made, or
3 issuing back his firearm is made under the totality
4 of the whole circumstance.
5     Q.   And you said it's made based on the FDIT
6 finding?
7     A.   Not on the FDIT finding, on the preliminary
8 investigation.
9     Q.   By the FDIT team and the DA?
10     A.   No.  I think by Internal Affairs in
11 conjunction with the FDIT team.  The DA will do a
12 separate criminal investigation.
13     Q.   So who are the different players who should
14 evaluate the officer and the situation before the
15 firearms are reissued?
16        MS. McATEER: Objection.
17     A.   Well, Internal Affairs, the FDIT team, and
18 our human resource department.
19     Q.   Okay.  Looking at the top section of this
20 where it says, "Bureau of Administration &
21 Technology," do you see that?
22     A.   Yes.
23     Q.   And it's signed by Nancy Driscoll?
24     A.   Yes.

Page 41

1     Q.   Was she the chief of the Bureau of
2 Administration & Technology?
3     A.   Yes.  She was the director.
4     Q.   Is Occupational Health Services part of the
5 Bureau of Administration & Technology?
6     A.   Yes.
7     Q.   And do you see where there's a checkmark
8 next to the box that says, "Occupational Health
9 Services Unit reports that the above officer has
10 passed a physical/medical and/or psychological exam,
11 and may carry a firearm without restrictions"?
12     A.   I see it.
13     Q.   Then it says, "(see attached sheet)"?
14     A.   Where does it say that?  (Examines
15 document)  Oh, yes.  Got it.  I was looking at the
16 wrong place.
17     Q.   Where is the attached sheet to which that
18 notation refers?
19     A.   I'm not sure.
20     Q.   Did you do anything to find out before you
21 came to testify today?
22     A.   I just had this form in front of me.  I
23 only went with what I had in front of me.
24     Q.   So as you sit here today, do you know on

Page 42

1 behalf of the City what attached sheet is supposed
2 to accompany this form?
3    A.  I know I got other paperwork.  It could be
4 one of those forms, but it's not attached to the
5 sheet I had.
6    Q.  Is there supposed to be a specific form?
7    A.  I don't know.
8    Q.  And in this case, is it true that
9 Occupational Health Services reported that the
10 officer had passed a physical or psychological exam?
11       MS. McATEER:  Objection.
12    A.  Based on the form I'm looking at, the box
13 is checked.
14    Q.  Well, I can see that the box is checked.
15 I'm asking you if it's accurate.
16       MS. McATEER:  Objection.
17    A.  I sign it.  I don't dig deeper into it.
18       This has probably gone over a lot of
19 reviews until it gets to my desk.  I look, and I see
20 that the box is checked.  I assume what the box is
21 checked for happened.  Do I check, no, because I am
22 the Police Commissioner, and I have numerous eyes,
23 and other people would have the responsibility
24 before this gets to me.

Page 43

1    Q.  So would you look at the attached sheet if
2 one were attached?
3       MS. McATEER:  Objection.
4    A.  I would.
5    Q.  Would you do anything else to check that
6 Occupational Health Services had evaluated this person?
7       MS. McATEER:  Objection.
8    A.  I would look at the form.  And, you know,
9 it goes through numerous people before it gets to
10 me.  I would never question their responsibility.
11 When it gets to me, I am under the impression
12 everything was -- all the dots -- you know, that
13 everything was done according to the policy.
14    Q.  And in preparation for your deposition
15 today as a witness for the City, did you do anything
16 to figure out what in fact happened in the process
17 in this case?
18    A.  I did not.
19    Q.  Were you aware that you were going to
20 testify on this issue?
21    A.  I received this document, and I was aware I
22 was going to have to speak on the document.
23    Q.  And were you aware you were going to have
24 to speak about any information known by the Boston

Page 44

1 Police Department, not just information that you
2 personally were aware of?
3       MS. McATEER:  Objection.
4    A.  I was not aware of that.  I was given this
5 document to look at, and that's the -- that's all I
6 did.
7    Q.  You see that Nancy Driscoll's signature is
8 dated November 2, 2016, right?
9    A.  Yes.
10    Q.  And when was the shooting in this case?
11    A.  Can you tell me?  I'm not sure.  I don't
12 have the police report with me.
13    Q.  If I told you it was October 30, 2016, does
14 that sound right?
15    A.  If you are telling me that's the day, yes.
16 I dealt with a lot of shootings, not just
17 police, over the course of my career.  They all run
18 together.  If you are telling me that's the date,
19 then that's the date.
20    Q.  And would you assume looking at this that
21 Internal Affairs had completed its process before
22 this form came to your desk?
23       MS. McATEER:  Objection.
24    A.  I wouldn't assume they completed their

Page 45

1 final investigation.  I would assume they had looked
2 into it and had given a preliminary update at least,
3 being only a couple of days after it.  It won't be a
4 completed because the DA, as well as the FDIT team,
5 takes longer.
6       I would assume this was a quick preliminary
7 investigation on the use of force.
8    Q.  Okay.  And that preliminary investigation
9 was conducted by Internal Affairs as opposed to FDIT?
10    A.  I don't know.  I don't know if it was in
11 conjunction, if they shared notes.  I'm not sure how
12 this came to my desk.
13    Q.  Right underneath Nancy Driscoll's
14 signature, do you see it says, "Bureau of Internal
15 Investigations"?
16    A.  Yes.
17    Q.  And then there's a box that has a number of
18 different options, all relating to the FDIT commander?
19    A.  Yes.
20    Q.  And various options for what the FDIT
21 commander may have reported?
22    A.  Yes.
23    Q.  Why is there no box checked on here?
24       MS. McATEER:  Objection.

12 (Pages 42 - 45)

Page 46

1    A.  Because the FDIT has to do a more in-depth,
2 detailed investigation.  They have to do a lot of
3 forensic work.  They have to analyze ballistic
4 information.  That would take some time.
5        FDIT doesn't come out with a preliminary
6 investigation right after the incident.
7    Q.  And the FDIT preliminary investigation is
8 not required in order to reissue firearms; is that
9 correct?
10    A.  I'm not sure.  Again, I know Internal
11 Affairs, FDIT, all of them are involved.  I just
12 don't know their specific protocol.
13    Q.  Have you done anything to find out in
14 preparation for today's deposition?
15    A.  I haven't.
16    Q.  Underneath the box, do you see where it
17 says, "Based on a review of IAD records and other
18 information supplied to me, I recommend the
19 following"?
20    A.  Yes.
21    Q.  What are IAD records?
22    A.  IAD records are basically reports about the
23 incident.  You know, they are probably facts of the
24 case and the initial findings of the case, based on

Page 47

1 the totality of what took place.
2    Q.  Initial findings by who?
3    A.  Internal Affairs, as well as, again, the DA
4 would be involved, as well as the FDIT team.
5    Q.  So when this box was checked and signed,
6 did you assume that the person who signed it had in
7 fact reviewed IAD records?
8        MS. McATEER:  Objection.
9    A.  If that's what he is checking, I would assume.
10    Q.  Would you look at the IAD records?
11    A.  No, because I put people in positions that
12 I appoint them to, and I trust their authority.
13        When it gets to me, again, numerous people
14 look at this.  My chief of staff Superintendent
15 Buckley reviews all this.  When it gets to me, I am
16 the final signer, but I assume people who I trust
17 and put in positions of authority had done
18 everything they could do to make sure that this is a
19 truthful document.
20    Q.  And whose signature appears there for chief
21 of the Bureau of Professional Standards?
22    A.  I can't make it out.  I know Superintendent
23 Mancini was chief of it, but it's a tough signature.
24 I don't want to say whose it is.

Page 48

1    Q.  Did you do anything to find out in
2 preparation for today's deposition?
3    A.  I did not.
4    Q.  And you testified that your signature at
5 the bottom was completed after the other two people
6 had signed and checked the boxes; is this right?
7    A.  Usually that's the protocol, yes.
8    Q.  Who initiates this process of reissuing
9 firearms?
10    A.  I'm not sure who does, but I believe it's
11 probably Internal Affairs that initiates it.
12        I was never involved, deeply involved in
13 the process, so I don't know all the specific steps.
14 I was never assigned to Internal Affairs.  I was
15 always in uniform.  This was never part of my job.
16    Q.  So what is the first involvement that you
17 as Commissioner would have in the firearms
18 reissuance process?
19    A.  For the most part, when this report comes
20 on my desk.
21    Q.  When you say "for the most part," what are
22 the other options?
23    A.  Well, just knowing about the facts of the
24 case, my knowledge of it on the scene, you know, but

Page 49

1 I'm not involved at all in the investigation.  When
2 something like this paper gets to me, I assume that
3 all the right people have reviewed it, and it's my
4 responsibility to authorize it.
5    Q.  So you would rely on their investigation;
6 is that correct?
7    A.  That's correct.
8    Q.  Do you remember how this paper came across
9 your desk in this case?
10    A.  Absolutely not.  I don't remember.
11    Q.  Do you remember signing it?
12    A.  If my signature is there, yes.
13    Q.  But do you have any independent
14 recollection of the reissuance of firearms in this
15 case?
16    A.  Absolutely not.
17    Q.  Did you do anything to prepare for today as
18 far as going back and looking and seeing what
19 happened in this case?
20        MS. McATEER:  Objection.
21    A.  I have no access to any records.  I've only
22 been back in police headquarters one day since I
23 left in five years.  I don't have access to any of
24 the records that you are talking about.

13 (Pages 46 - 49)

Page 50

1    Q.   Did you ask anyone at the City?
2         MS. McATEER:  Objection.
3    A.   I did not.
4    Q.   Are you aware that Officers Finn and Boyle
5  in this case testified that Pat Rose called you in
6  connection with the reissuance of firearms to the
7  officers?
8         MS. McATEER:  Objection.
9    A.   I have no recollection of Pat Rose ever
10  calling me on this.
11    Q.   Are you aware that the officers testified
12  that he did?
13        MS. McATEER:  Objection.
14    A.   This is the first time, Amy, that I've
15  heard this.
16    Q.   Do you have any reason to question the
17  officers' testimony that Pat Rose called you in
18  connection with the reissuance of firearms in this
19  case?
20        MS. McATEER:  Objection.
21    A.   Again, you know, it's third party.  It's
22  hearsay.  As we know, Pat Rose said a lot of things
23  that were not true.  Given the messenger to them, I
24  wouldn't say it's very credible.

Page 51

1    Q.   Their testimony was that they spoke with
2  Pat Rose who told them that he had spoken with you
3  and that they witnessed Pat Rose calling you.  Do
4  you have any reason to question their testimony?
5         MS. McATEER:  Objection.
6    A.   I have reason to question Pat Rose calling
7  me, but not the officers at all.
8    Q.   Were you at the hospital on the night of
9  the shooting?
10    A.   No.
11    Q.   Was Pat Rose at the hospital on the night
12  of the shooting?
13        MS. McATEER:  Objection.
14    A.   I have no knowledge if he was.
15    Q.   Is it possible that Pat Rose called you on
16  the night of the shooting?
17        MS. McATEER:  Objection.
18    A.   I don't know.  I don't remember him ever
19  calling me.  I thought -- at the time, looking back,
20  when I was preparing this, I thought I was dealing
21  with the vice president of the union, not Pat Rose.
22    Q.   Okay.  So your recollection is that you
23  spoke with the vice president of the union, not the
24  union?

Page 52

1    A.   Well, I know at the scene I spoke with the
2  vice president.  I don't ever recall dealing with
3  Pat Rose, in my memory, with Pat Rose on this
4  particular shooting.
5    Q.   Who was the vice president of the union?
6    A.   I think it was Lahey, or Leary.  Again, a
7  lot of my shootings run into each other.  To the
8  best of my recollection, I thought the union
9  official that handled this was Leary, not Rose, so.
10    Q.   Okay.  And what would the role of the union
11  official be in this process?
12    A.   He would represent the officers, not --
13  having nothing to do with my position.
14    Q.   Would he represent the officers in seeking
15  to have firearms reissued?
16        MS. McATEER:  Objection.
17    A.   He could.
18    Q.   How would that happen?
19    A.   He would probably call, whether it be
20  myself, the chief of patrol, or call some of the
21  other superintendents and make a request for the
22  officers' firearms to be returned.
23    Q.   Did that happen here?
24    A.   I don't know.

Page 53

1    Q.   Did you do anything to find out?
2    A.   I did not.
3    Q.   Did you ask anyone?
4    A.   I did not.
5    Q.   Did you ask anyone at the union?
6    A.   I don't speak with the union.  No.
7    Q.   Let's look at the next page of this
8  exhibit.  You can actually look at all four of them
9  and just see that there are two forms apiece for
10  each of Finn and Boyle that concern their clearance
11  on different dates; do you see that?
12    A.   (Examines document)  Yes.
13    Q.   Why would you have two of these?
14    A.   Because there were two officers involved.
15  It's two separate ones.  Each one gets their own form.
16    Q.   But there are two for each of them.  So for
17  Boyle, this form was signed off on November 2, and
18  and that's Page 3885.
19    A.   Yes.
20    Q.   And then the next page, 3886, is the same
21  form dated January 6, 2017, do you see that?
22    A.   Right.  Yes.
23    Q.   Why are there two forms?
24    A.   I don't know.  Maybe one was a preliminary

14 (Pages 50 - 53)

Page 54

1 firearm going back to them, and then maybe the next
2 one was a more permanent firearm. Again, I'm
3 looking at the forms. I don't recall why this took
4 place.
5    Q.   Did you do anything to find out?
6    A.   I did not.
7    Q.   Is there anything on the form that tells
8 you whether this is preliminary or final?
9    A.   They are the same forms. No.
10    Q.   Is there anything on the form that tells
11 you whether these concerned different weapons?
12    A.   I don't see them on the form.
13    Q.   If the officers were cleared as fit and
14 issued weapons on November 2nd, why would Officer
15 Boyle, for instance, need to be re-cleared and
16 reissued a firearm in January of 2017?
17       MS. McATEER: Objection.
18    A.   Because sometimes after a shooting officers
19 are issued temporary firearms for their safety and
20 at a later date are issued a more permanent one,
21 whether it's their old firearm back or a new one
22 issued to them while the District Attorney and the
23 FDIT team continue their investigation.
24    Q.   On what date was Officer Garrett Boyle

Page 55

1 issued a firearm by the BPD?
2    A.   According to this, 11/2 he was issued one,
3 and then there's another form that says January 6th.
4    Q.   So on which date was he actually issued a
5 firearm?
6    A.   11/2.
7    Q.   And do you know which firearm that was?
8    A.   It's not on the paper that I have.
9    Q.   Was he issued another firearm in January of
10 2017?
11       MS. McATEER: Objection.
12    A.   Again, I am assuming he was issued a
13 temporary firearm shortly after the incident because
14 our Ballistics Unit, as well as the FDIT team, would
15 want to examine the handguns used in the shooting.
16    Q.   So your testimony is that he was issued a
17 temporary firearm on November 2, 2016?
18    A.   I'm not 100 percent sure. Based on the
19 process and the shortage of time afterwards, I would
20 assume it was a preliminary firearm.
21    Q.   And which firearm was issued in January of
22 2017?
23    A.   I don't know. I don't know if it was his
24 assigned academy handgun or he was issued a

Page 56

1 permanent replacement for that gun. Because the
2 investigation would go on until the DA would make
3 his final determination.
4    Q.   Did you do anything to find out which
5 firearm was issued and when?
6    A.   I did not.
7    Q.   Did you do anything to find out which
8 firearm was issued to Officer Finn and when?
9    A.   I did not.
10    Q.   Let's look at another exhibit. I will put
11 this in the Chat and share it.
12       (Document marked as Evans
13       Exhibit 3 for identification)
14    Q.   Commissioner, can you see this document?
15 It says, "Kevin Finn" at the top.
16    A.   Let me see if I can open it. (Examines
17 document) Okay, I have it now, Amy.
18    Q.   On the bottom of the first page --
19       MS. McATEER: Hold on one second. I don't
20 have it. (Examines document) Okay.
21    Q.   On the bottom of the first page here, who
22 signed this document?
23    A.   A clinician. I'm not sure who it is.
24    Q.   Did you do anything to find out?

Page 57

1    A.   This is the first time I seen this.
2    Q.   On the bottom right-hand side, do you see
3 the date, and then underneath it says, "per Nancy
4 Driscoll"?
5    A.   I see her name, yes.
6    Q.   What does that mean to be dated per Nancy
7 Driscoll?
8    A.   It means she seen this document and she's
9 signing.
10    Q.   Meaning she added the date or she added the
11 signature on the left?
12       MS. McATEER: Objection.
13    A.   I don't know what that means.
14    Q.   Did you do anything to find out what
15 happened in terms of clearing the officers in this
16 case?
17       MS. McATEER: Objection.
18    A.   This is the first time I seen this
19 document. I don't usually go down to the level of
20 looking at all this paperwork.
21    Q.   And in your capacity as a designee for the
22 City, did you do anything to find out what happened
23 in terms of clearing the officers to return to work?
24    A.   I signed the final form that you showed me

Page 58

1 earlier, and that was about the extent.

2        I have people in positions who do that, and

3 I sign off on the end one. I don't dig into the

4 details and who signs off on what. I'm the final

5 arbitrator, and I leave that to people in positions

6 of authority who I trust.

7        So the answer is no, I didn't dig down into

8 the decision making in the final paperwork that I got.

9    Q.   Nor did you do that in preparation for

10 today's deposition, correct?

11        MS. McATEER: Objection.

12    A.   I looked at the paperwork that I was going

13 to be examined on. I did not dig any further.

14    Q.   On what date was Officer Finn cleared as

15 fit to return to duty?

16        MS. McATEER: Objection.

17    A.   Based on the paperwork I'm looking at,

18 November 2nd of 2016.

19    Q.   And what was that clearance based on?

20    A.   I don't know.

21    Q.   And when did Officer Finn actually return

22 to duty?

23    A.   I don't know.

24    Q.   Do you know if he returned to duty on

Page 59

1 November 2, 2016?

2    A.   I know the paperwork says that. I don't

3 know if he needed more time because of the trauma of

4 the incident, so I can't tell you when he physically

5 returned to duty.

6        I know the paperwork says 11/2, but if he

7 was dealing with the Stress Unit or other matters,

8 I'm not really sure when physically he did go back

9 to duty.

10    Q.   Do you know what his status was in the

11 interim?

12    A.   According to this, it says, "Full duty as

13 of: 11/2," and I'm sure before that time he was on

14 administrative duty with pay.

15    Q.   And between 11/2 -- because I can represent

16 to you that he did not actually return to work on

17 11/2 -- between 11/2 and the date on which he did

18 return, what was his status?

19        MS. McATEER: Objection.

20    A.   According to this, he's back full duty.

21    Q.   So the testimony on behalf of the City is

22 that Officer Kevin Finn returned to active duty on

23 November 2, 2016; is that right?

24        MS. McATEER: Objection.

Page 60

1    A.   I'm not saying he returned to active duty.

2 His status says, "Full duty." I'm not saying he was

3 physically active back on patrol. I have no

4 knowledge of that.

5    Q.   What have you done to figure out what the

6 officers' leave status was and when they returned to

7 work?

8        MS. McATEER: Objection.

9    A.   Again, this is the first time I have seen

10 this form. I just looked at the paperwork in front

11 of me. I did no investigation on anything further.

12    Q.   If an officer were cleared as medically and

13 physically fit to return to duty, would they still

14 have the option to not yet return to duty?

15    A.   I think we always gave officers some leeway

16 when they are involved in a traumatic incident like

17 this where the worst thing we ever have to do is

18 take someone's life. We give them a lot of latitude

19 to make sure when they are willing and able and have

20 everything -- all their affairs in order, and then

21 we will bring them back. We never rush anyone back

22 to work if they are not ready.

23    Q.   Is there a difference between certifying

24 someone as cleared to receive a firearm and

Page 61

1 certifying someone as fit for duty?

2    A.   There is a difference, yes.

3    Q.   What is the difference?

4    A.   Well, one is you give them a firearm while

5 they are on modified duty, you know, while they get

6 their affairs in order.

7        Because a police officer oftentimes feels

8 like they are very vulnerable when they don't have

9 their firearm. Both of these officers, for example,

10 both have to live in the City. People know very

11 easily when they go on the internet where officers

12 live. I think there's a lot of fear.

13        Our practice was to try to get an officer

14 back at least a firearm, whether it be temporary, to

15 make sure he feels secure for his person and for his

16 family. That doesn't mean because we issued him a

17 firearm he's fit physically and mentally to go back,

18 but sometimes we worry about his family as well as

19 his personal safety.

20    Q.   And would you issue a firearm to an officer

21 before finding out whether they were at fault in the

22 shooting?

23        MS. McATEER: Objection.

24    A.   We had overwhelming, at least in my

16 (Pages 58 - 61)

Page 62

1 opinion, evidence from four witnesses that this
2 officer used reasonable force when he was faced with
3 the threat. Every indication did not indicate
4 anything criminal in this case. It was, in my mind,
5 more than justified, and in a lot of people's.
6        We were comfortable that there wasn't going
7 to be criminal, so we issued him a temporary license
8 to protect himself and his family and his home.
9    Q.   And on what was that conclusion based?
10   A.   On overwhelming evidence from witnesses and
11 people at the scene.
12   Q.   What overwhelming evidence did you have as
13 of November 2, 2016, when you signed these forms?
14   A.   We had two EMTs who were interviewed
15 separately, along with the officers, who all gave a
16 story that their lives were in danger and they had
17 no choice. So, to me, based on the totality of the
18 circumstances, I believed that they were justified
19 in using force.
20   Q.   Were you aware of what they said in their
21 interviews when you signed off on this paperwork on
22 November 2nd?
23   A.   My supervisors, as well as on scene, when I
24 was on scene, all the stories were very consistent.

Page 63

1        I had no reason to believe four individuals
2 got together and colluded that someone did not --
3 came at them with a knife. So based on the
4 totality, I had more than just cause to believe
5 that's what took place.
6    Q.   Sir, I'm asking, as of November 2nd, had
7 the officers been interviewed --
8    A.   I don't know the date, but I know from
9 speaking to my supervisors, to my superintendents
10 and everyone who was involved, that's where I
11 received my information.
12   Q.   Okay, Commissioner, I'm asking you
13 questions as of the date when you signed off on the
14 paperwork issuing firearms to the officers,
15 November 2nd, 2016. Had the officers given
16 interviews at that time?
17   A.   I don't know when they did.
18   Q.   Had the EMTs given interviews at that time?
19       MS. McATEER: Objection.
20   A.   I don't know. I don't know when they did.
21   Q.   Did your supervisors, as you said, have an
22 awareness of the contents of their interviews?
23       MS. McATEER: Objection.
24   A.   Not the particular interviews, no. They

Page 64

1 had a snapshot of what took place on the scene, the
2 testimony and the story given at the scene, and what
3 followed over the next few days.
4    Q.   So you are saying that you based your
5 decision on what the supervisors were told at the
6 scene; is that right?
7    A.   No, I'm not just saying that. There was a
8 lot of different factors that went into it. It was
9 the totality of everything that took place.
10   Q.   What were those different factors that you
11 based the decision on?
12   A.   Well, there were witnesses' accounts. I
13 think it was witnesses' accounts, how it all played
14 out.
15       You know, it was the totality of the
16 circumstances. Again, seven, nine years, I don't
17 know what all the factors were, but, you know, I was
18 briefed while on the case.
19   Q.   I'm trying to understand what was the
20 evidence that was available as of November 2nd.
21 First you said interviews, and then you said --
22       MS. McATEER: Objection.
23   A.   I never said interviews, all right? I said
24 I spoke to my officers, I spoke to EMTs,

Page 65

1 supervisors, and everybody had the same story.
2    Q.   You said you spoke to your officers. Which
3 officers?
4    A.   I have no clue. I've been to so many
5 shootings unfortunately over the course of my
6 career. All these incidents run together. I don't
7 know who I spoke to.
8    Q.   Are you saying you spoke with Officers Finn
9 and Boyle prior to November 2nd?
10       MS. McATEER: Objection.
11   A.   No, I did not.
12   Q.   Are you saying you spoke with officers who
13 had themselves spoken with Officers Finn and Boyle
14 prior to November 2nd?
15       MS. McATEER: Objection.
16   A.   I don't know who I spoke to. I said that
17 to you already.
18   Q.   Would it have been proper for any other
19 officers to sit in on the FDIT interviews?
20       MS. McATEER: Objection.
21   A.   I don't know what takes place. I would
22 never have been involved in those.
23   Q.   So your testimony is that you signed this
24 paperwork because you thought other people had told

17 (Pages 62 - 65)

Page 66

1 you that the officers were not at fault?
2       MS. McATEER:  Objection.
3    A.   I had done due diligence with my superiors.
4 Based on their recommendation on what took place, I
5 was more than comfortable signing off on them going
6 back.
7    Q.   Who were the superiors?
8    A.   I don't know.  I told you that.
9    Q.   Do you mean people under you or people over
10 you?
11   A.   There's no one over me.
12   Q.   Are you aware that Mrs. Hope Coleman, who
13 was also present at the shooting, testified that
14 there was no knife?
15      MS. McATEER:  Objection.
16   A.   I am aware she has testified, but I'm also
17 aware it was clear she was outside the residence
18 that night.
19   Q.   So you had enough information to discount
20 her testimony when you signed this paperwork?
21      MS. McATEER:  Objection.
22   A.   I did, based on her account to the officers
23 initially.
24   Q.   Her account to the officers initially was

Page 67

1 that she witnessed the entire incident and there was
2 no knife.
3       MS. McATEER:  Objection.
4    A.   The information I had from my supervisors
5 was that she was outside when it happened, and she,
6 more or less, told them that; and then based on the
7 EMTs and the officers, she was not inside.
8    Q.   So you based your decision on what your
9 supervisors told you that Hope Coleman told them; is
10 that right?
11      MS. McATEER:  Objection.
12   A.   No.  Again, don't be stretching the story
13 here.  It goes back to I had four witnesses whose
14 lives were threatened, who all gave the same story
15 that there was a lethal weapon, which under
16 Rule 303, a knife, with someone putting their lives
17 in danger, more than justifies the use of deadly
18 force.  That's where I made the decision.
19      It had nothing to do with the mother's
20 story.  It was four separate interviews saying the
21 same facts over and over.
22   Q.   But, Commissioner, you just testified that
23 you don't even know whether those interviews had
24 happened as of the date you signed, let alone

Page 68

1 whether they happened and you were told what was
2 said during the interviews.
3       MS. McATEER:  Objection.
4    A.   The story I got from the superiors who
5 spoke to the officers, not the official interview
6 but the initial investigation, not the follow-up
7 investigation, all indicated that all four lives
8 were in danger and they used justified lethal force.
9    Q.   And was that your conclusion, that they
10 used justified force?
11      MS. McATEER:  Objection.
12   A.   It was everybody's who spoke with the
13 superiors.  And I rely on the trust and respect I
14 have for all the superiors under me, and I delegate
15 that authority, and I base my decisions on their
16 recommendations.
17   Q.   In a general sense, in the normal course,
18 when there's an officer-involved shooting, are there
19 any reasons that you would not want the officers to
20 be armed immediately after the shooting?
21      MS. McATEER:  Objection.
22   A.   I don't recall one that I felt the officer
23 wasn't putting himself in any danger with returning
24 a firearm.  I don't recall one where I was not

Page 69

1 comfortable for an officer to have their weapon.
2    Q.   But, in general, what are the reasons for
3 and against arming officers who have just killed
4 people?
5       MS. McATEER:  Objection.
6    A.   You know, I'm not going to generalize on
7 something that -- you know, if, you know, they want
8 to carry, you know, they can carry.  I never ran
9 into a situation where after a shooting that I was
10 uncomfortable giving an officer back his weapon.
11   Q.   So is it your testimony that you would give
12 an officer back his weapon unless there was
13 something that made you uncomfortable?
14      MS. McATEER:  Objection.
15   A.   Yes.
16   Q.   And the document that we looked at that was
17 the firearms paperwork that you singed on the bottom
18 and it had the box for FDIT and then it had a
19 statement about IAD records, do you remember that?
20   A.   Yes.
21   Q.   And you said that you assumed that someone
22 had looked at IAD records prior to this document
23 coming across your desk?
24      MS. McATEER:  Objection.

18 (Pages 66 - 69)

Page 70

1    A.   You know, I don't assume.  I'm sure they
2  read all the reports and looked at everything they
3  had to before they gave this to me.
4    Q.   And what were those reports?  Remember, the
5  document was signed on November 2nd.
6    A.   Yes.
7    Q.   What were those reports?
8        MS. McATEER:  Objection.
9    A.   I don't know.  I don't know what they
10  looked at.
11    Q.   Do you know if there were any reports that
12  were written prior to November 2nd?
13    A.   I'm sure there was.
14    Q.   And what report would that be?
15        MS. McATEER:  Objection.
16    A.   I am sure the incident report, for one.
17    Q.   Is that an IAD record?
18    A.   Well, it would go to IAD, but I don't know
19  if IAD writes records.  I don't know what they did.
20    Q.   But your testimony is that the person who
21  signed this document -- and you don't know who that
22  person is -- that that person looked at IAD records?
23        MS. McATEER:  Objection.
24    A.   I can't speak for them.  All I can speak to

Page 71

1  is they signed the record.
2    Q.   And on behalf of the City, did such IAD
3  records exist when this form was signed?
4        MS. McATEER:  Objection.
5    A.   I don't know.
6    Q.   What have you done to find out?
7    A.   Nothing.  Again, I'm far removed from
8  something that happened seven years ago.
9    Q.   Did you know that you are testifying under
10  oath as a witness for the City and the Police
11  Department?
12        MS. McATEER:  Objection.
13    A.   Yes.
14    Q.   And that that requires you to learn
15  information that you did not personally know?
16        MS. McATEER:  Objection.
17    A.   I don't have access to those records.
18    Q.   So is it your testimony sitting here today
19  that the attestation by the Bureau of Professional
20  Standards that they reviewed IAD records prior to
21  signing this is accurate?
22        MS. McATEER:  Objection.
23    A.   I trust them.  I put them in positions of
24  authority.  I expect everything they put their name

Page 72

1  on to be accurate.
2    Q.   So what is the answer to the question?
3        MS. McATEER:  Objection.
4    A.   I believe it to be accurate because I have
5  no reason to believe otherwise.
6    Q.   So the City's answer to the question is
7  that the chief of the Bureau of Professional
8  Standards as of November 2nd, 2016 reviewed IAD
9  records in this matter; is that right?
10        MS. McATEER:  Objection.
11    A.   Yes, I would believe that would be true.
12    Q.   And where would we find those records?
13        MS. McATEER:  Objection.
14    A.   By going to the Internal Affairs Unit of
15  the Boston Police Department.
16        MS. RAZA:  Sorry, Amy, like I said, I have
17  a hard stop at 11:00.  I have to leave.
18        MS. BARSKY:  I have a few more questions,
19  maybe 15 minutes of questions.
20        MS. RAZA:  Okay.  So 15 minutes, and then I
21  will have to go.  I can only stay for 15 more minutes.
22        MS. BARSKY:  Okay.  Let's try and get this
23  done.
24    Q.   Commissioner, as of November 3rd, 2016,

Page 73

1  what was Officer Boyle's status with the Boston
2  Police Department?
3    A.   It says here -- all I know is on the form
4  it says, "Full duty as of:  11/2/16."
5    Q.   So did he return to full duty as of 11/2/16?
6    A.   I don't know.
7    Q.   Do you know when he did return to full duty?
8    A.   I don't.
9    Q.   Do you know why he was out for that period
10  of time?
11    A.   I don't.
12    Q.   Do you know whether he was on medical leave?
13    A.   I don't.
14    Q.   Do you know the basis for his medical
15  leave, if he was on medical leave?
16        MS. McATEER:  Objection.
17    A.   I don't.
18    Q.   What are the criteria for medical leave at
19  the Boston Police Department?
20    A.   It could be anything.  It could be COVID.
21  It could be a wife sick.  It could be a child sick.
22  There's numerous reasons why someone could be on
23  medical leave.
24    Q.   Who makes the decision?

Page 74

1     MS. McATEER:  Objection.
2     A.  Well, if they had a doctor who felt they
3  were not capable of going to work, they would come
4  in with a doctor's note to the human resource
5  department, and human resource would be the ultimate
6  one.  The Department physician would make the call
7  whether they were capable of doing their job or not.
8     Q.  So they would need a doctor's note in order
9  to be on medical leave; is that right?
10    A.  If it was personal, they would.  If it was
11 Department related, usually it would be that the
12 Department's physician would make the call.
13    Q.  But there would have to be a medical basis
14 for the leave?
15    MS. McATEER:  Objection.
16    Q.  Is that right?
17    A.  Well, it wouldn't have to be -- well, it
18 could be medical.  It could be psychological.  It
19 could be also a loved one with the Family Medical
20 Leave Act who is sick.  It could be a pregnancy of a
21 wife and be on paternity leave, or it could be a
22 female officer on maternity leave.  There's a wide
23 range of areas where someone could be placed on
24 medical leave.

Page 75

1     Q.  I'm just trying to understand the process.
2  Did the officer get to choose, "I need a personal
3  day.  I'm going on medical leave tomorrow"?
4     MS. McATEER:  Objection.
5     A.  He doesn't get to choose.  It's usually
6  done in consultation with the human resource
7  department and the medical people in it.
8     Q.  Do the medical people in the human
9  resources department need to find that there's a
10 medical or psychological basis for the leave?
11    MS. McATEER:  Objection.
12    A.  I don't know.  I assume there has to be a
13 medical reason for it.
14    Q.  Was there a medical reason for Officers
15 Finn and Boyle to be on leave?
16    MS. McATEER:  Objection.
17    A.  I can't speak to that.
18    Q.  And if they were out on leave, you
19 testified that they would have been reissued
20 firearms in order to feel secure at home; is that
21 right?
22    MS. McATEER:  Objection.
23    A.  I said sometimes that's why we give it back
24 to them.  I don't know in this particular case, but

Page 76

1  that is a reason, and it's a big, overwhelming
2  concern every time when we have some of these, when
3  I have had these, two or three -- or I think we've
4  had four when I was the Commissioner in five years,
5  that has been the protocol.
6     Q.  Do ordinary citizens who are involved in
7  shootings get guns in order to feel secure afterwards?
8     MS. McATEER:  Objection.
9     A.  They are not, you know, on 24/7 like police
10 officers are.  You know, we have an obligation when
11 we are off duty to act when we witness something.
12 That's why we are issued firearms by the Department
13 that allows us to carry these guns off duty.  We are
14 required if we see something serious, whether we are
15 on duty or off, to activate ourselves.  That doesn't
16 take place with a civilian.
17    Q.  Would it be proper for an officer involved
18 in an officer-involved shooting to carry a weapon
19 immediately after the shooting before any Internal
20 Affairs finding, preliminary or otherwise?
21    MS. McATEER:  Objection.
22    A.  If the totality of the circumstances were
23 overwhelmingly in favor of the officers, then there
24 would be a situation where we would be comfortable,

Page 77

1  as in this situation, on giving them back their weapon.
2     Q.  And does that totality of the circumstances
3  need to be evaluated by Internal Affairs?
4     MS. McATEER:  Objection.
5     A.  Not specifically them only.  I think
6  myself, my superintendents, and all my bosses, if we
7  came to that conclusion, as we did here, that this
8  was a justifiable shooting and there was no really
9  legitimate reason not to give these officers back at
10 least some measure of security with their temporary
11 weapon, then they would do it.
12    Q.  Is it your testimony that in 2016, the
13 Boston Police Department would be willing to arm
14 officers who had been involved in officer-involved
15 shootings prior to any initial finding by Internal
16 Affairs or FDIT?
17    MS. McATEER:  Objection.
18    MS. BOSTWICK:  Objection.
19    A.  In this case I'm not sure, but I'm willing
20 to bet that we were given a preliminary finding
21 because they are required to give a quick
22 preliminary finding.  I don't remember when that
23 took place, but we didn't just give it back to them
24 without some type of due diligence to make it happen.

Page 78

1    We just don't willy-nilly give it back to
2 them. We consider all the circumstances and the
3 results of our initial investigation.
4    Q.   Why don't you willy-nilly give it back to
5 them?
6         MS. McATEER: Objection.
7         MS. BOSTWICK: Objection.
8    A.   Because if it was to be a criminal case or
9 if we felt they could endanger themselves or the
10 public, we would not give them back.
11        In our mind, this was a clearly justifiable
12 use of force, and there was no reason to deny them a
13 temporary firearm.
14   Q.   And you and your supervisors made that
15 decision as of November 2, 2016?
16        MS. McATEER: Objection.
17   A.   Again, I don't know what input I had from
18 Internal Affairs. I don't know where -- I think the
19 totality of what I heard from Internal Affairs, what
20 I heard from my supervisors, what I heard about what
21 took place, all those factors going together made me
22 feel comfortable giving them back their weapons to
23 protect themselves.
24   Q.   Commissioner Evans, did you ask Nancy

Page 79

1 Driscoll to sign this document on November 2, 2016?
2         MS. McATEER: Objection.
3    A.   Absolutely not.
4    Q.   Did you ask the chief of the Bureau of
5 Professional Standards to sign this document on
6 November 2nd?
7         MS. McATEER: Objection.
8    A.   No.
9    Q.   Was Officer Garrett Boyle in fact evaluated
10 by Occupational Services as of November 2, 2016?
11        MS. McATEER: Objection.
12   A.   I have no knowledge of that.
13   Q.   Whether he was or he wasn't?
14   A.   Yes.
15        MS. McATEER: Objection.
16   Q.   Was he required to have been evaluated?
17        MS. McATEER: Objection.
18   A.   Based, you know, on the form, Occupational
19 Health has to, you know, have a consultation with him.
20   Q.   Would it have been in compliance with the
21 policy of the Boston Police Department to reissue
22 firearms absent any medical evaluation?
23        MS. McATEER: Objection.
24   A.   I don't think we have a strict policy on that.

Page 80

1    Q.   In the absence of a strict policy, does the
2 Commissioner have discretion to reissue the firearms
3 absent any medical or psychological evaluation?
4         MS. McATEER: Objection.
5    A.   If I felt the officer was fully capable and
6 fully justified, there's no reason these officers
7 should be punished for doing their job.
8    Q.   If the Commissioner in your own discretion
9 decided that they were doing their job?
10   A.   And I felt comfortable --
11        MS. McATEER: Objection.
12   A.   And I felt comfortable giving them back,
13 absolutely.
14   Q.   Are you aware that the officers applied for
15 licenses to carry firearms on or around November 2,
16 2016?
17        MS. McATEER: Objection.
18   A.   I never heard of that. This is the first
19 I've heard of that.
20   Q.   Are you aware that they did not have
21 licenses to carry firearms?
22        MS. McATEER: Objection.
23   A.   I did not know that.
24   Q.   Did the City require or recommend that the

Page 81

1 officers get licences to carry before they received
2 firearms?
3         MS. McATEER: Objection.
4    A.   We do not recommend that. I did not have
5 one until I retired. So it's not a requirement.
6    Q.   And what authorized them to carry firearms
7 if they were not on duty?
8         MS. McATEER: Objection.
9    A.   They have to have a license to carry off
10 duty if it's a private weapon.
11   Q.   How about a Department-issued weapon?
12   A.   They don't need a license to carry.
13   Q.   Is that true in the absence of any
14 investigative finding about the shooting that they
15 were involved in?
16        MS. McATEER: Objection.
17   A.   They do not need a license to carry their
18 Department weapon. It comes inherent with their
19 position and authority. I carried a gun for
20 34 years without a license to carry.
21   Q.   So was it the Boston Police Department's
22 position that officers involved in shootings were
23 immediately eligible to carry weapons without
24 licenses after the shooting if the Commissioner

21 (Pages 78 - 81)

1  signed off on it?
2      MS. McATEER:  Objection.
3      A.  It wasn't our position to give it to them.
4  This was one particular case.  It wasn't a policy.
5  It wasn't procedure.  This was in this instance only.
6      Q.  Is it fair to say that the Boston Police
7  Department did not have policies that govern the
8  decision?
9      MS. McATEER:  Objection.
10      MS. BOSTWICK:  Objection.
11      A.  We had built-in procedures within the
12  units, so there was policy, there was procedure, but
13  it wasn't in the overall policy of all those
14  specific steps.
15      Q.  Where would we find the policies and
16  procedures that you are referring to?
17      A.  Most likely with the FDIT procedures, as
18  well as inside the Internal Affairs.  They have
19  their own internal policies and probably steps to
20  take when an incident like this happens.
21      Q.  And where are the internal policies written
22  down?
23      A.  You know, most likely in Internal Affairs.
24  I don't know if they are written down.  What I am

1  saying to you is they have procedures in, you know,
2  their own internal to basically carry out their duties.
3      Q.  And you mentioned something about being on
4  duty 24 hours a day; is that right?
5      MS. McATEER:  Objection.
6      A.  They are always on duty when they are off
7  duty.  If someone was robbing a bank, they have the
8  ability to activate themselves even if they are
9  pushing their baby carriage if they should so desire
10  and make an arrest.  So we are always on when we are
11  off, if that makes sense.
12      MS. RAZA:  Amy...
13      MS. BARSKY:  Sorry, just two questions.
14      Q.  Is that true if the officer is on leave?
15      A.  Absolutely if he's carrying a Department
16  revolver.
17      MS. BARSKY:  Okay.  I think we should
18  suspend the deposition at this time, both, because
19  we are going to continue with another witness and
20  because we have very serious concerns about the
21  preparation of this witness to answer questions on
22  the topics that he was designated to answer.
23      MS. BOSTWICK:  I guess we would just like
24  to put on the record, I mean, we did ask in our

1  phone call with Amy, Daniel, Sophia, and I think
2  Bill Fick was present, and it was suggested in that
3  phone call because Sarah and I are new to the case,
4  that I think it was Bill that said, "We can send you
5  questions, particular questions that we are looking
6  for answers for," and we never received that
7  information.  So we just want to note that for the
8  record.  Thank you.
9      MS. BARSKY:  Okay.  Let's note for the
10  record too that I emailed you some of those
11  questions, but that the Court's order was very clear
12  about what the topics were.
13      MS. BOSTWICK:  I don't want to get into a
14  big squabble on the record.  I think we have a
15  disagreement, but that's fine.
16      MS. BARSKY:  We can go off the record.
17      THE COURT REPORTER:  Would everyone like
18  the same transcript order?
19      MS. RAZA:  We will order the same.
20      MR. TERRY:  So will I, the electronic.
21      MS. BOSTWICK:  Electronic is fine for us also.
22      MS. BARSKY:  Same for us.
23      (Whereupon the deposition
24      was suspended at 11:17 a.m.)

1      C E R T I F I C A T E
2      I, WILLIAM EVANS, do hereby certify that I have
3  read the foregoing transcript of my testimony,
4  Volume VIII, and further certify under the pains and
5  penalties of perjury that said transcript
6  (with/without) suggested corrections is a true and
7  accurate record of said testimony.
8      Dated at _____, this ____ day of _____,
9  20____.
10
11      _____
12
13
14
15
16
17
18
19
20
21
22
23
24